## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FADI DAHHAN, Individually and on Behalf of All Others Similarly Situated, <br><br>         Plaintiff, <br><br>    v. <br><br> OVASCIENCE, INC., MICHELLE DIPP, and JEFFREY E. YOUNG, <br><br>         Defendants. | Civil Action No.  17-10511 <br><br> **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Fadi Dahhan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding OvaScience, Inc. ("OvaScience" or the "Company"), and information readily obtainable on the Internet, including, but not limited to, pleadings and other filings in the securities fraud class action lawsuit captioned *Carlson et al. v. OvaScience, Inc., et al.*, Case No. 1:15-cv-14032 (D.Mass.). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a securities class action on behalf of all purchasers of common stock of OvaScience between January 8, 2015 and March 26, 2015, inclusive (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      OvaScience is a fertility company that claims to have discovered a therapy through which to increase *in vitro* fertilization ("IVF") live birth rates by extracting mitochondria (a substance in egg cells which is generally viewed as the energy source of the egg) from egg precursor cells (immature egg cells found in the protective outer layer of a woman's own ovaries) and injecting the same into the mature egg being utilized in the IVF process.  This process, the AUGMENT$^{SM}$ treatment ("AUGMENT"), is the Company's sole marketable product.

3.      The Company's sole scientific innovation is the idea of taking mitochondria from precursor eggs and injecting it into mature eggs, in the hope that by doing so the mitochondria from the precursor egg is somehow healthier than the mitochondria from the mature egg and its injection will somehow improve egg health for enhanced IVF success rates.

4.      The theory that such injection of additional mitochondria improves egg health and IVF success rates, is notoriously difficult to test and prove since due to the nature of a fertility therapy it would be practically impossible to find women willing to participate in a test with a control group not receiving the supposedly helpful therapy.  It is further difficult to test the efficacy of the AUGMENT treatment since a significant portion of women undergoing IVF without AUGMENT become pregnant and have a live birth.

5.      Difficult as it is to conduct scientifically valid studies of the efficacy of AUGMENT, the Company simply made no meaningful effort to do so.  The size of the few study groups of women undergoing AUGMENT therapy publicized by the Company were so small as

to be statistically meaningless.  In essence, the Company did not attempt to conduct scientifically meaningful trials of its treatment.  As Company co-founder and long-time Chief Executive Officer ("CEO"), defendant Michelle Dipp, stated on March 30, 2015 to Science Magazine, which was reprinted in numerous other on-line medical science related journals, "[t]he fertility [industry] just doesn't do trials."[1]

6.     Nonetheless, and as detailed herein, the Company repeatedly communicated to investors that the efficacy of AUGMENT had been scientifically validated, which was untrue. Further, on March 16, 2015, the Company represented to investors that it was on target to have 1,000 active AUGMENT treatment cycles in process by the end of fiscal 2015, which was untrue and known by the Company to be untrue.

7.     Throughout the Class Period, defendants issued false and misleading statements and/or failed to disclose material adverse facts about the Company's business, operations and prospects.  In particular, defendants caused the Company to issue false and misleading statements and/or failed to disclose, among other things, that: (1) the science behind AUGMENT had not been scientifically validated; (2) the Company was unable to achieve the purported success rates it claimed; (3) the reasons why the Company moved its studies outside of the United States; and (4) that at all relevant times, the Company's profitability and prospects were false and misleading.

8.     As such, throughout the Class Period, defendants failed to disclose that the approximately 150 patients that had received OvaScience's AUGMENT procedure in 2014 did not achieve a pregnancy success rate that was significantly higher than the rate achieved without

---

[1] Jennifer Couzin-Frankel, *Controversial fertility treatments focus on eggs' power plants*, American Association for the Advancement of Science (Mar. 30, 2015), *available at* http://www.sciencemag.org/news/2015/03/controversial-fertility-treatments-focus-eggs-power-plants.

the Company's AUGMENT procedure.  As a result of the false and misleading statements issued by defendants, the price of the Company's shares was artificially inflated throughout the Class Period.

9.       The truth began to emerge on March 26, 2015 and March 28, 2015, when the Company issued two press releases that reported results of IVF clinics utilizing the AUGMENT procedure.  On March 26, 2015, the Company disclosed that of the twenty-six women who received the AUGMENT treatment in Canada, nine women achieved a pregnancy, a success rate of only approximately 35%.

10.      On March 27, 2015, Gena Wang and Howard Liang, analysts for Leerink Partners LLC ("Leerink") who covered the Company, stated that AUGMENT's "[o]verall pregnancy rate appears less robust with a different denominator" and "the magnitude of AUGMENT benefit is unclear given no clear benchmarks and lack of standardized metrics."

11.      On March 28, 2015, the Company disclosed that of the eight women who received the AUGMENT treatment in Turkey, two achieved a pregnancy, a success rate of only 25%.  These success rates were comparable to the success rate achieved for women undergoing IVF without AUGMENT.  For example, according to the Centers for Disease Control and Prevention ("CDC"), in 2012, of the women studied who were 35 and under (and thus at an age where higher fertility rates are expected) who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33% were expected to deliver a live birth.

12.      On March 30, 2015, Andrew S. Fein, an analyst for H.C. Wainwright & Co. ("H.C. Wainwright"), questioned the Company's AUGMENT data pregnancy rate calculation stating that "the data raised interesting questions: (1) the use of embryo transfer as the denominator in calculating success rates…."  Fein went on to explain that viewed in the alternative, using the

method utilized by the Society for Assisted Reproductive Technology ("SART"), the data would result in a 35% success rate as opposed to the 53% success rate OvaScience stated it had achieved.

13.     After the truth was revealed concerning the AUGMENT treatment results, the Company's shares plummeted $17.14 from $48.29 on March 26, 2015 to $31.15 on April 1, 2015, a loss of approximately 35% on unusually heavy volume of approximately 1.9 million shares.

14.     On April 2, 2015, an analyst for Oppenheimer & Co. ("Oppenheimer"), Rohit Vanjani, opined that "[s]hares of OvaScience have traded down over 40% over the last week" because investors were stuck on one metric, AUGMENT's reported pregnancy rate.  Vanjani also stated that "[w]e certainly understand why investors have put the pregnancy rate metric in focus. Investors are still trying to understand if the AUGMENT technology works and if it will get adopted, and that metric is undoubtedly important."

15.     On this news, the Company's shares again dropped from $35.06 on April 2, 2015 to close at $29.59 on April 7, 2015, a drop of over 15%, on usually heavy volume of approximately 2.1 million shares.

16.     On April 16, 2015, Roddy Boyd of the Southern Investigative Reporting Foundation ("SIRF"), published an article entitled "Irreproducible Results, Inc."[2]  Critically, the SIRF article challenged the reported 53% clinical pregnancy rate observed from the Canadian physician's data and stated, in pertinent part, "26 women got the [AUGMENT] treatment and, of them, 7 were able to successfully maintain a pregnancy for just under a 27 percent success rate."

17.     The SIRF article went on to state, in pertinent part:

More importantly, given the absence of a control group, or a group of women who didn't receive OvaScience's treatment, discerning whether these results are

_____

[2] Roddy Boyd, *Irreproducible Results, Inc.*, Southern Investigative Reporting Foundation: The Investigator (Apr. 6, 2015), *available at* http://sirf-online.org/2015/04/06/irreproducible-results-inc/.

troubling or promising is unknowable. Since it's not a formal study, calculating results that might ordinarily depart from industry norms, like ignoring the full amount of women receiving the treatment, is perfectly feasible. The results can then be interpreted in a host of different ways which Dipp seized on, proclaiming at the end of the release: "Our AUGMENT treatment is having a positive impact on pregnancy rates in a variety of women who are struggling with infertility."

18.     Further, the SIRF article asserted that the data from the AUGMENT treatment presented did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT treatment (rates provided by the CDC).

19.     The SIRF article also called into question the motives of defendant Dipp, and stated, in pertinent part:

This is not the first time Dipp and her Longwood partners, Christoph Westphal and Richard Aldrich, have been under the spotlight for launching companies whose heavily touted prospects have been called into question.

Frankly, it's not hard to discern a pattern of sorts in how the Longwood trio handle their investments. Partner with high-profile researchers from prestigious institutions, incorporate with a mix of venture capital outfits and local celebrities, quickly cash out investors by going public, obtain fawning press coverage, leverage multiple underwritings into research analyst support, and in two instances discussed below, profitably sell the company before critical scientific flaws surface.

20.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.  The Company's shares currently trade at under $2.00 per share and have since December 2016.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

24.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

25.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased OvaScience common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Defendant OvaScience is a Delaware corporation with its principal executive offices located at 9 Fourth Avenue, Waltham, Massachusetts 02451.

27.     Defendant Michelle Dipp ("Dipp") co-founded the Company in April 2011, and was the Chief Executive Officer ("CEO") from June 2011 until her resignation on July 1, 2016. Defendant Dipp has been a member of the Board since July 2011, and became the Executive Chair of the Board beginning January 6, 2016.  Defendant Dipp was also the President of the Company from September 2011 until December 2014.

28.     Defendant Jeffrey E. Young ("Young") was the Chief Financial Officer ("CFO") of the Company from September 2014 until September 6, 2016.

29.     Defendants Dipp and Young are collectively referred to herein as the "Individual Defendants."

30.     The Individual Defendants and defendant OvaScience are collectively referred to herein as the "defendants."

31.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of OvaScience's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

32.     The Company was founded in 2011 by defendant Dipp, Richard Aldrich ("Aldrich"), Jonathan Tilly ("Tilly"), and Christoph Westphal ("Westphal").  Defendant Dipp, Aldrich and Westphal are all Partners at Longwood Fund, LP, in which its affiliate,

Longwood Fund GP, LLC, is an approximately 7% holder of the Company.

33.    OvaScience is a fertility company that claims to have discovered a therapy by which to increase the "health" of female eggs for use in IVF by extracting mitochondria from egg precursor cells and injecting the same into mature eggs for better results in the IVF process.

34.    The Company did not discover the scientific fact that egg precursor cells exist. Nor did the Company originate the idea of transferring mitochondria from one egg to another (IVF specialists used mitochondria from donor eggs). The Company's original idea was to utilize mitochondria from a patient's own precursor eggs during the IVF process.

35.    The efficacy of Company's primary new idea – extracting mitochondria from egg precursor and injecting it into mature eggs – lacks scientific validation. It is difficult to scientifically prove that Company's therapy increases live birth rates since due to the nature of the therapy there can never be a control group and – unlike clinically testing whether a medication cures a disease – normally a significant portion of women undergoing IVF anyway become pregnant and have a live birth.

36.    The size of the study groups where the Company purports to have tested AUGMENT are so small as to be statistically meaningless. In essence, the Company did not attempt to conduct scientifically meaningful trials of its product. Defendant Dipp, the Company's co-founder and long-time CEO, stated to Science Magazine, "The fertility [industry] just doesn't do trials."

37.    On September 10, 2013, the Company issued a press release to provide an update on AUGMENT, which stated that the Company suspended enrollment in AUGMENT in the U.S. while moving forward with its plans for enrollment outside of the U.S. This decision came after the Company received an "untitled" letter from the U.S. Food and Drug Administration ("FDA")

questioning the status of AUGMENT and advising the Company to file and Investigational New Drug ("IND") application.  At that time, the Company stated "OvaScience anticipates having further discussions with the FDA to present details on AUGMENT and its qualifications…to determine the appropriate path forward."  Upon information and belief, instead of continuing to develop AUGMENT to meet FDA standards, the Company took its IVF studies outside of the U.S. and never engaged in further discussions with the FDA.

38.     On November 10, 2014, the Company filed a Form S-3 registration statement with the SEC for the registration of up to $150,000,000 of any combination of the Company's securities, including common stock, preferred stock, debt securities, warrants, rights, purchase contracts and units (the "Registration Statement").  The SEC declared the Registration Statement effective on November 21, 2014.

39.     On December 17, 2014, the Company issued a press release announcing "AUGMENT Treatment Available in Four International Regions."  The press release further stated:

> The AUGMENT fertility treatment is available in select *in vitro* fertilization (IVF) clinics in Canada, the United Kingdom (UK), the United Arab Emirates (UAE) and Turkey.
>
> *     *     *
>
> OvaScience exceeded its AUGMENT patient treatment goal with more than 150 patients now receiving the treatment.  The Company has started transitioning some of the IVF clinics to commercial centers.

40.     In connection with the Registration Statement, on January 6, 2015, the Company filed a preliminary prospectus for the sale of its common stock and a final prospectus on January 8, 2015 (the "Prospectus," together with the Registration Statement, the "Offering Materials"), in which the Company offered 2,300,000 shares of its common stock at a public offering price of

$50.00 per share (the "Offering").

41.     In connection with the Offering, the Company sold an aggregate of 2,645,000 shares of common stock at $50.00 per share, which included 345,000 shares that represented the full exercise of an option to purchase additional shares granted to the underwriters of the Offering.

42.     The Offering resulted in $124.1 million on net proceeds, after deducting underwriting discounts and commissions and other offering expenses.

**Materially False and Misleading
Statements Issued During the Class Period**

43.     The Class Period begins on January 8, 2015, when the Company issued the Prospectus in connection with the Offering, which incorporated the Registration Statement.  The Offering Materials contained false and misleading statements and/or omitted material information concerning the true results for the women who participated in the AUGMENT fertility treatment, including that the Company's AUGMENT procedure did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure.

44.     In particular, the Offering Materials emphasized that the Company's AUGMENT treatment had been launched in select international clinics as early as 2014, and stated, in pertinent part:

> *The AUGMENT treatment*
>
> In 2014. we launched the AUGMENT treatment in select international IVF clinics through AUGMENT Centers of Excellence, or ACE clinics, in Canada, the United Kingdom, Turkey and the United Arab Emirates.

45.     The Offering Materials were signed by defendants Dipp and Young.

46.     On March 16, 2015, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K").  Under the section entitled

"Management's Discussion and Analysis of Financial Condition and Results of Operations," the

2014 10-K stated, in pertinent part:

> The AUGMENT treatment is not available in the United States. This treatment is specifically designed to improve egg health by supplementing a mitochondrial deficiency which may in turn offer the potential for enhanced IVF. With the AUGMENT treatment, energy-producing mitochondria from a patient's own EggPC cells are added to the patient's mature eggs during the IVF process to supplement the existing mitochondria. ***We expect 1,000 AUGMENT treatment cycles will be in process by the end of 2015***.[3]

47.     The 2014 10-K was signed by defendants Dipp and Young and contained signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Dipp and

Young.  The SOX certifications state the following:

> 1.   I have reviewed this Annual Report on Form 10-K of OvaScience, Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

---

[3] All emphasis in original unless otherwise noted.

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.     Also on March 16, 2015, the Company issued a press release and corresponding current report on Form 8-K with the SEC announcing its fourth quarter and year end 2014 financial results.  In the press release, the Company stated, *"[i]n 2015, OvaScience plans to have 1,000 AUGMENT treatment cycles in process."*

49.     Throughout the Class Period, defendants issued false and misleading statements and failed to disclose material adverse facts about the Company's business, operations and prospects.  In particular, defendants caused the Company to issue false and misleading statements and/or failed to disclose, among other things, that: (1) the science behind AUGMENT had not been scientifically validated; (2) the Company was unable to achieve the purported success rates it

claimed; (3) the reasons why the Company moved its studies outside of the United States (due to failure to achieve FDA approval); and (4) that at all relevant times, the Company's profitability and prospects was false and misleading.

50.     As such, throughout the Class Period, defendants failed to disclose that the approximately 150 patients that had received OvaScience's AUGMENT procedure in 2014 did not achieve a pregnancy success rate that was significantly higher than the rate achieved without the Company's AUGMENT procedure.  As a result of the false and misleading statements issued by defendants, the price of the Company's shares was artificially inflated throughout the Class Period.

## The Truth Begins to Emerge

51.     The market first began to learn the truth concerning the success rate of the Company's AUGMENT fertility treatment when Company disclosed the results in press releases on March 26, 2015 and March 28, 2015.

52.     On March 26, 2015, the Company issued a press release entitled "OvaScience AUGMENT Fertility Treatment Shows Improved Pregnancy Rates in Women with Prior Failed IVF Cycles."  The press release stated, in pertinent part:

> Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners of Toronto, Canada, a mitochondrial expert and one of the first IVF specialists to use the AUGMENT treatment in clinical practice, reported initial patient experiences in women whose ages ranged from 28 to 40 years and who had one to three previous failed IVF cycles, often with poor embryo quality. ***In 26 women who received the AUGMENT treatment, there were 9 clinical pregnancies out of 17 embryo transfers (53%).***
>
> The results reported in the poster presentation represent experiences from a small number of patients with different diagnoses, ages and prior IVF history. ***As of this reporting, pregnancy rates across IVF clinics that offer the AUGMENT treatment currently range from 25% - 53%, which includes clinics that are treating some of the more challenging infertility patients***. OvaScience is collecting AUGMENT patient experience in a first-of-its-kind international registry, and anticipates sharing information from a broader patient experience

when it is available.

53.     In the press release, Dr. Casper further stated:

*We are impressed with the pregnancy rate that we have seen with the AUGMENT treatment in women who tried IVF multiple times and never had a successful pregnancy…We are encouraged by these results and believe the AUGMENT treatment may offer a much needed fertility treatment for women who are seeking new options*. We look forward to continuing to report our clinical experiences in a wide range of patients who may benefit from the AUGMENT treatment.

54.     On March 28, 2015, the Company issued a press release entitled "Additional Clinical Reports of OvaScience AUGMENT Fertility Treatment Show Improved Pregnancy Rates in Women with Multiple Prior Failed IVF Cycles."  The press release stated, in pertinent part:

Kutluk Oktay, M.D., F.A.C.O.G, of Gen-art IVF in Ankara, Turkey, and one of the initial IVF specialists to use the AUGMENT treatment in clinical practice, presented initial clinical experience in eight women whose ages ranged between 27 and 41 years with three or more IVF failures and poor egg and embryo quality. In eight women who received the AUGMENT treatment, *there were two clinical pregnancies out of eight embryo transfers (25%)*. Most notably, the two pregnancies occurred with single embryo transfers in women aged 34 and 41 who had previously failed to become pregnant following seven and three IVF cycles, respectively. One patient has an ongoing clinical pregnancy.

55.     On March 30, 2015, Andrew S. Fein, an analyst for H.C. Wainwright & Co., questioned the Company's AUGMENT data pregnancy rate calculation stating that "the data raised interesting questions regarding…the use of embryo transfer as the denominator in calculating success rates…."  Fein further explained that an alternative representation of the data would result in a 35% success rather than the 53% success rate declared, and this method is utilized by SART. Fein stated the following:

Success rates for AUGMENT were presented as a fraction of the total number of embryo transfers, reporting a 53% pregnancy rate (9 pregnancies of 17 embryo transfers) for the Canadian site and 25% (2 pregnancies of 8 embryo transfers) at the site in Turkey.  *However, we note that an alternative representation of the data would have included all IVF cycles as the denominator (9 pregnancies form 26 cycles; 35% success rate).*  Due to the nature of the technology (requiring additional manipulation of the oocyte at time of ICSI), the denominator could have

reflected those patients that failed fertilization and failed to produce viable blastocysts. ***This method is not without precedent: we note that The Society for Reproductive Technology (SART), which represents the majority of IVF clinics in the US, reports IVF pregnancy rates as a percentage of IVF cycles,*** which are further delineated by fresh and frozen transfers.

56.     After the truth began to emerge concerning the AUGMENT treatment results, the Company's shares plummeted $17.14 from $48.29 on March 26, 2015 to $31.15 on April 1, 2015, a loss of approximately 35% on unusually heavy volume of approximately 1.9 million shares.

57.     On March 31, 2016, Arthur Tzianabos, Ph.D., stepped down as the President and Chief Scientific Officer of OvaScience. Dr. Tzianabos and the Company entered into a consulting agreement which provides for Dr. Tzianabos to act as an advisor to the Company through December 31, 2016.

58.     On April 2, 2015, Oppenheimer analyst Rohit Vanjani, opined that "[s]hares of OvaScience have traded down over 40% over the last week," because investors were stuck on one metric, AUGMENT's reported pregnancy rate. Vanjani also added that "[m]uch has been made about the correct denominator to use in calculating the AUGMENT pregnancy rate…" and "[w]e certainly understand why investors have put the pregnancy rate metric in focus. Investors are still trying to understand if the AUGMENT technology works and if it will get adopted, and that metric is undoubtedly important."

59.     On April 6, 2015, SIRF published an article entitled, "Irreproducible Results, Inc.," which challenged the reported 53% clinical pregnancy rate observed from the Canadian physician's data and countered that ***"26 women got the treatment (AUGMENT) and, of them, 7 were able to successfully maintain a pregnancy for just under a 27 percent success rate."***

60.     In addition, the SIRF article suggests that the AUGMENT procedure data presented did not achieve a significant success rate of clinical pregnancies compared to previous rates

achieved without the Company's AUGMENT procedure (rates provided by the CDC). The article

stated the following, in pertinent part:

> …the Centers for Disease Control's archive of assisted reproductive technology statistics suggests at least a broad idea of what the press release's reported effects mean.
>
> The median age of the women receiving OvaScience's treatment in the Toronto clinic was 33 years old, with an average of two previous IVF treatment cycle failures.
>
> ***According to the CDC in 2012 – the most recent year available for data – of the women studied who were 35 and under who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33 percent were expected to deliver a live birth.***

61.     Other analyst reports opined that the SIRF article was partly responsible for investor

doubt that led to material drops in the price of OvaScience stock.  After this news was revealed,

the Company's share price dropped $5.47, from $35.06 on April 2, 2015, to close at $29.59 on

April 7, 2015, a loss of approximately 15%, on unusually heavy volume.

### Partial Disclosures as the Truth Emerges

62.     On July 6, 2015, the Company published on its webpage a blog entitled, "Women

Receiving AUGMENT Treatment had Improved Pregnancy Rates and Healthy Births."[4]  The blog

post stated:

**07/06/15 | MICHELLE DIPP, M.D., PH.D.**

The European Society of Human Reproduction and Embryology (ESHRE) conference is where new fertility innovations and treatments take center stage and collaboration within the fertility community is fostered.

During this year's ESHRE in Lisbon, Portugal, OvaScience hosted the scientific symposium, "Experts in Egg Health: Advancing Fertility Patient Care." We were fortunate to have fertility specialists from more than forty countries in attendance - all united by the goal of bringing new fertility treatment options to patients. The scientific session featured leading physicians, some of whom have experience using

---

[4]     *Available     at*     http://www.ovascience.com/patients/blog/post/women-receiving-augment-treatment-had-improved-pregnancy-rates-and-healthy.

the AUGMENT<sup>SM</sup> fertility treatment in their clinics. The AUGMENT treatment is not available in the United States.

In addition to presentations on the importance of egg health and its important role in fertility, the scientific session also included the patient experiences of women who have used the AUGMENT treatment.

Of note, Michael Fakih, M.D., Founder and Chairman of Fakih IVF in the United Arab Emirates, reported his patients' experiences for the first time.

- He showed positive results from 59 women with poor egg health and embryo quality who were given the AUGMENT treatment during IVF.

- Before using the AUGMENT treatment, these women had a combined four percent clinical pregnancy rate and a two percent live birth rate based on a combined total of 257 previous IVF cycles.

- With the AUGMENT treatment, the women's clinical pregnancy rates increased at least five-fold.

Additionally, Kutluk Oktay, M.D., F.A.C.O.G, of Gen-Art IVF in Ankara, Turkey, shared the exciting news of the second birth by a woman who received the AUGMENT treatment. The healthy baby girl was born to a mother in Turkey who had failed seven previous IVF cycles and had never before had a successful pregnancy.

Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners in Toronto, Ontario, also presented his patient experiences, as were previously reported during the 21st COGI Congress: Innovation in Reproductive Medicine, including the first birth with the AUGMENT treatment.

63. On August 27, 2015, David Harding resigned as Chief Commercial Officer of the Company, effective August 28, 2015.

64. Then, on September 28, 2015, the Company issued a press release entitled "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment" announcing "the Company does not expect to meet the 2015 goal of 1,000 AUGMENT treatment cycles."

65. Previously, the Company issued guidance to investors to expect 1,000 AUGMENT treatment cycles by year-end 2015. OvaScience blamed the shortfall on marketing and acquisitions activity within clinics offering AUGMENT, stating, "We recently became aware of M&A

activities in our key clinics. We believe these factors will prevent us from achieving our goal as we had anticipated the majority of AUGMENT treatment cycles would initiate in the fourth quarter."

66.     On this news, the Company's shares fell from $14.52 on September 28, 2015 to close at $8.57 on September 29, a drop of over 40%, on unusually heavy volume.

67.     Upon information and belief, on March 16, 2015, when the Company announced that it "planned" to have 1,000 AUGMENT treatment cycles in progress by the end of 2015, the Company and the Individual Defendants knew that the number was false and misleading and, in fact, the Individual Defendants knew the Company was unable to achieve its stated goal of having 1,000 AUGMENT treatment cycles in progress by the end of 2015.

68.     Running low on money and even lower on credibility, on December 21, 2016, OvaScience announced that it would continue to make the AUGMENT treatment available to patients at partner clinics in Canada and Japan and maintain its current commercial footprint, but would slow its commercial expansion, reassess its ongoing and planned clinical studies of AUGMENT, and undertake a corporate restructuring, including a workforce reduction to better align its workforce to its revised corporate strategy and to carefully manage the Company's cash burn.

69.     On July 1, 2016, defendant Dipp resigned as Company CEO.

70.     On December 21, 2016, Harald Stock resigned from his positions as President and CEO and director and Paul Chapman resigned from his position as Chief Operating Officer.

75.     As of December 31, 2016, the Company reported having only 118 employees left and announced a further corporate restructuring that would take place in January 2017, in which the Company would be reducing its workforce even more so by approximately 30%.

71.     By December 2016, the Company's stock traded, and continues to trade, at under $2.00 per share, down from a Class Period high of $53.46 per share.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased OvaScience's securities between January 8, 2015 and March 28, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, OvaScience's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of OvaScience shares were traded publicly during the Class Period on the NASDAQ.  As of February 27, 2017, OvaScience had 35,641,505 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by OvaScience or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

75.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

76.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

   b.   whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of OvaScience; and

   c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

77.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

78.    The market for OvaScience's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, OvaScience's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired OvaScience's securities relying upon the integrity of the market price of the Company's securities and market information

relating to OvaScience, and have been damaged thereby.

79.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of OvaScience's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about OvaScience's business, operations, and prospects as alleged herein.

80.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about OvaScience's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

81.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

82.     During the Class Period, Plaintiff and the Class purchased OvaScience's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

83.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding OvaScience, his/her control over, and/or receipt and/or modification of OvaScience's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning OvaScience, participated in the fraudulent scheme alleged herein.

84.     The August 28, 2015 resignation of David Harding as Chief Commercial Officer of the Company, the March 31, 2016 resignation of Arthur Tzianabos, Ph.D. as President and Chief Scientific Officer of OvaScience, the July 1, 2016 resignation of defendant Dipp as CEO, the December 21, 2016 resignation of Harald Stock as the Company's President and CEO and director, and the December 21, 2016 resignation of Paul Chapman from his position as Chief Operating Officer, were all unexplained resignations. The unexplained departure from employment of several of the key executive members of the Company's management team after the truth began to emerge concerning and the Company's false and misleading statements were made known to the investing public indicate scienter.

85.     The defendants knew the statements and representations were false because the number of AUGMENT treatment cycles in process and the outcomes of the completed treatment cycles were the two most basic measures of the Company's business.   The number of women undergoing the Company's therapy and the results achieved thereby define the state of the Company at any given moment.   That defendants admitted that they would not have 1,000 AUGMENT treatment cycles in process by the end of 2015 after having months earlier announced they would, creates a reasonable inference that defendants knew it to be unfeasible when they originally made the announcement.   The Company's failure to inform investors how many treatment cycles the Company did have in process, is an indication that defendants had grossly exaggerated the numbers in announcing that the Company was on line to achieve 1,000 treatment cycles in 2015.   The defendants knew the statements and representations claiming that AUGMENT was an effective fertility therapy were false because the Company never reported the number of active cycles in progress at any given point in time, or the results.

86.     The defendants knew the statements concerning the efficacy of AUGMENT were false and misleading and/or failed to disclose to adverse information because defendants studiously avoided informing investors of the reasons why the Company moved its studies outside of the United States (due to failure to achieve FDA approval)

87.     The defendants knew the statements concerning the efficacy of AUGMENT were false and misleading and/or failed to disclose to adverse information because defendants studiously avoided conducting any meaningful scientific tests of AUGMENT and instead relied upon anecdotal information.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

88.     The market for OvaScience's securities was open, well-developed and efficient at

all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, OvaScience's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of OvaScience's securities and market information relating to OvaScience, and have been damaged thereby.

89.    During the Class Period, the artificial inflation of OvaScience's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false and/or misleading statements about OvaScience's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of OvaScience and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially Inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

90.    At all relevant times, the market for OvaScience's securities was an efficient market for the following reasons, among others:

      a.    OvaScience stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      b.    As a regulated issuer, OvaScience filed periodic public reports with the SEC and/or the NASDAQ;

      c.    OvaScience regularly communicated with public investors via established

market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and/or

        d.     OvaScience was followed by securities analysts employed by brokerage

firms who wrote reports about the Company, and these reports were distributed to the sales force

and certain customers of their respective brokerage firms. Each of these reports was publicly

available and entered the public marketplace.

        91.     As a result of the foregoing, the market for OvaScience's securities promptly

digested current information regarding OvaScience from all publicly available sources and

reflected such information in OvaScience's stock price. Under these circumstances, all purchasers

of OvaScience's securities during the Class Period suffered similar injury through their purchase

of OvaScience's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

        92.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the speaker had actual

26

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of OvaScience who knew that the statement was false when made.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against all Defendants

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase OvaScience's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

95.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for OvaScience's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

96.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about OvaScience's

financial well-being and prospects, as specified herein.

97.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of OvaScience's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about OvaScience and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

98.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

99.     The defendants had actual knowledge of the misrepresentations and/or omissions

of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing OvaScience's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

100.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of OvaScience's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired OvaScience's securities during the Class Period at artificially high prices and were damaged thereby.

101.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that

OvaScience was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their OvaScience securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

102.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

103.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the
### Exchange Act Against the Individual Defendants

104.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105.    The Individual Defendants acted as controlling persons of OvaScience within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

107.    As set forth above, OvaScience and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

A.    Declaring this action to be a proper class action and certifying Plaintiff as class representative;

B.    Awarding compensatory damages in favor of the Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 24, 2017

Respectfully submitted,

**OF COUNSEL:**
LIFSHITZ & MILLER LLP
Edward W. Miller
821 Franklin Ave, Suite 209
Garden City, NY 11530
Tel: (516) 493-9780
Email: edmilleresq@aol.com

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO# 649304)
Matorin Law Office, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlaw.com