UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FADI DAHHAN, Individually and on Behalf of All Others Similarly Situated, | ) ) | No. 1:17-cv-10511-IT |
| | ) | CLASS ACTION |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| OVASCIENCE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................ 1

II.   JURISDICTION AND VENUE .................................................................................... 6

III.  PARTIES ........................................................................................................................ 6

      A.    Plaintiff .............................................................................................................. 6

      B.    Defendants ......................................................................................................... 6

IV.   SUBSTANTIVE ALLEGATIONS ............................................................................... 9

      A.    Background ......................................................................................................... 9

      B.    The Science Behind AUGMENT ..................................................................... 10

      C.    OvaScience Attempts to Launch Its Experimental AUGMENT Treatment
            in the United States .......................................................................................... 12

      D.    To Avoid FDA Scrutiny, OvaScience Discontinues Its AUGMENT Study
            and Ceases Efforts to Launch AUGMENT in the United States ...................... 13

      E.    OvaScience Rolls out AUGMENT by Offering It for Free in International
            Locations Outside the FDA's Reach ................................................................ 13

      F.    Defendants Announce that They Had Given Away 150 AUGMENT
            Cycles and Expect to Sell 1,000 Commercial AUGMENT Cycles in 2015 ......... 15

      G.    Defendants Reveal the First AUGMENT Results, and the Market Begins
            to Question the Efficacy of the Treatment ....................................................... 17

      H.    OvaScience Reveals the Departure of Its Chief Commercial Officer and
            Reveals for the First Time that It Will Not Come Close to Reaching 1,000
            Commercial Cycles in 2015 ............................................................................. 23

      I.    AUGMENT Was Not Commercially Viable and Defendants Were Not on
            Track to Hit 1,000 Commercial Cycles ........................................................... 24

      J.    Defendants Knowingly Misled Investors About AUGMENT's
            Commercial Viability and OvaScience's Ability to Reach 1,000
            Commercial Cycles of AUGMENT .................................................................. 26

V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD
      STATEMENTS ............................................................................................................. 33

      A.    December 17, 2014 Investor Day ..................................................................... 35

**Page**

B.     January 6, 2015 Preliminary Prospectus Supplement, January 7, 2015 Prospectus Supplement, and January 14, 2015 JPMorgan Healthcare Conference ..................................................................................................38

        1.     January 7, 2015 Prospectus Supplement.....................................................39

        2.     January 14, 2015 JPMorgan Healthcare Conference ................................40

C.     Fourth Quarter and Fiscal Year 2014 Financial Results .......................................41

D.     First Quarter 2015 Financial Results ....................................................................43

E.     Second Quarter 2015 Financial Results ................................................................45

VI.     TRUTH BEGINS TO EMERGE ......................................................................................48

VII.     POST-CLASS PERIOD REVELATIONS .......................................................................59

VIII.     LOSS CAUSATION.........................................................................................................62

A.     March 26-28, 2015 Revelations.............................................................................62

B.     April 6, 2015 Revelation........................................................................................63

C.     September 28-29, 2015 Revelations .......................................................................65

IX.     PRESUMPTION OF RELIANCE ...................................................................................66

X.     NO SAFE HARBOR .......................................................................................................69

XI.     PLAINTIFF'S CLASS ACTION ALLEGATIONS........................................................70

By and through its undersigned counsel, Lead Plaintiff Freedman Family Investments LLC ("Plaintiff") alleges the following against OvaScience, Inc. ("OvaScience" or "Company"), Dr. Michelle Dipp, M.D., Ph.D. ("Defendant Dipp"), and Jeffrey E. Young ("Defendant Young") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by OvaScience with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; (e) information readily obtainable on the Internet; and (f) interviews with factual sources, including individuals formerly employed by OvaScience. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.      Plaintiff brings this federal securities fraud class action on behalf of itself and all other similarly situated persons or entities who purchased or otherwise acquired the publicly traded common stock of OvaScience between December 17, 2014 and September 28, 2015 ("Class Period") and who were damaged thereby ("Class"). Plaintiff brings this action against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a).

2.      OvaScience is a fertility company founded to develop and commercialize new fertility treatments utilizing egg precursor or "EggPC" cells to improve egg health and "revolutionize" in vitro fertilization ("IVF"). EggPC cells are immature egg cells found in the outer ovary, which

- 1 -

possess the ability to grow into new eggs.  Since launching in 2011, the Company has hypothesized

three potential treatments based on this experimental science, only one of which has been developed

to the point of commercialization.  This treatment, known as AUGMENT, involved harvesting

mitochondria from a woman's EggPC cells and injecting them into her egg at the time of IVF in

order to supplement the energy level in the egg and to address problems caused in the development

of newly formed embryos by inadequate energy in the cell division process.

3.     OvaScience first sought to launch AUGMENT in the United States.  In 2012, the

Company announced its intention to initiate a study of 40 women ages 38 to 42, who had failed two

to five IVF cycles.  The Company began its U.S.-based study in February 2013, noting that it would

commercialize the AUGMENT treatment *only* if it showed positive efficacy and safety.  However,

as soon as the Company received scrutiny from the Food and Drug Administration ("FDA") for

failing to file an investigative new drug application for the treatment, the Company discontinued its

efforts to study and commercialize AUGMENT in the United States.

4.     The Company shifted its efforts to commercializing AUGMENT internationally.  It

partnered with select international IVF clinics, known as AUGMENT Centers of Excellence or

"ACE" clinics, offering them initial cycles of the treatment for free.  Although such initial cycles of

AUGMENT would not generate revenue, Defendants planned to demonstrate the treatment's

efficacy, to subsequently convert the initial IVF clinics into commercial centers (*i.e.*, requiring

patients to pay for AUGMENT), and to eventually expand the commercial use of AUGMENT

globally.  By the end of 2014, Defendants projected that 40 to 60 free AUGMENT cycles would be

in progress and that the Company would have begun charging for treatments.

5.     On December 17, 2014, the first day of the Class Period, Defendants held

OvaScience's first Investor Day and announced that they had initiated 150 free cycles through their

ACE clinics.  While Defendants did not disclose the results from these free treatments, they used them as a basis to announce that OvaScience expected to have 1,000 commercial (*i.e.*, revenue generating) cycles of AUGMENT in progress by the end of 2015.  The price for the treatment would be $15,000 to $25,000 with clinics charging patients an additional amount, which would be ***on top*** of a patient's costly IVF cycle.  In such a way, Defendants created the impression that the data they had amassed through the free treatment cycles and ACE partnerships indicated that AUGMENT was safe and effective and that there was significant patient demand for the treatment despite its cost.  In short, Defendants led investors to believe that AUGMENT was in demand and would be commercially viable and revenue generating.

6.      The market was thrilled.  Analysts believed that Defendants' statements suggested "physician confidence in initial efficacy data" and that such favorable uptake "de-risks the continued commercial launch of AUGMENT."  The Company's stock price rose 62%.  Defendants harnessed investor enthusiasm driven by Defendants' 1,000-cycle promise and raised $132.25 million in gross proceeds through a secondary public offering ("SPO") of the Company's stock that closed on January 13, 2015.

7.      On March 16, 2015, the Company announced its 2014 annual results and filed its Form 10-K, reaffirming the 1,000-cycle target.  The next day, Defendants announced that, for the first time, clinical reports of the AUGMENT treatment would be made available at the Society for Reproductive Investigation's ("SRI") Annual Meeting on March 26 and 28, and provided the market abstracts of this data.  At the SRI meeting, Defendants discussed the AUGMENT data from their partnerships with two ACE clinics in Canada and Turkey in more detail.  Defendants presented AUGMENT as successfully achieving a pregnancy rate of 53% at its Canadian clinic (nine clinical pregnancies/17 embryo transfers).  In reality, the Company had performed the AUGMENT treatment

- 3 -

on 26 women in Canada, seven of whom obtained ongoing clinical pregnancies, representing a much lower pregnancy rate than 53%. Moreover, the reported results from Canada and Turkey were from just 34 patients in total, representing a small subset of the total treatments the Company had given away for free in the previous year. They also represented a younger population than originally contemplated by the U.S. trials. The uncertainty of the results caused the market to call into question the efficacy and commercial viability of AUGMENT, resulting in a stock price decline of over 23%.

8.      Indeed, a closer analysis of the data undertaken by the Southern Investigating Reporting Foundation on April 6, 2015, revealed that the reported AUGMENT results may have actually represented a lower pregnancy success rate than typically achieved with IVF for a similar age group as reported by Center for Disease Control ("CDC") data. And, without any controls, the market questioned whether the AUGMENT results were meaningful and whether the Company would be able to sell the treatment at its high price tag, further challenging the Company's ability to commercialize AUGMENT.

9.      In the face of inconclusive AUGMENT treatment results, Defendants repeatedly affirmed that they were on track to achieve the 1,000-cycle target – conveying to the market that internal data supported both the success of the treatment and demand sufficient to support achievement of the 1,000 cycles. In reality, throughout 2015, OvaScience was falling woefully short. Defendants were intimately aware of this fact, as they tracked every AUGMENT cycle undertaken, were involved in every major step of the AUGMENT treatment, and maintained laboratories within or contiguous to every IVF clinic that offered AUGMENT. Yet, Defendants led the market to believe that the 1,000 commercial treatment cycles were achievable. It was critical to Defendants that the market believe that the Company was able to commercialize and generate revenue from its only developed treatment based on the highly controversial EggPC science. If

AUGMENT was a success, there would be great promise for the Company's other potential treatments. If it was ineffective or inviable commercially, it challenged the core science behind the Company and its future business prospects. Defendants' deceptive statements and omissions had the intended effect of inflating the Company's stock price throughout the Class Period.

10.     However, on August 27, 2015, just two weeks after affirming the 1,000-cycle target, the Company announced that David Harding ("Harding"), OvaScience's Chief Commercial Officer ("CCO"), hired to assist in AUGMENT's roll-out, had departed the Company after just nine months. And, one month later, on September 28 and 29, Defendants finally disclosed to the market that they would ***not*** achieve the 1,000-cycle target they had affirmed at least ten times during the past nine months.   Moreover, they admitted that the Company had initiated ***only approximately 35 commercial cycles of AUGMENT*** – most of which had been initiated in September.  This was an acknowledgement that the Company had initiated very few cycles between January and August, there was not significant demand for the treatment, its commercial prospects were dubious, and Defendants' earlier assurances that they were on track to achieve 1,000 commercial treatment cycles were invalid.  As a result, OvaScience's stock price plummeted 40.98% by the close of trading on September 29, 2015.  Investors suffered millions in losses.

11.     Following the close of the Class Period, Defendants' fraud continued to be revealed. On January 6, 2016, the Company announced that Defendant Dipp would be replaced as CEO.  On December 21, 2016, the Company disclosed that OvaScience had slowed its commercial expansion of AUGMENT while it reassessed its ongoing and planned clinical studies of the treatment and that it had undertaken a corporate restructuring.  And, on June 21, 2017, the Company announced that it was discontinuing all efforts related to AUGMENT outside of North America and would reduce its remaining workforce by 50%.  AUGMENT was abandoned.  The Company's stock price never

recovered.  As of the date of this filing, OvaScience's stock traded at $1.47 per share, down more than 97% from its all-time and Class Period high of $55.69.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants maintain an office in this District, and many of the acts and omissions complained of herein occurred in substantial part in this District.

15.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiff

16.    Plaintiff, as set forth in the certification on file [Dkt. No. 13-3], and incorporated by reference, purchased OvaScience shares at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

### B.    Defendants

17.    Defendant OvaScience is a Delaware corporation with its principal executive offices located at 94th Avenue, Waltham, Massachusetts.  OvaScience common stock trades on The Nasdaq Global Market ("NASDAQ") under the ticker symbol "OVAS."

18.    Defendant Dipp co-founded OvaScience in April 2011, has been its Executive Chairman of the Board since January 6, 2016, and also serves as its Acting President.  She previously served as OvaScience's Chief Executive Officer ("CEO") from June 2011 until July 1, 2016.  In that capacity, Defendant Dipp was a senior executive officer and controlling person of OvaScience.  During the Class Period, Defendant Dipp participated in the drafting of, and was a signatory to, the Company's Annual Report for the fiscal year ended December 31, 2014, and the Quarterly Reports for the quarters ended March 31, 2015 and June 30, 2015, each of which were filed with the SEC on Forms 10-K and 10-Q, respectively.

19.    Defendant Young served as the Chief Financial Officer ("CFO") of OvaScience from September 18, 2014 to September 6, 2016.  As CFO, Defendant Young was a senior executive officer and controlling person of OvaScience.  During the Class Period, Defendant Young participated in the drafting of, and was a signatory to, the Company's Annual Report for the fiscal year ended December 31, 2014, and the Quarterly Reports for the quarters ended March 31, 2015 and June 30, 2015, each of which were filed with the SEC on Forms 10-K and 10-Q, respectively.

20.    During and prior to the Class Period, Defendants Dipp and Young, as senior executive officers of OvaScience, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. They also had access to material adverse non-public information concerning the true number of AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT, as discussed in detail below.  Because of their positions with the Company, Defendants Dipp and Young had access to non-public information about OvaScience's business, finances, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and

- 7 -

employees, attendance at management and/or board of directors meetings and any committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants Dipp and Young knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     Defendants Dipp and Young are liable as direct participants in the wrongs complained of herein.  In addition, Defendants Dipp and Young, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause (and did cause) the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants Dipp and Young were able to, and did, directly or indirectly, control the conduct of OvaScience's business.

22.     Defendants Dipp and Young participated in the drafting and preparation of, and had ultimate authority over, various public, shareholder, and investor reports, and other communications complained of herein and was aware of the misstatements contained therein and omissions therefrom.  Because of their executive and managerial positions with OvaScience, Defendants Dipp and Young had access to the adverse undisclosed information about OvaScience's business prospects, financial condition, and sales trends as particularized herein, and knew that these adverse facts rendered the positive representations made by or about OvaScience and its business issued or adopted by the Company materially false and misleading.

23.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, Defendants Dipp and Young had a duty to promptly disseminate accurate and truthful information with respect to OvaScience's financial condition and performance, growth, operations, financial statements,

business, sales, management, earnings, and present and future business prospects, and to correct any previously issued statements that were materially misleading or untrue so that the market price of OvaScience's common stock would be based upon truthful and accurate information.  Defendants Dipp and Young's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     Defendants Dipp and Young are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of OvaScience's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding the Company's business prospects and the intrinsic value of OvaScience common stock, causing Plaintiff and other members of the Class to purchase OvaScience common stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

25.     OvaScience is a global fertility company focused on the development and commercialization of new fertility treatments for women.  There are two broad categories of infertility treatments:  (1) treatments that do not involve retrieval of an egg from a woman (*e.g.*, fertility drugs or injecting sperm directly into a woman's uterus); and (2) treatments that do involve egg retrieval.  The latter category of treatments are known as assisted reproductive technology ("ART"), the most common type of which are IVF treatments.

26.     In an IVF procedure, a doctor extracts a woman's own eggs, or the eggs of a donor; fertilizes the eggs outside of the woman's body to create embryos; observes the embryos for up to 6 days to determine which are strong enough to survive; and transfers one or more of the surviving embryos into the woman's uterus.  These several steps are referred to as a "cycle" of treatment.

27.     Unfortunately, the IVF process poses limited success rates.  A cycle might fail at any stage.  The extracted eggs might not successfully fertilize and become embryos, or the embryos that do develop might not survive long enough to be transferred into the patient's uterus.  If at least one embryo does survive and is transferred into the uterus, a pregnancy might not occur.  If a pregnancy does occur, then there might be a subsequent miscarriage.  Consequently, the CDC reported that only 32% of the 147,260 ART cycles performed in the United States in 2010 resulted in live births.  Individuals undergoing this treatment may undergo multiple cycles before achieving pregnancy or, unfortunately, before stopping such treatment because it has not proven effective.

28.     IVF is extremely costly.  One cycle can range from $15,000 to as much as $25,000, depending on the clinic.  When a patient has to undergo more than one cycle, the IVF cost per live birth can exceed $50,000.  These high costs, coupled with rising infertility rates, have led to a burgeoning industry.  Indeed, in 2012, the global IVF market had an estimated value of $9.3 billion and was projected to reach $21.6 billion by 2020.  In 2013, the European Society for Human Reproduction ("ESHRE") reported that 1.5 million ART cycles are performed worldwide each year.

29.     Defendants sought to tap into the growing market by generating concepts for new fertility treatments that could be utilized in conjunction with IVF.

**B.      The Science Behind AUGMENT**

30.     OvaScience was founded to develop fertility treatments based on egg precursor or EggPC cells, which are immature egg cells that are found in the protective outer layer of an ovary and have the ability to grow into new eggs.  In 2004, one of OvaScience's founders, Jonathan Tilly, Ph.D., discovered the existence of EggPC cells within the ovaries of adult mice.  He subsequently hypothesized that EggPC cells also exist in human ovaries, have the potential to mature into eggs, have the potential to replenish a woman's egg supply, and might provide a source of fresh mitochondria that could potentially be used to enhance the health of existing eggs.

- 10 -

31.     OvaScience purports to use proprietary methods to isolate EggPC cells from a patient's own ovarian tissue and to use cells for new fertility treatment options that improve egg health.  OvaScience advanced that its treatments could generate higher quality eggs and, in turn, increase live birth rates, reduce the number of IVF cycles, reduce the incidence of multiple births, and lower the overall cost of the IVF process.

32.     However, the underlying hypotheses and the scientific foundation for Tilly's EggPC treatments are controversial.  Multiple scientists, including two of Tilly's colleagues from Harvard University, expressed that Tilly's findings could not be replicated or otherwise lacked support. Indeed, Tilly's Harvard colleagues published an article indicating that they had attempted to induce a pair of mice to produce more eggs but were unable to do so.[1]

33.     Since launching in 2011, the Company has attempted to harness Tilly's science into the development of three fertility treatments:  (1) AUGMENT; (2) OvaPrime; and (3) OvaTure. Prior to and during the Class Period, only AUGMENT had been developed, tested in human populations, and offered to the public.  As of early 2015, OvaPrime and OvaTure were only potential treatments that the Company was attempting to optimize.

34.     The AUGMENT treatment sought to address a problem where inadequate energy prevents newly formed embryos from developing through cell division by injecting mitochondria from a woman's EggPC cells into her egg at the time of fertilization in order to supplement the energy level in the egg and, in turn, improve the success of embryo development during the IVF process. The AUGMENT treatment involved the following steps: (a) obtain a biopsy of tissue from

---

[1]     Roddy Boyd, Irreproducible Results, Inc., So. Investigative Reporting Found.  (Apr. 6. 2015), http://sirf-online.org/2015/04/06/irreproducible-results-inc.

a woman's ovary; (b) isolate EggPC cells from that tissue; (c) isolate mitochondria from those EggPC cells; and (d) inject the mitochondria into the egg alongside a single sperm during ICSI.[2]

### C.     OvaScience Attempts to Launch Its Experimental AUGMENT Treatment in the United States

35.     Prior to 2012, therefore, the entire concept for the AUGMENT treatment was based on Tilly's experiments with mice – experiments that other scientists had challenged.  Accordingly, Defendants' plans for a study with humans were vital to the Company's ability to commercialize AUGMENT and generate any revenue.  And the Company's ability to commercialize **any** treatment based on EggPC cells (*e.g.*, OvaPrime or OvaTure) would be impacted by the initial scientific and commercial success of AUGMENT.

36.     OvaScience initiated its AUGMENT study in the United States in February 2013 and described the study as follows in its Form 10-K for fiscal year 2012, filed with the SEC on February 25, 2013:

> The protocol for the study calls for the enrollment of up to 40 premenopausal female patients between the ages of 38 and 42 who have failed at least two but not more than five previous IVF attempts. . . .
>
> The patients will be divided into four cohorts of 10 patients each. . . . [W]e plan to review the relevant safety and efficacy data of all patients who have been treated, including adverse events, miscarriages, premature births and congenital malformations, if any, as well as fertilization rates, progression to blastocyst, chemical pregnancy, gestational sacs, and live births. . . . Depending on the pace at which we enroll the study, we expect to be able to analyze preliminary pregnancy rate data in late 2013.  ***We expect to make our decision as to whether to proceed with commercialization activities for AUGMENT based on these preliminary data.***

---

[2]     ICSI, which stands for intracytoplasmic sperm injection ("ICSI"), is a process through which a small needle is used to inject a single sperm directly into an egg.  IVF with ICSI is an alternative to the standard IVF process through which tens of thousands of sperm are placed directly on an extracted egg with the aim of one of the sperm penetrating the egg normally.  IVF with ICSI has become the predominant form of IVF, comprising 66% of all IVF procedures performed in the United States in 2011.  *See* OvaScience, Inc., Annual Report (Form 10-K) at 7 (Feb. 25, 2013).

The primary objective of the study will be to evaluate the safety of AUGMENT in women undergoing IVF who have had a history of IVF failure.  The secondary objectives of the study will be to evaluate egg and embryo quality, fertilization, implantation, pregnancy and live birth rates.

**D.    To Avoid FDA Scrutiny, OvaScience Discontinues Its AUGMENT Study and Ceases Efforts to Launch AUGMENT in the United States**

37.    OvaScience's efforts to study and commercialize AUGMENT did not get far off the ground.  On September 10, 2013, OvaScience announced that it had received a letter from the FDA advising the Company to file an investigational new drug application for AUGMENT.  In other words, the FDA indicated that AUGMENT was not exempt from the FDA's review and approval process for new drugs in the United States.

38.    Instead of facing that regulatory process and pursuing clinical data evidencing AUGMENT's efficacy, OvaScience simply discontinued its U.S.-based clinical study and transferred its study overseas.

**E.    OvaScience Rolls out AUGMENT by Offering It for Free in International Locations Outside the FDA's Reach**

39.    Commercializing AUGMENT was critical for Defendants – it was OvaScience's only developed treatment, to which they had devoted considerable time and resources.  Accordingly, Defendants devised a plan for a targeted roll-out of AUGMENT internationally in 2014, which enabled the Company to avoid pre-market review and approval under U.S. laws and regulations. OvaScience's international plans involved partnering with IVF clinics in four international regions, providing them with the AUGMENT treatment for free, and ultimately turning them into commercial centers for the treatment.  On January 13, 2014, the Company stated that it would "introduce AUGMENT Centers of Excellence (ACE) access program into international IVF clinics for physicians to gain experience using AUGMENT and to generate data."

40.     OvaScience would work closely with each ACE clinic.   Indeed, OvaScience employees actually performed the AUGMENT procedures needed to isolate the mitochondria from EggPC cells, and thus, the Company maintained labs within or next to each ACE clinic.  This close proximity enabled OvaScience to administer free AUGMENT treatments, train the clinics' physicians on the treatment, demonstrate the treatment's efficacy, and set the groundwork for commercialization.

41.     In January 2014, OvaScience announced that it planned to initiate 40 to 60 AUGMENT cycles through its ACE clinics in 2014.  These cycles would be free – ACE clinics were not initially "commercial."  As the Company had previously stated regarding its U.S. study, the preliminary data from initial cycles would dictate the Company's plans for commercializing AUGMENT.  And Defendants hoped to start charging for AUGMENT through those clinics by the end of 2014, thus transitioning them to commercial centers.  As one analyst subsequently described, these ACE clinics were essentially "beta" centers for AUGMENT.

42.     As the year progressed, OvaScience continued to report growth in the numbers of AUGMENT treatment cycles in progress.  For the quarterly period ending June 30, 2014, OvaScience announced that "[w]e are more than halfway toward executing on our plan for at least 40 AUGMENT cycles in 2014" – *i.e.*, the Company had over 20 cycles in progress in the first half of 2014.  After the next quarterly period, ending September 30, 2014, the Company announced that "more than 60 patients are receiving the AUGMENT treatment, exceeding our target of 40-60 patients in treatment by the end of 2014."

43.     As Defendants would later inform the market, they had actually performed 150 treatments – defined as performing 150 biopsies – through their ACE clinics by the end of 2014.  In the fourth quarter of 2014, moreover, they had performed their first ***commercial*** cycle.  This initial

commercial cycle was material to investors, because Defendants represented that AUGMENT would be commercialized only if it was shown to be safe and effective.

> **F.    Defendants Announce that They Had Given Away 150 AUGMENT Cycles and Expect to Sell 1,000 Commercial AUGMENT Cycles in 2015**

44.    Emboldened by their initial roll-out of free AUGMENT cycles, and eager to assuage investors that they had developed an effective, commercially viable and revenue generating treatment, the Company held its first Investor Day on December 17, 2014.  At this Investor Day, Defendants announced that in 2014, "OvaScience exceeded its AUGMENT patient treatment goal with more than 150 patients now receiving the treatment" and disclosed that it had transitioned some of its IVF clinics to commercial centers.

45.    Defendants did not disclose the collective results of the 150 initiated free treatments, but Defendants unequivocally stated that based on their experience to date, "In 2015, the Company expects *at least 1,000 additional patients* to be receiving the AUGMENT treatment."  As Defendant Dipp confirmed, the 1,000 metric referred to *commercial* cycles (*i.e.*, revenue generating cycles) rather than cycles provided for free, and OvaScience would be universally charging the clinics $15,000 to $25,000 for the treatment, with the clinics potentially charging patients an additional amount – on top of a patient's already costly IVF cycle.

46.    And, as detailed below, Defendant Dipp indicated that the Company's performance of 150 cycles was driven by both the success of and demand for the treatment:

- ¶¶85-87 ("The doctors are already using AUGMENT, and we believe that, as you saw with some of the case studies.  So, it's not a question of does AUGMENT work, it's a question of in which population does AUGMENT work best?"); and

- ¶88 ("I would say that's not even close to the demand.  So, we get, like I said, hundreds of inquiries every day, and so it's certainly demand driven to the extent that patients want AUGMENT.").

47.     In such a way, Defendants led the market to believe that the data amassed from 150 cycles and from working closely with ACE clinics, doctors, and patients demonstrated that:  (a) AUGMENT worked; (b) there was significant demand for the treatment, such that patients would pay for 1,000 cycles of AUGMENT treatment despite its cost; and (c) the treatment would be commercially viable and revenue generating.  Analysts' reactions on December 18, 2014, confirmed that they believed those representations.   For example:

- Leerink Partners LLC:  "Our key takeaways include: 1) AUGMENT training cycles (150 vs 40-60) and announced pricing ($15-25K vs $15K) exceed expectations, suggesting *physician confidence in initial efficacy data*."

- JMP Securities LLC:   "The company has exceeded its initial guidance regarding the targeted number of AUGMENT procedures in its AUGMENT Centers of Excellence (ACE).  A total of 150 IVF procedures have been completed to date, significantly more than the initial guidance of 40-60.  We believe *the favorable uptake in procedures significantly de-risks the continued commercial launch of AUGMENT*, as the company proceeds with the conversion of its established centers into commercial operation. . . . That *the number of AUGMENT procedures* has exceeded expectations *sends a strong positive signal of robust market demand*, in our view. . . . We believe that the potential for AUGMENT in the ex-US market is significant, with peak sales reaching an estimated $1.4B in 2025."

48.     Indeed, in response to this news – *i.e.*, that 150 free cycles had generated positive data indicating a demand for 1,000 commercial cycles in 2015 – OvaScience stock increased from a closing price of $29.38 on December 16, 2014, to a closing price of $34.96 on December 17, a closing price of $43.22 on December 18, and a closing price of $47.85 on December 19.  In total, the stock gained *62.87%* in value from December 16 to December 19.

49.     Capturing the excitement for AUGMENT generated by Defendants' expectation of 1,000 commercial cycles, Defendants closed an SPO of the Company's stock at $50.00 per share on January 13, 2015, raising gross proceeds of $132.25 million to be used to continue funding AUGMENT.

G.      **Defendants Reveal the First AUGMENT Results, and the Market
        Begins to Question the Efficacy of the Treatment**

50.     On March 16, 2015, Defendants released their year-end results for 2014, reiterating

that "OvaScience anticipates expanding the availability of the AUGMENT treatment and expects

1,000 AUGMENT treatment cycles will be in process by the end of 2015" and that "[t]he Company

set this target to ensure that it is building a high quality and scalable operating process to support

OvaScience's future fertility treatment portfolio."   In light of their pronouncements regarding

AUGMENT's commercial growth, Defendants were eager to also highlight AUGMENT's efficacy.

On March 17, 2015, therefore, Defendants  issued a press release with a link to abstracts containing

the *first* clinical data from the use of AUGMENT.   The abstracts were prologues to live

presentations by two doctors from Defendants' partner clinics in Canada and Turkey at SRI's annual

meeting on March 26 and 28.   In conjunction with these presentations, Defendants issued two

additional press releases on March 26 and March 28 and held a public conference call on March 27

to discuss the clinical data in more detail.

51.     The fact that Defendants had released some data was encouraging to investors, who

had not expected metrics at that time.   However, the actual data put AUGMENT's efficacy in

question.  Although Defendants had amassed data from 150 free AUGMENT cycles offered in 2014

– and that data laid the foundation for the demand in ACE clinics for 1,000 commercial cycles –

Defendants released results of just 34 patients from two clinics offering AUGMENT.   Out of 26

AUGMENT patients with a median age of 33 in a clinic in Canada, 7 obtained and maintained a

clinical pregnancy.[3]   In a clinic in Turkey, eight patients with an average age of 34 received

AUGMENT, and one obtained and maintained a clinical pregnancy.   By releasing data for only 34

AUGMENT patients, Defendants obscured the results from the remaining 116 patients.

---

[3]   The Company defined "clinical pregnancy" as a pregnancy diagnosed by ultrasound.

52.     Furthermore, Defendants portrayed the data in a misleading light by highlighting a pregnancy success rate of 53% for the Canadian patients.  That statistic was based on only women who reached the IVF stage of receiving embryo transfers (*i.e.*, 9 clinical pregnancies from 17 embryo transfers) and included two women who suffered miscarriages (*i.e.*, spontaneous abortions). The real success rate from this small sample of 26 women – including those women who began cycles of IVF with AUGMENT but did not develop any viable embryos to transfer – was approximately 27% (7 ongoing clinical pregnancies from 26 AUGMENT cycles).  Including the 8 patients and 1 ongoing clinical pregnancy from Turkey, moreover, 34 total patients received AUGMENT, and 8 of those patients obtained an ongoing clinical pregnancy – a success rate of only 23.5%.

53.     These limited results, which were conducted without a controlled experiment and which were presented in a misleading light, caused the market to question the efficacy of AUGMENT, the true demand for it, and its commercial prospects.  As a result, OvaScience's stock price plummeted 23.33% from a March 25, 2015 closing price of $49.80 per share to a March 30, 2015 closing price of $38.18 per share on unusually high trading volume, and continued to fall for two trading days thereafter.

54.     Subsequently, on April 3, 2015, Science Magazine published an article questioning the reliability of the limited results and describing the ongoing debate in the scientific community regarding the entire concept of injecting mitochondria into eggs.  For example, the article quoted one fertility specialist as follows:

> Glen Schattman, a fertility specialist at Weill Cornell Medical College in New York City, says OvaScience's results are "not that impressive."  Many of his patients have failed two IVF Cycles at another clinic before they reach him, yet many get pregnant. Schattman considers a control group essential.  Cohen [a clinical embryologist] agrees that OvaScience's technology warrants a randomized trial, though he acknowledges it's difficult to control all the variables in IVF, such as age.

- 18 -

But the company has no such plans.  "The fertility [industry] just doesn't do trials," Dipp says.

55.    On April 6, 2015, the Southern Investigative Reporting Foundation, undertook a more in-depth analysis of Defendants' AUGMENT data and published an article describing why the Company's March data demonstrated that AUGMENT's efficacy was questionable:

> So what spooked investors?  A good place to start was OvaScience's release itself. The company claimed that 17 women had received the embryo transfer and 9 became clinically pregnant for a 53 percent success rate. But reading the release more closely shows that 26 women got the treatment and, of them, 7 were able to maintain a pregnancy for just under a 27 percent success rate.

> *    *    *

> Given the absence of a control group, or a group of women who didn't receive OvaScience's treatment, discerning whether these results are troubling or promising is unknowable.  Since it's not a formal study, calculating results that might ordinarily depart from industry norms, like ignoring the full amount of women receiving the treatment, is perfectly feasible.  The results can then be interpreted in a host of different ways which Dipp seized on, proclaiming at the end of the release:  "Our AUGMENT treatment is having a positive impact on pregnancy rates in a variety of women who are struggling with infertility.

> Notwithstanding the difficulty posed by the absence of a control group, the Centers for Disease Control's archive of assisted reproductive technology statistics suggests at least a broad idea of what the press release's reported effects mean.

> The median age of the women receiving OvaScience's treatment in the Toronto clinic was 33 years old, with an average of two previous IVF treatment cycle failures.

> ***According to the CDC in 2012*** — ***of the women studied who were 35 and under who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33 percent were expected to deliver a live birth***.

> *    *    *

> The lack of data would be odd for most companies touting a revolutionary treatment for one of humanity's most vexing issues, but OvaScience is different:  Its website lacks presentations from analyst days or investor conferences, there are no speeches from its executives or scientists and, per above, there are no formal studies.

> *    *    *

- 19 -

Concerns about the efficacy of OvaScience's treatment program pale in comparison
to the controversial history of the science — and scientists — behind the company.

56.     According to the article, by comparison to the 33% success rate published by the

CDC, therefore, the 23.5% success rate for the 34 AUGMENT patients discussed by Defendants was

not that promising.

57.     Additionally, on July 1, 2015, the Center for Human Reproduction published an

article analyzing the existing AUGMENT data and stating that AUGMENT was only a "hypothesis"

and noting that the treatment was not without risk:

> As of this point, it is important to understand that AUGMENT$^{SM}$ is only a
> hypothesis, with no evidence to support that (i) improving mitochondrial content in
> older eggs really improves pregnancy chances; and (ii) that ovarian precursor cells
> used in the procedure really exist and/or contain appropriate mitochondria when
> "ground up" and used in the procedure.  Moreover, even if points (i) and (ii) are
> correct, there currently is no evidence that AUGMENT$^{SM}$ improves pregnancy
> chances in older women undergoing IVF.   In summary, in order to determine
> whether AUGMENT$^{SM}$, indeed, does improve pregnancy chances, a properly
> designed study has to be conducted.
>
> *          *          *
>
> Another important aspect, often unknown to patients, is that AUGMENT$^{SM}$ requires
> surgery. . . .   [I]n absence of any supportive evidence for the efficacy of
> AUGMENT$^{SM}$, it is important for patients to understand that (i) they may be
> undergoing a surgical procedure for naught . . . and (iii) that every surgical
> procedure, of course, carries risk, including risks of additional damage to already
> compromised ovaries.

58.     Faced with challenges to AUGMENT's efficacy and internal data demonstrating

inconclusive results, Defendants failed to disclose the true demand for AUGMENT.  The Company

was not on track to achieve 1,000 commercial cycles, and the Company's partner clinics were not

increasing usage of AUGMENT.  Indeed, the treatment added $15,000 to $25,000 to the cost of each

IVF cycle, and involved an invasive procedure, yet it was not clear that IVF with AUGMENT

presented a higher success rate than the success rate of IVF alone.   Nonetheless, Defendants

continued to assure investors that patients were buying AUGMENT and that, in fact, the Company

was on track to achieve its 1,000-cycle goal:

- <u>May 11, 2015</u>: "On Track to Meet 2015 AUGMENT Cycles Goal. As anticipated, OvaScience continued transitioning certain IVF clinics to commercial centers and anticipates meeting the Company's own limit of 1,000 AUGMENT treatment cycles in process by the end of the year."

- <u>June 23, 2015</u>: "So for AUGMENT for this year we have launched this in three regions of the world. We are getting up and running in the United Kingdom as well and what we are doing is building this infrastructure globally internationally with 1000 AUGMENT cycles."

- <u>August 10, 2015</u>: "The Company continues to expect to reach its goal of 1,000 AUGMENT treatment cycles in process by the end of 2015."

- <u>August 11, 2015</u>: "We do continue to expect to achieve our goal of 1,000 AUGMENT treatment cycles in process. And, to your point, I'm glad you said biopsies, because that's exactly what we mean by 1,000 treatment cycles in process. So just as a reminder, the cycle begins when we actually receive the patient's tissue after the biopsy. That's also when we receive payment. But we defer revenue until we deliver the mitochondria to the clinic."

59.    Defendants' ability to commercialize AUGMENT and reach 1,000 cycles was highly

significant to investors.  As stated above, scientists questioned Tilly's studies and conclusions

regarding EggPC cells and debated the scientific foundations underlying the treatment; therefore, the

key metric for the market was whether clinics and their patients were actually willing to purchase

AUGMENT.  Consequently, Defendants specifically directed the market to focus on the 1,000-cycle

metric, and throughout the Class Period, investors did, in fact, rely on that metric:

- <u>January 8, 2015 – Oppenheimer & Co. Inc.</u>: "Our 2015 AUGMENT cycles forecast remains ~1,200 cycles, which compares with OvaScience's guidance to treat ~1,000 patients.  We maintain our Outperform rating and $55 price target."

- <u>March 31, 2015 – Ladenburg Thalmann Financial Services Inc.</u>: "AUGMENT's international launch continues, with pricing estimated between $15k-$25k per procedure.  We currently estimate just over 1500 AUGMENT cycles during 2015 and maintain our AUGMENT revenue estimate of $23mm in 2015."

- <u>May 12, 2015 – Wedbush Securities, Inc.</u>: "The company reaffirmed its goal to complete 1,000 AUGMENT biopsies in 2015 which appears to be slightly more 4Q15 weighted than our prior model. . . . [W]e are optimistic on the 1,000 goal due to the likelihood of medical tourism."

- <u>May 12, 2015 – Leerink Partners LLC Research</u>: "Management reaffirmed 1,000 paid cycle guidance, unpaid AUGMENT training cycles in UK and Japan to be launched in 2H:15. Management noted that 1,000-cycle guidance was neither a reflection of capacity nor demand. OVAS limited itself to 1,000 cycles to prepare for quality operation (currently one lab per region) to accommodate multiple treatments in the future."

- <u>May 12, 2015 – Oppenheimer & Co. Inc.</u>: "[W]e believe the more important metric to focus on is the targeted number of AUGMENT cycles. OvaScience maintained its guidance for 1,000 cycles in 2015, which we view as positive. . . . We maintain our Outperform rating and $60 price target."

- <u>May 12, 2015 – JMP Securities LLC</u>: "The company is confident that it is on track to meet guidance regarding the targeted number of AUGMENT procedures in 2015, and it continues to expect 1,000 commercial procedures by year end."

- <u>June 11, 2015 – Leerink Partners LLC Research</u>: "In addition to upcoming AUGMENT results, some investors are paying close attention to OVAS's ability to hit its 2015 guidance of ~1,000 commercial cycles."

- <u>July 7, 2015 – Oppenheimer & Co. Inc.</u>: "Management maintained its guidance of 1,000 AUGMENT cycles in 2015."

- <u>August 11, 2015 – JMP Securities LLC</u>: "[T]he company confirmed that it remains on track to launch the UK and Japan AUGMENT Centers of Excellence with a small proportion of commercial cycles from these sites contributing to the overall 1,000-cycle guidance. In addition to last evening's news of the expansion into Panama that will serve Latin America, we are comfortable with the company's guidance."

- <u>August 11, 2015 – Oppenheimer & Co. Inc.</u>: "Management maintained its 1,000 cycles guidance for 2015, which will be split between reported/deferred revenues. OVAS indicated that current patients still in the middle of their cycles, the backlog of patients in the three commercial AUGMENT regions, and the insurance reimbursement decision in the UAE are enough contributing factors to meet guidance. . . . We maintain our Outperform rating."

**H.     OvaScience Reveals the Departure of Its Chief Commercial Officer and Reveals for the First Time that It Will Not Come Close to Reaching 1,000 Commercial Cycles in 2015**

60.     On August 27, 2015, OvaScience announced that Harding would resign as CCO effective August 28, 2015.  Harding had been CCO since December 11, 2014 – less than 9 months.  This sudden departure of Harding, who was hired to assist in rolling out AUGMENT, was a prelude to Defendants' revelation that their statements about reaching 1,000 commercial cycles were fraudulent and indicated to the market that the commercialization of AUGMENT was not as successful as Defendants had promised.

61.     Then, on September 28, 2015, OvaScience stated, for the first time, that it did "not expect to meet the 2015 goal of 1,000 AUGMENT$^{SM}$ treatment cycles."

62.     Worse news was to follow.  On September 29, 2015, OvaScience revealed that, despite months of affirming the 1,000-cycle expectation to the market, the Company had undertaken *approximately 200 cycles* since its launch and *approximately 35* of those were commercial, with the *majority of those commercial cycles occurring in September*.  As the Company subsequently revealed, moreover, most of these cycles were at a price discount.

63.     Thus, with only 3 months remaining in 2015, Defendants had reached only 3.5% of the 1000-commercial-cycle goal that they had reiterated as late as August 2015.  As further detailed below, the market reacted immediately and decisively to these announcements, causing the Company's stock price to plummet by *40.98%* on September 29, 2015 on unusually high trading volume, causing millions in investor losses, and the stock price continued to fall the following trading day.

64.     Analysts were shocked by these disclosures, which stood in stark contrast to the Company's earlier assurances, and downgraded their outlooks for OvaScience stock.  As stated by one analyst, "[t]his announcement sheds light on a recent lack of transparency, as the company has

- 23 -

chosen not to conduct quarterly results calls despite being in the throes of AUGMENT's launch (and

on the verge of a second), and noted in an 8-K filing the recent departure of its recently-hired chief

commercial officer."

     **I.**     **AUGMENT Was Not Commercially Viable and Defendants Were Not
on Track to Hit 1,000 Commercial Cycles**

     65.     Contrary to Defendants' indication to the market that the data generated from the 150

free cycles established AUGMENT's efficacy and demand for the treatment, Defendants had no

basis to proclaim that AUGMENT was commercially viable.  Nor were Defendants ever on track to

reach 1,000 commercial cycles, despite their repeated assurances to the contrary.  Indeed,

Defendants' admissions and data released after the Class Period – data that Defendants knew of in

real time but concealed from investors – confirmed that Defendants' Class Period statements

concerning the 1,000-cycle metric, the demand for AUGMENT, and the Company's ability to

commercialize AUGMENT were false when made.

     66.     On September 29, 2015, Defendants revealed that they had "approximately 35 . . .

commercial patients with [the] majority of commercial patients occurring i[n] September [2015]."

Given that the majority of the approximate 35 commercial cycles (*i.e.*, 18 or more) occurred in

September 2015, according to Defendants, the remaining commercial cycles (*i.e.*, 17 or less)

occurred from January through August 2015.  Therefore, on August 11, 2015 – when Defendant

Dipp reiterated that "[w]e do continue to expect to achieve our goal of 1,000 AUGMENT treatment

cycles in process" – the Company had initiated, at best, ***17 commercial cycles***.  At that point,

Defendants' statements could have been true only if they were expecting 983 commercial cycles to

initiate from August 11 through the end of 2015 – approximately 196 new cycles per month for 5

months.  In other words, Defendants would have needed to increase their monthly average from less

than 3 cycles to 196 cycles.  But this was impossible, as Defendants had no means or history of initiating anything close to that number in such a short time frame.

67.     Throughout all of 2015 and 2016, moreover, OvaScience ultimately recognized revenue for only ***129 total commercial cycles***, and it sold those cycles at an average price point of $7,209.30.[4]  In other words, it took Defendants two years to reach only 12.9% of their one-year goal, while selling AUGMENT at a substantial discount.  By December 21, 2016, moreover, the Company announced that it had stopped its commercial expansion of AUGMENT, that its CEO was departing, and that its workforce was reducing by 30%.  By June 21, 2017, the Company revealed that it was no longer planning to focus on its AUGMENT treatment and announced the layoffs of half of its remaining employees.

68.     In sum, Defendants' repeated statements of being on track directly contradicted the data available at that time.  Indeed, OvaScience performed all AUGMENT-related proprietary procedures and maintained laboratories that were within or contiguous to the IVF clinics. Defendants, therefore, were always privy to the exact numbers of AUGMENT cycles in progress, and they cannot claim that, as late as August 2015, they were unaware of the low AUGMENT numbers (*e.g.*, there were no more than 17 commercial cycles by that time).  Nor can Defendants claim that they reasonably expected participating IVF clinics to suddenly ramp up and conduct 983 cycles from August through December 2015.  Even after an additional year had passed, Defendants had not exceeded 129 cycles, and the average price per-cycle was less than half of the low end of the $15,000 to $25,000 range that Defendants had repeatedly stated.

---

[4]     As stated in their Form 8-K filed on March 2, 2017, Defendants had 2015 revenue of $277,000 from 22 AUGMENT cycles and 2016 revenue of $653,000 from 107 AUGMENT cycles, for a total of $930,000 of revenue from 129 AUGMENT cycles.

J.     **Defendants Knowingly Misled Investors About AUGMENT's Commercial Viability and OvaScience's Ability to Reach 1,000 Commercial Cycles of AUGMENT**

69.     Numerous facts support Defendants' knowledge of the materially false and misleading nature of their public statements and omissions during the Class Period.  First, AUGMENT was OvaScience's only developed treatment throughout the Class Period, and, therefore, the commercialization of AUGMENT was OvaScience's primary operation, garnering Defendants' full attention as OvaScience's CEO and CFO.  Because AUGMENT was the Company's primary focus, coupled with the small size of the Company (fewer than 100 full-time employees during the Class Period), it would be absurd to suggest that Defendants were without knowledge of matters directly affecting AUGMENT's commercialization, including the treatment's lack of progress toward the projection of 1,000 commercial cycles in 2015.  In particular, as an M.D., Ph.D., and co-founder of the Company, Defendant Dipp was closely involved with and responsible for developing AUGMENT's underlying science since the Company's formation, meaning she fully understood AUGMENT's disappointing clinical results and their negative implications on patient demand and commercial viability.

70.     Moreover, Defendants repeatedly stated that, in order to perform the proprietary procedures needed to isolate the mitochondria from EggPC cells, OvaScience developed laboratories that were within or contiguous to the IVF clinics that offered AUGMENT.  The Company also trained personnel at its partner clinics to conduct AUGMENT treatments and stationed OvaScience employees within or contiguous to the clinics; therefore, OvaScience could report the number of AUGMENT treatments in process in real time.  Defendant Dipp and other OvaScience executives routinely visited those clinics to meet with doctors, embryologists, and nurses administering AUGMENT, and had access to an international registry reporting data on AUGMENT treatments.  Accordingly, OvaScience was intimately involved in *every* AUGMENT cycle and was necessarily

privy to **all data** arising from AUGMENT cycles performed at its partner clinics.   As such, Defendants knew that the efficacy of AUGMENT was questionable, the demand for AUGMENT at $15,000 to $25,000 per cycle was minimal, and the Company was not on track to achieve, and could never achieve, 1,000 commercial treatment cycles in 2015.   This was true throughout the Class Period.   Remarkably, as late as August 2015, when Defendants had many months of data demonstrating the poor clinical and commercial results of AUGMENT, they falsely reassured investors that the Company was on track to achieve the 1,000 commercial cycles in 2015.

71.     Defendant Dipp's own public statements confirm these facts.   Defendant Dipp routinely discussed AUGMENT throughout the Class Period, including statements regarding its commercialization, patient demand, efficacy, and the precise number of AUGMENT treatment cycles the Company was performing (*e.g.*, over 150 cycles as of December 17, 2014) and on pace to perform (*e.g.*, 1,000 commercial cycles).   In fact, during every public conference call during the Class Period, Defendant Dipp and/or her colleagues at OvaScience discussed AUGMENT, typically in great detail.   Defendant Dipp confirmed that such information was known through various sources, including patient case studies, an international data registry, and on-site clinical visits. Through these statements, Defendant Dipp conveyed that Defendants had specific knowledge of the matters of which she spoke, and led investors to believe that she was speaking truthfully about them. For example, Defendant Dipp made the following statements about AUGMENT during the Class Period:

### OvaScience Investor Day, 12/17/14

- "The interest in AUGMENT in our global IVF clinic partners around the world has exceeded our expectations.   We've met our goal of offering AUGMENT in select IVF clinics in four international regions. . . . *We've exceeded our treatment goal of 40 to 60 patients, and now more than 150 patients are in AUGMENT treatment*.   And finally, the clinics have begun to

transition to commercial, and we plan to expand the availability of AUGMENT internationally in 2015."

- "The IVF market is really interesting. And those of you that know the Company know that we think a lot about this and we talk a lot about this. So the market is actually dominated by a very small number of clinic groups globally. And because of this, it has allowed us to take a really focused approach to our [AUGMENT] launch, and that allows for a really efficient commercial model. So AUGMENT is being offered in four of the leading clinic networks."

- "More than 150 patients are now in AUGMENT treatment. ***That's more than double our original goal, and we plan to have at least 1,000 patients in treatment next year***. Our partner clinics have begun to successfully transition to commercial and we have established a price range of $15,000 to $25,000, which we charge to the clinic for each AUGMENT cycle."

- "I actually want to give you a little bit of insight into the patients who are currently receiving the AUGMENT treatment. And I've had the pleasure of the last year of traveling all over the world." [Dipp then provided a lengthy, detailed discussion of case studies involving patients who received the AUGMENT treatment.]

- "***So we have started to collect data [on AUGMENT] similar to what you saw in the case studies, and that goes into an international registry.*** And it's actually the first international registry of its kind. So I am really excited that we are doing that. And so you're exactly right. We do plan to use that registry to be able to look to see not if AUGMENT is working. The doctors are already using AUGMENT, and we believe that, as you saw with some of the case studies. So, it's not a question of does AUGMENT work. It's a question of in which population does AUGMENT work best? . . . . ***[W]e are a science-driven company, we are a data-driven company, and we look forward to sharing that data once we have it.***"

- "So demand driven from the patients, I would say that's not even close to the demand. So, we get, like I said, hundreds of inquiries every day, and so it's certainly demand driven to the extent that patients want AUGMENT. ***But there's no question that doctors are able to see, even patient by patient, what's happening***. . . . [Data showing successful implementation of AUGMENT] is the kind of data that certainly has driven the uptake and the very rapid uptake, yes."

- "***But I've spent the last year traveling to each of these clinics and meeting with these doctors***. . . . So it is really important – I spend a lot of time and actually [OvaScience CCO] David Harding is at one of our sites now, we spend a lot of time talking to all the physicians. So I am typically with a group of 20 to 40 physicians. ***But it doesn't stop with a physician right? . . .***

> *And then we talked with the nurses [at clinics].   We talk with the*
> *embryologists [at clinics].   And in fact, the embryologists are the ones who*
> *are trained to do the AUGMENT procedure*."

### JP Morgan Healthcare Conference, 01/14/15

- "[W]e have launched AUGMENT. . . .  We converted [AUGMENT] to
  commercial, with a price range of $15,000 to $25,000.  That is what the
  clinics pay OvaScience.  And in 2015, we are planning to treat 1,000 patients.
  . . .  And 2015 is a build year for us, where we are adding these labs at the
  clinics where we are active and we can add on what we need in order to be
  able to meet the demand.  We anticipate there to be a great demand, not only
  for AUGMENT, but also for OvaPrime."

### OvaScience 2Q15 Earnings Call, 08/11/15

- "We are really pleased with our progress over the last six months as we've
  made AUGMENT available to patients in Canada, Europe, Latin America,
  the Middle East, and Asia through some of the most well-respected clinic
  groups in the world.  We continue to expect to be operational in Japan and
  the UK by the end of this year, and we are focused on developing a broad
  global infrastructure by partnering with the top clinic groups in order to be
  able to provide patients with our fertility treatment. . . .   The patient
  experience has been overwhelmingly positive, including this most recent
  publication of another approach to demonstrate the benefits of AUGMENT."

- "At the end of the year, that is when you will hear us talk about the total
  number [of biopsies], just like we did last year.  *We do continue to expect to*
  *achieve our goal of 1,000 AUGMENT treatment cycles in process.*  And, to
  your point, I'm glad you said biopsies, because that's exactly what we mean
  by 1,000 treatment cycles in process.  So just as a reminder, the cycle begins
  when we actually receive the patient's tissue after the biopsy.  That's also
  when we receive payment.  But we defer revenue until we deliver the
  mitochondria to the clinic."

72.    In addition to these statements, Defendants' knowledge of the fraud alleged herein is

supported by a highly suspicious pattern of reporting commercial information regarding

AUGMENT.  In the second half of 2014, Defendants publicly reported the specific number of

AUGMENT treatment cycles that were in progress on a quarterly basis.  However, after the

Company's Investor Day on December 17, 2014, Defendants changed course and stopped reporting

the AUGMENT cycles in progress throughout the remainder of the Class Period, a period of over

nine months.  Instead, they repeatedly provided only one metric – their expectation of achieving

1,000 commercial cycles in 2015 – without reporting the Company's actual progress towards that

goal.  Indeed, when an analyst specifically questioned the number of commercial cycles rolled out in

the second quarter of 2015, Defendant Dipp dodged the question and focused only on the 1,000-

cycle target:

> **Zarak Khurshid – _Wedbush Securities – Analyst_**:  Thanks for taking the questions.
> I have a two-parter as well.  First, can you break out the number of biopsies or rolled
> commercial cases from Q2? . . . .
>
> **Defendant Dipp**:  In terms of the biopsies [a.k.a cycles], _we are not going to say the_
> _number of biopsies that we've achieved this quarter._  At the end of the year, that is
> when you will hear us talk about the total number, just like we did last year.  We do
> continue to expect to achieve our goal of 1,000 AUGMENT treatment cycles in
> process.

73.     This dramatic change in reporting suggests that Defendants knowingly concealed that

AUGMENT's commercial cycles were far below their repeated target of 1,000 commercial cycles

for 2015, and could never come close to meeting that projection, which Defendants knew would be

ill-received by investors.  Indeed, when Defendants finally broke their silence on September 28,

2015, acknowledging that _approximately 35_ commercial cycles were completed or in progress (a far

cry from the 1,000 commercial cycles repeatedly projected), investors were shocked and the

Company's stock price plummeted.  Defendants' knowledge is also supported by the close temporal

proximity between their false commercial projections, as late as August 11, 2015, and the stunning

revelation that such projections would not be met on September 28, 2015.

74.     In addition to Defendants' highly suspicious reporting of commercial cycles, during

the Class Period they did not disclose the full results of the 150 free treatment cycles that were

supposedly in progress as of December 2014.  Defendants instead released data from only 34

patients who had received AUGMENT, and misleadingly couched those results as a success, hoping

that such results would convey efficacy and commercial potential to the market.

75.     Also suspicious was the fact that a number of OvaScience's senior executives left the Company or suffered demotions in the wake of the fraud.  In total, six senior executives including Defendant Young departed the Company, while Defendant Dipp relinquished her positions as CEO and Executive Chair and her seat on the OvaScience Board, moving to a reduced role as Company advisor.  These sudden management changes, under highly questionable circumstances, provide additional support for Defendants' knowledge of the fraud:

- **08/27/15**:  CCO Harding suddenly departed the Company after only nine months in the position and approximately one month before Defendants stunned investors by revealing that the Company would not reach 1,000 commercial AUGMENT cycles in 2015.

- **01/06/16**:  The Company announced that Defendant Dipp would be stepping down as CEO and replaced by Board member Harald Stock ("Stock"), effective July 1, 2016.  Defendant Dipp was given the title of Executive Chairman of the Board in connection with this change.

- **03/31/16**:    President and Chief Scientific Officer Arthur Tzianabos ("Tzianabos") resigned from the Company.

- **09/06/16**:  Defendant Young resigned from the Company.

- **12/21/16**:  CEO Stock (Defendant Dipp's replacement) and Chief Operating Officer ("COO") Paul Chapman ("Chapman") both resigned from the Company.  Stock had served as CEO for less than six months, while Chapman had served as COO for less than ten months.  According to the Company, both Stock and Chapman had been "brought on board to lead a global commercial expansion of AUGMENT."

- **06/21/17**:  The Company announced that Defendant Dipp would once again be relinquishing senior leadership positions at the Company, stepping down from the Board and her role as Executive Chair and moving to Company advisor after September 1, 2017.  On the same day, CFO Christophe Couturier ("Couturier") (Defendant Young's replacement) resigned, after serving in the position for a short stint of just over seven months.

76.     Defendants were highly motivated to make the false and misleading statements and omissions alleged herein, including the bullish projection of 1,000 commercial AUGMENT cycles, in order to maintain the public perception that AUGMENT was an effective and commercially viable

treatment within the multi-billion dollar IVF market.  This perception was vitally important to Defendants because it validated, not only AUGMENT, but also the EggPC science upon which all of the Company's fertility treatments (AUGMENT, OvaPrime, and OvaTure) were based.  Defendants knew that, if these problems were exposed to the market, they would badly undermine that science, all of the Company's fertility treatments, and the ongoing viability of the Company itself. Defendants sought to avoid that outcome by concealing those problems and giving the market a false impression of AUGMENT's efficacy and commercialization.

77.    Defendants were also motivated to maintain a positive perception of AUGMENT in order to keep the Company's stock price afloat, enabling Defendants to conduct a highly lucrative SPO of the Company's stock during the Class Period.  The SPO was completed on January 13, 2015, less than a month after Defendants began to falsely tell investors that "at least 1,000 additional patients to be receiving the AUGMENT treatment" in 2015.  Through the offering, the Company was able to sell 2,645,000 shares of common stock (including the underwriters' overallotment option of 345,000 shares) at $50.00 per share, for gross proceeds of $132.25 million.  Among other things, the money raised in the offering was earmarked for "further development and commercialization of the AUGMENT treatment."  In other words, Defendants used the offering as a way to obtain more seed money to continue funding AUGMENT and other treatments (which were generating little to no revenue) from investors who were duped into buying Company stock at an artificially inflated price of $50.00 per share based on the purported commercial success of AUGMENT.  A few months later, the truth began to leak out that AUGMENT was a commercial failure with little market demand, causing the Company's stock price to fall well below the offering price in a series of declines ($8.57 per share as of September 29, 2015).  Had investors known the truth, the SPO could

not have been conducted at $50.00 per share, and OvaScience would not have been able to reap

$132.25 million from the offering.

78.     These facts collectively support a strong inference that Defendants knowingly made

materially false and misleading public statements during the Class Period, which are discussed in

detail in the following section.  In addition, the cumulative knowledge of Defendants Dipp and

Young and other OvaScience employees is imputed to the Company and supports a finding of the

Company's corporate scienter.

## V.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

79.     Throughout the Class Period, Defendants repeatedly made positive statements about

the AUGMENT treatment, demand for it, and its commercial prospects, continuously reaffirming the

Company's ability to achieve 1,000 commercial treatment cycles in 2015.  However, Defendants'

positive statements did not provide a full picture of the true circumstances surrounding AUGMENT.

As Defendants knew but failed to disclose, the Company had initiated very few commercial cycles

of the AUGMENT treatment, rendering the 1,000-cycle target baseless, demand for the costly

treatment nil, and the commercial prospects of AUGMENT illusory.

80.     Additionally, the public filings also omitted material information required by Item

303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303").  Item 303 requires the disclosure of all

"known trends . . . that have had or that the registrant reasonably expects will have a material . . .

unfavorable impact on . . . net sales or revenues or income from continuing operations."  In addition

to the identification of such "known trends," Item 303 specifically requires disclosure of:  (a)

whether those trends have had or are reasonably expected to have a material negative impact on net

sales or revenues or income from continuing operations; and (b) the extent of any such impact on net

sales or revenues or income from continuing operations.

81.     Likewise, the January 2015 offering materials, detailed below, failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, one of the most significant factors that made the offering speculative or risky to investors was the fact that, at the time of the offering, the Company had no basis for, nor indication that, it would achieve 1,000 commercial treatment cycles in 2015, let alone that they would achieve 1,000 treatment cycles – commercial or otherwise.

82.     When Defendants repeatedly elected to state that the Company expected to initiate 1,000 commercial treatment cycles and were on track to achieve it, as well as make associated positive statements concerning demand and efficacy of the treatment, they were under a duty to disclose all material facts known that would have made these statements not misleading. Specifically, they were under a duty to disclose that the results from the AUGMENT treatment did not conclusively establish a higher success rate than IVF without AUGMENT, there was little demand for the treatment at such a high cost, and, therefore, the Company had initiated very few commercial cycles, was not on track to achieve its 1,000 commercial treatment cycle target in 2015, and AUGMENT's commercial prospects were dubious.  This information was material because it would have altered the total mix of information made available to reasonable investors.  However, Defendants failed to reveal this information, and, instead, omitted and concealed it from investors, thereby creating the misimpression that the 1,000 commercial treatment cycle goal for 2015 was achievable based on Defendants' experience with clinics and patients, as well as internal data known to them.

83.     In addition, many of Defendants' statements about demand and commercial viability were explicitly and materially false and misleading in and of themselves.  Defendants' material omissions and false and misleading statements are detailed in this section.

**A.     December 17, 2014 Investor Day**

84.     The Class Period begins on December 17, 2014.  On that day, the Company issued a Form 8-K, which reported, among other things, "In 2015, the Company expects *at least 1,000 additional patients to be receiving the AUGMENT treatment*."

85.     That same day, the Company hosted its first Investor Day, which featured presentations by guest speakers and Company management on the EggPC cell technology and the global fertility market, as well as an update on OvaScience's fertility treatments.  Defendant Dipp presented opening remarks wherein, through emphasis on the Company's experience with AUGMENT to date and its initiation of 150 free treatment cycles in 2014, as a basis for the Company's plan to have "*at least 1,000 patients in treatment*" in 2015.

86.     During the question and answer session that followed the Company's prepared remarks, analysts questioned the "success rate, . . . inasmuch as you suggested that 2015 could see 1,000 patients having experienced AUGMENT," the Company's views as to what drove the Company's "bump up" to 150 patients from the 40-60 it had originally projected in 2014, and whether that increase was driven by demand or the treatment's success.

87.     First, with regard to the "success rate," Defendant Dipp explained that "[t]he doctors are already using AUGMENT, and we believe that, as you saw with some of the case studies. So, *it's not a question of does AUGMENT work. It's a question of in which population does AUGMENT work best*?"

88.     As to the "bump up" to 150 patients, and whether that increase was driven by demand or the treatment's success, Defendant Dipp attributed the number to "*both*" the demand for the

treatment and the patients' success, elucidating that the "***demand driven from the patients, . . . [is]***

***not even close to the demand. . . . [W]e get, like I said, hundreds of inquiries every day, and so it's***

***certainly demand driven to the extent that patients want AUGMENT***."

89.     Defendant Dipp's statements created the false impression that, based on Defendants'

experience with AUGMENT to date, as well as access to data concerning the treatment cycles it was

receiving from its partner clinics and patients, the 150 cycles the Company achieved in 2014

represented both physician confidence in AUGMENT and the concomitant demand for it, such that

the Company's target of 1,000 commercial treatment cycles in 2015 was not only reasonable and

attainable, it signaled strong commercial prospects.

90.     Accordingly, analysts maintained their "BUY," "OUTPERFORM," and/or

"PERFORM" ratings, viewing the Company's 2015 guidance of 1,000 cycles favorably and even

suggesting that the goal might be conservative:

(a)     "Our key takeaways include: 1) AUGMENT training cycles (150 vs 40-60)

and announced pricing ($15-25K vs $15K) exceed expectations, suggesting physician confidence in

initial efficacy data."  Leerink Partners LLC, OvaScience, Inc., Investor Day Highlights Multiple

Milestones Achieved, PT to $56 from $23, Dec. 18, 2014.

(b)     "The company has exceeded its initial guidance regarding the targeted number

of AUGMENT procedures in its AUGMENT Centers of Excellence (ACE).  A total of 150 IVF

procedures have been completed to date, significantly more than the initial guidance of 40-60.  We

believe the favorable uptake in procedures significantly de-risks the continued commercial launch of

AUGMENT, as the company proceeds with the conversion of its established centers into commercial

operation. . . .  That the number of AUGMENT procedures has exceeded expectations sends a strong

positive signal of robust market demand, in our view. . . .  We believe that the potential for

AUGMENT in the ex-US market is significant, with peak sales reaching an estimated $1.4B in 2025." JMP Securities LLC, OvaScience, Inc. (OVAS) Investor Day Outlines 2015 Goals and Highlights 2014 Deliverables, Dec. 18, 2014.

(c)      "OVAS is expecting around 1k AUGMENT procedure[s] in 2015, which was about 400 below our model." Wedbush Pac Grow Life Sciences, Upgrading to OUTPERFORM from NEUTRAL Following Encouraging Cases Studies, Pricing and OvaTure Progress –Raising PT to $47, Dec. 18, 2014.

(d)      "OVAS plans to treat 1,000 patients in 2015.  We forecast roughly ~2,700 cycles in 2015 in the four ACE regions plus Japan." Oppenheimer, Investor Day Kicks Off on a High Note, Dec. 18, 2014.

(e)      "[E]xperience with AUGMENT training cycles and favorable geographic regions suggest 2015 guidance (~1K cycles) is achievable." Leerink, OvaScience, Inc. Investor Day Highlights Multiple Milestones Achieved; PT to $56 from $23, Dec. 28, 2014.

91.      In fact, as the analyst from H.C. Wainwright & Co. reported, "management's enthusiasm during the company's investor day in NYC spilled over into the market to push OVAS shares to an all-time high." H.C. Wainwright & Co., Augmented Revenue Assumptions Driven by Executional Egg-cellence: Reit Buy and Raising PT to $100, Dec. 18, 2014.

92.      For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's December 17, 2014 Form 8-K and at the Company's Investor Day presentation on the same day, each of which reiterated that the Company expects "at least 1,000 additional patients to be receiving the AUGMENT treatment" in 2015, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:  (a) by guiding 1,000 commercial treatment cycles in

2015 following the Company's initiation of 150 in 2014, Defendants created the false impression

that its 2015 goal was based on OvaScience's experience with the data and the true demand that

existed for AUGMENT; (b) initiating 150 free treatment cycles of AUGMENT in 2014 did not

provide a basis for the Company to expect 1,000 cycles of AUGMENT in 2015 at an additional cost

of $15,000 to $25,000 per IVF treatment; (c) Defendants maintained and tracked all AUGMENT

data in real time and, as such, knew or should have known that the Company had initiated very few

AUGMENT treatment cycles, let alone on a commercial basis; (d) it was unreasonable to expect

payment for 1,000 high cost cycles, as Defendants had yet to present any clinical studies or results to

establish the efficacy of the AUGMENT treatment in humans; and (e) the Company's Form 8-K that

announced the Company had achieved its 2014 corporate goals and established its target for 1,000

commercial treatment cycles for 2015 failed to disclose to the market (in violation of Item 303) the

materially adverse conditions described in this paragraph.

    **B.**    **January 6, 2015 Preliminary Prospectus Supplement, January 7, 2015 Prospectus Supplement, and January 14, 2015 JPMorgan Healthcare Conference**

    93.    On January 6, 2015, the Company issued a Preliminary Prospectus Supplement

("January 6, 2015 Preliminary Prospectus Supplement") to its effective shelf registration statement

on Form S-3 pursuant to Rule 424 under the Securities Act of 1933, for $85,000,000 worth of shares

of its common stock.  According to the January 6, 2015 Preliminary Prospectus Supplement, the net

proceeds from the offering were going to be used "to fund the expanded international launch of the

AUGMENT$^{SM}$ treatment, planned international launch of the OvaPrime$^{SM}$ treatment, development of

the OvaTure$^{SM}$ treatment and pursuit of a potential accelerated development pathway, establishment

of an international headquarters in the United Kingdom and additional subsidiaries, and for other

general corporate purposes."

94.     Again accentuating the Company's 2014 achievement of exceeding its patients in treatment goal, the January 6, 2015 Preliminary Prospectus Supplement highlights:

> We exceeded our 2014 AUGMENT goal of 40-60 patients in treatment, with more than 150 patients now receiving the treatment, and we started transitioning some of the IVF clinics to commercial centers in 2014.  ***In 2015, we expect at least 1,000 additional patients to be receiving the AUGMENT treatment.***

### 1.     January 7, 2015 Prospectus Supplement

95.     On January 7, 2015, the Company filed the Prospectus Supplement ("January 7, 2015 Prospectus Supplement") pursuant to the Company's effective shelf registration statement on Form S-3 and an accompanying prospectus (Registration Statement No. 333-200040) filed with the SEC on November 10, 2014 and declared effective by the SEC on November 21, 2014, and a preliminary and final prospectus supplement filed with the SEC in connection with the offering, for $115,000,000 worth of shares of its common stock.  According to the Form 8-K filed with the SEC that same day, "[t]he net proceeds to the Company from the sale of the Common Stock are expected to be approximately $107.9 million[5] after deducting underwriting discounts and commissions and estimated aggregate offering expenses payable by the Company."

96.     The January 7, 2015 Prospectus Supplement reiterated "***[i]n 2015, we expect at least 1,000 additional patients to be receiving the AUGMENT treatment***."

97.     Oppenheimer & Co. issued an analyst report following the announcement of the Company's SPO, maintaining its "Outperform" rating and reporting "[o]ur 2015 AUGMENT cycles forecast remains ~1,200 cycles, which compares with OvaScience's guidance to treat ~1,000 patients."

---

[5]     According to the Company's later-filed Form 10-K, OvaScience received "approximately $124.1 million of net proceeds . . . from our January 2015 secondary public offering."

### 2.    January 14, 2015 JPMorgan Healthcare Conference

98.    On January 14, 2015, OvaScience presented at the JPMorgan Healthcare Conference. Defendant Dipp made a presentation to the audience wherein she again emphasized the success of AUGMENT in 2014 and reiterated that the Company "*will treat 1,000 patients*" in 2015.

99.    For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's January 6, 2015 Preliminary Prospectus Supplement, the January 7, 2015 Prospectus Supplement, and the Company's presentation at the JPMorgan Healthcare Conference on January 14, 2015, each of which reiterated the Company's goal that "at least 1,000 additional patients" would receive the AUGMENT treatment in 2015, were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because: (a) initiating 150 free treatment cycles of AUGMENT in 2014 did not provide a basis for the Company to expect 1,000 cycles of AUGMENT in 2015 at an additional cost of $15,000 to $25,000 per IVF treatment; (b) by guiding 1,000 commercial treatment cycles in 2015 following the Company's initiation of 150 in 2014, Defendants created the false impression that its 2015 goal was based on OvaScience's experience with the data and the true demand that existed for AUGMENT; (c) Defendants maintained and tracked all AUGMENT data in real time and, as such, knew or should have known that the Company had initiated very few AUGMENT treatment cycles, let alone on a commercial basis; (d) it was unreasonable to expect payment for 1,000 high cost cycles, as Defendants had yet to present any clinical studies or results to establish the efficacy of the AUGMENT treatment in humans; and (e) the Company's January 6, 2015 Preliminary Prospectus Supplement and January 7, 2015 Prospectus Supplement failed to disclose to the market (in violation of Item 503) the most significant factors that make the offering speculative or risky.

C.      **Fourth Quarter and Fiscal Year 2014 Financial Results**

100.    On March 16, 2015, the Company announced its financial results for the quarter and the year ended December 31, 2014 in a news release titled, "OvaScience Reports Fourth Quarter and Year End 2014 Financial Results," which was filed with the SEC that day on Form 8-K.  Defendant Dipp called the year "transformational," and reported that the Company "anticipates expanding the availability of the AUGMENT treatment and *expects 1,000 AUGMENT treatment cycles will be in process by the end of 2015*."

101.    That same day, the Company issued its Annual Report for the fiscal year ended December 31, 2014, which it filed with the SEC that same day on Form 10-K.  Among other things the Form 10-K reiterated numerous times: "*[w]e expect 1,000 AUGMENT treatment cycles will be in process by the end of 2015*."

102.    The Form 10-K was signed by Defendants Dipp and Young and contained materially similar certifications by Defendants Dipp and Young pursuant to the Sarbanes-Oxley Act of 2002, which stated in relevant part:

1.      I have reviewed this Annual Report on Form 10-K of OvaScience, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

*      *      *

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

- 41 -

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

103.     In response to the Company's statements, most analysts remained positive about AUGMENT's "ultimate potential" and optimistic that the Company would achieve its 1,000 commercial treatment cycle goal:

(a)     "We confirmed with management that guidance remains on track and the company is confident in meeting the goal."  Oppenheimer, Positive Interim Data from AUGMENT, Mar. 18, 2015.

(b)     "Progress with the AUGMENT commercial launch and pipeline commercial prospects continue; we reaffirm our Market Outperform rating and lower our price target to $53 (from $54) on OvaScience."  JMP Securities LLC, OvaScience, Inc. Reports 4Q14 Results and Progress With the AUGMENT Launch, Mar. 17, 2015.

104.     For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's March 16, 2015 Form 8-K and its Annual Report filed on Form 10-K that same day, each which reiterated that the Company "expect[s] 1,000 AUGMENT treatment cycles will be in process by the end of 2015," were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because: (a) initiating 150 free treatment cycles of AUGMENT in 2014 did not provide a basis for the Company to expect 1,000 cycles of AUGMENT in 2015 at an additional cost of $15,000 to $25,000 per IVF treatment; (b) by guiding 1,000 commercial treatment cycles in 2015 following the Company's initiation of 150 in 2014, Defendants created the false impression that its 2015 goal was based on OvaScience's experience with the data and the true demand that existed for AUGMENT; (c) OvaScience labs were located within or contiguous to the IVF clinics that offered the AUGMENT treatment such that Defendants knew and/or could know in real time the true demand

- 42 -

and commercial viability for the treatment; (d) Defendants maintained and tracked all AUGMENT data such that they knew or should have known that the Company would not achieve its 1,000 commercial treatment cycle goal in 2015; (e) it was unreasonable to expect payment for 1,000 high cost cycles, as Defendants had yet to present any clinical studies or results to establish the efficacy of the AUGMENT treatment in humans; and (f) the Company's Form 8-K for fourth quarter 2014 and Form 10-K for fiscal year 2014 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

### D.    First Quarter 2015 Financial Results

105.    On May 11, 2015, OvaScience published a news release reporting its first quarter 2015 financial results which it filed that same day with the SEC on Form 8-K. The report quotes Defendant Dipp, stating, "***We are confident in our ability to achieve our goals this year as demand for the AUGMENT treatment grows*** . . . ." The report also emphasized that OvaScience was "***On Track to Meet 2015 AUGMENT Cycles Goal***," noting, specifically, that it "***anticipates meeting the Company's own limit of 1,000 AUGMENT treatment cycles in process by the end of the year***."

106.    Also on May 11, 2015, OvaScience issued its Quarterly Report for the quarter ended March 31, 2015 which it filed with the Company that same day on Form 10-Q. In it, the Company reiterated "***[w]e expect 1,000 AUGMENT treatment cycles will be in process by the end of 2015***."

107.    Analysts reacted positively to the Company's announcements – in particular its continued confidence that it would achieve its 1,000 AUGMENT cycle goal – reiterating their "Outperform" and "Buy" ratings:

(a)    "The company reaffirmed its goal to complete 1,000 AUGMENT biopsies in 2015 which appears to be slightly more 4Q15 weighted than our prior model . . . . [W]e are optimistic on the 1,000 goal due to the likelihood of medical tourism." WedBush Pac Grow Life

Sciences, OvaScience (OVAS) 1Q15 Volumes a Black Box - Revenue Recognition Slower - Opex Ok - ESHRE Conf. Key to Understanding Ramp - Maintain OP - PT to $52, May 12, 2015.

(b)     "[W]e believe the more important metric to focus on is the targeted number of AUGMENT cycles. OvaScience maintained its guidance for 1,000 cycles in 2015, which we view as positive." Oppenheimer, OvaScience Inc. 1Q15 Results: Looking Towards ESHRE, May 12, 2015.

(c)     "The company is confident that it is on track to meet guidance regarding the targeted number of AUGMENT procedures in 2015, and it continues to expect 1,000 commercial procedures by year end." JMP Securities LLC, OvaScience, Inc. (OVAS) Reports 1Q15 Results and Progress in the AUGMENT Launch, May 12, 2015.

(d)     "Management reaffirmed 1,000 paid cycle guidance, unpaid AUGMENT training cycles in UK and Japan to be launched in 2H:15. Management noted that 1,000-cycle guidance was neither a reflection of capacity nor demand. OVAS limited itself to 1,000 cycles to prepare for quality operation (currently one lab per region) to accommodate multiple treatments in the future." Leerink Partners LLC, OvaScience, Inc. 1Q15: AUGMENT Launch Remains a Key Focus in 2015, May 12, 2015.

108.     For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's May 11, 2015 earnings release and its Quarterly Report filed that same day, both of which touted strong growth and continued momentum in AUGMENT treatment cycles, including that it was "[o]n track to meet 2015 AUGMENT cycle goals," and "confident in [its] ability to achieve our goals this year as demand for the AUGMENT treatment grows," were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because: (a) initiating 150 free

treatment cycles of AUGMENT in 2014 did not provide a basis for the Company to expect 1,000 cycles of AUGMENT in 2015 at an additional cost of $15,000 to$ 25,000 per IVF treatment; (b) by guiding 1,000 commercial treatment cycles following the Company's initiation of 150 in 2014, Defendants created the false impression that its 2015 goal was based on OvaScience's experience with the data to date and the true demand for AUGMENT; (c) OvaScience labs were located within or contiguous to the IVF clinics that offered the AUGMENT treatment such that Defendants knew and/or could know in real time the true demand and commercial viability for the treatment; (d) Defendants maintained and tracked all AUGMENT data such that they knew or should have known that the Company had initiated very few cycles and was not on track to achieve its 1,000 commercial treatment cycle goal in 2015; (e) OvaScience was not meaningfully on track to achieve 1,000 commercial treatment cycles because, as Defendants would later admit, they had achieved, at best, 17 commercial cycles between January 1 and September 2015; (f) the clinical results presented at the March SRI conference  were manipulated in such a way so as to give the false impression of efficacy and commercial viability when, in fact, the results were from a younger population than originally intended and achieved inconclusive if not worse results which undermined the treatment's efficacy and future commercialization; (g) in light of the inconclusive clinical results for AUGMENT presented at the March SRI conference, and the challenges that had been raised to AUGMENT's efficacy, Defendants had no basis to continue to assert that they would achieve 1,000 paid cycles of AUGMENT in 2015 at a cost of $15,000 to $25,000 on top of costs associated with IVF; and (h) the Company's Form 10-Q for its first quarter 2015 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

### E.     Second Quarter 2015 Financial Results

109.     On August 10, 2015, the Company issued its financial results for the second quarter 2015 ended June 30, 2015 which it filed with the SEC that same day on Form 8-K.  According to

Defendant Dipp, "***major IVF clinic networks all over the world have approached us about offering the treatment to their patients***[.]"

110.    The press release also noted, "The Company ***continues to expect to reach its goal of 1,000 AUGMENT treatment cycles in process by the end of 2015***."

111.    That same day, the Company issued its Quarterly Report for the quarterly period ended June 30, 2015, which it filed with the SEC that day on Form 10-Q. The Form 10-Q reiterated the Company's treatment goals, maintaining "***[w]e continue to expect to achieve our goal of 1,000 AUGMENT treatment cycles in 2015***."

112.    The Company hosted a corporate call the next day, on August 11, 2015. During the question and answer session that followed the Company's opening remarks, Defendant Dipp responded to questions from various analysts concerning the Company's continued expectation to achieve its 1,000 treatment cycles by year-end, requests for transparency with regard to the current number of cycles to date, and questions from analysts regarding the control groups utilized to generate accurate success rates through AUGMENT.

113.    In response to a direct question requesting, "the number of biopsies or rolled commercial cases from Q2," data which Defendants had provided in the second half of 2014, Defendant Dipp stated:

> In terms of the biopsies, we are not going to say the number of biopsies that we've achieved this quarter. At the end of the year, that is when you will hear us talk about the total number, just like we did last year. ***We do continue to expect to achieve our goal of 1,000 AUGMENT treatment cycles in process***.

114.    Analysts viewed the Company's news that it was maintaining its 1,000 commercial treatment cycle goals in place despite the continued expectation of deferred revenue as uneventful and/or positive information, reiterating their "Market Outperform," "Outperform," and "Buy" ratings:

- 46 -

(a)      "In addition to last evening's news of the expansion into Panama that will serve Latin America, we are comfortable with the company's guidance [of 1,000 cycles].   We continue to believe that there exists significant market potential for the AUGMENT procedure . . . ." JMP Securities, OvaScience, Inc. Publication and Market Expansion Support Guidance, Investment Highlights, Aug. 11, 2015;

(b)      "OvaScience reported 2Q15 results that were largely uneventful. While the shorts may focus on the revenue miss in the quarter versus expectations, management continues to expect an AUGMENT cycle ramp in 2H15 and 2016. . . .   Management maintained its 1,000 cycles guidance for 2015, which will be split between reported/deferred revenues. OVAS indicated that current patients still in the middle of their cycles, the backlog of patients in the three commercial AUGMENT regions, and the insurance reimbursement decision in the UAE are enough contributing factors to meet guidance. . . .   We maintain our Outperform rating." Oppenheimer, OvaScience, Inc. 2Q15 Results: More Catalysts to Come in 2H15, Aug. 11, 2015.

115.      For the reasons stated above in the Substantive Allegations section, and as further detailed herein, Defendants' statements made in the Company's August 10, 2015 earnings release filed on Form 8-K and its Quarterly Report filed on Form 10-Q that same day, both of which touted strong growth and continued momentum in AUGMENT treatment cycles, including that "major IVF clinic networks all over the world have approached us about offering the treatment to their patients," and that the Company "continues to expect to reach its goal of 1,000 AUGMENT treatment cycles in process by the end of 2015," were materially false and misleading when made or omitted material facts to make such statements not false and misleading, because:  (a) initiating 150 free treatment cycles of AUGMENT in 2014 did not provide a basis for the Company to expect 1,000 cycles of AUGMENT in 2015 at an additional cost of $15,000 to $25,000 per IVF treatment; (b) by guiding

1,000 commercial treatment cycles following the Company's initiation of 150 in 2014, Defendants created the false impression that its 2015 goal was based on OvaScience's experience with the data to date, and the true demand for AUGMENT; (c) OvaScience labs were located within or contiguous to the IVF clinics that offered the AUGMENT treatment such that Defendants knew and/or could know in real time the true demand and commercial viability for the treatment; (d) Defendants maintained and tracked all AUGMENT data such that they knew or should have known that the Company was not on track to achieve its 1,000 commercial treatment cycle goal in 2015;  (e) OvaScience was not meaningfully on track to achieve 1,000 commercial treatment cycles because, as Defendants would later admit, they had achieved very few (likely no more than 17) commercial cycles between January 1 and September 2015; (f) the clinical results presented at the March SRI conference were manipulated in such a way so as to give the false impression of efficacy and commercial viability when, in fact, the results were from a younger population than originally intended and achieved inconclusive if not worse results which undermined the treatment's efficacy and future commercialization; (g) in light of the inconclusive clinical results for AUGMENT presented at the March SRI conference, and the challenges that had been raised to AUGMENT's efficacy, Defendants had no basis to continue to assert that they would achieve 1,000 paid cycles of AUGMENT in 2015 at a cost of $15,000 to $25,000 on top of costs associated with IVF; and (h) the Company's Form 10-Q for its second quarter 2015 failed to disclose to the market (in violation of Item 303) the materially adverse conditions described in this paragraph.

## VI.     TRUTH BEGINS TO EMERGE

116.    On March 17, 2015, in addition to reiterating its 1,000 commercial treatment cycle goal and providing OvaScience's financial results for its fourth quarter 2014 and fiscal year 2014, Defendants issued a press release on their website that announced, for the first time, clinical reports of the AUGMENT treatment would be made available at SRI's annual meeting, and provided the

market with abstracts of this data. Specifically, according to the press release, "These presentations will be the first time detailed clinical reports of the AUGMENT treatment will be made available."

117.    Thereafter, on March 26, 2015, the Company issued a press release on its website titled "OvaScience AUGMENT Fertility Treatment Shows Improved Pregnancy Rates in Women with Prior Failed IVF Cycles," which announced "that presentations by fertility specialists offering the Company's AUGMENT fertility treatment reported encouraging pregnancy rates in women who previously failed multiple cycles of in vitro fertilization (IVF)."  Specifically, the press release reported:

> Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners of Toronto, Canada, a mitochondrial expert and one of the first IVF specialists to use the AUGMENT treatment in clinical practice, reported initial patient experiences in women whose ages ranged from 28 to 40 years and who had one to three previous failed IVF cycles, often with poor embryo quality.  In 26 women who received the AUGMENT treatment, there were 9 clinical pregnancies out of 17 embryo transfers (53%).
>
> "We are impressed with the pregnancy rates that we have seen with the AUGMENT treatment in women who tried IVF multiple times and never had a successful pregnancy," said Dr. Casper.  "We are encouraged by these results and believe the AUGMENT treatment may offer a much needed fertility treatment for women who are seeking new options.  We look forward to continuing to report our clinical experiences in a wide range of patients who may benefit from the AUGMENT treatment."
>
> The results reported in the poster presentation represent experiences from a small number of patients with different diagnoses, ages and prior IVF history.  As of this reporting, pregnancy rates across IVF clinics that offer the AUGMENT treatment currently range from 25% - 53%, which includes clinics that are treating some of the more challenging infertility patients.  OvaScience is collecting AUGMENT patient experience in a first-of-its-kind international registry, and anticipates sharing information from a broader patient experience when it is available.
>
> *       *       *
>
> "These initial experiences are promising and demonstrate that our AUGMENT treatment is having a positive impact on pregnancy rates in a variety of women who are struggling with infertility," said Michelle Dipp, M.D., Ph.D., Chief Executive Officer of OvaScience.  "By improving egg health, even in women who previously

failed IVF, the AUGMENT treatment may provide another opportunity for women to use their own eggs during IVF."

118.    On March 27, 2015, OvaScience conducted an "AUGMENT KOL" call, which it hosted from San Francisco where it was attending SRI's annual meeting wherein Dr. Casper (quoted *supra*) and Dr. Kutluk Oktay of Fertility Preservation Special Interest Group at American Society of Reproductive Medicine provided the details of their experience with and excitement about AUGMENT.

119.    The following day, on March 28, 2015, OvaScience published another press release on its website, titled, "Additional Clinical Reports of OvaScience AUGMENT Fertility Treatment Show Improved Pregnancy Rates in Women with Multiple Prior Failed IVF Cycles," which announced "additional clinical experience of the Company's AUGMENT[SM] treatment demonstrated improved pregnancy rates in women who had failed three to seven prior in vitro fertilization (IVF) cycles" that were presented by Dr. Oktay at SRI's annual meeting.  Specifically, the press release reported:

> Kutluk Oktay, M.D., F.A.C.O.G, of Gen-art IVF in Ankara, Turkey, and one of the initial IVF specialists to use the AUGMENT treatment in clinical practice, presented initial clinical experience in eight women whose ages ranged between 27 and 41 years with three or more IVF failures and poor egg and embryo quality.  In eight women who received the AUGMENT treatment, there were two clinical pregnancies out of eight embryo transfers (25%).  Most notably, the two pregnancies occurred with single embryo transfers in women aged 34 and 41 who had previously failed to become pregnant following seven and three IVF cycles, respectively.  One patient has an ongoing clinical pregnancy.

> "These initial AUGMENT pregnancy rates are quite encouraging, especially given that these were women who had failed multiple IVF cycles and were running out of options to use their own eggs," said Dr. Oktay.  "We were also pleased to see these pregnancy rates achieved with single embryo transfers during IVF, a practice that may limit the number of multiple births, which can cause health risks to the mother and infant during pregnancy and delivery and after. Based on our experiences to date, the AUGMENT treatment appears to benefit women with poor egg quality and we look forward to continuing to share our clinical experiences."

The results reported in the poster presentation represent experiences from a small number of patients with different diagnoses, ages and prior IVF history.  As of this reporting, pregnancy rates across IVF clinics that offer the AUGMENT treatment currently range from 25% - 53%, which includes clinics that are treating some of the more challenging infertility patients.  OvaScience is collecting AUGMENT patient experience in a first-of-its-kind international registry, and anticipates sharing information from a broader patient experience when it is available.

*       *       *

"The positive clinical evidence continues to build in support of our AUGMENT treatment," stated Michelle Dipp, M.D., Ph.D., Chief Executive Officer of OvaScience.  "These improved pregnancy rates in women who have failed IVF multiple times, coupled with similar encouraging clinical AUGMENT experiences at other IVF clinics, provide physicians and patients with important information about how the AUGMENT treatment may improve egg health in women with infertility."

120.    The market questioned the AUGMENT clinical data presented at SRI's annual meeting and discussed in the Company's press releases and conference call from March 26-28, 2015. Including those women who began cycles of IVF with AUGMENT, but did not develop any viable embryos to transfer, the combined rate of ***ongoing*** clinical pregnancies (excluding miscarriages) was only 23.5% (*i.e.*, eight ongoing clinical pregnancies from 34 AUGMENT cycles).  Therefore, the results from this small sample set did not clearly demonstrate an improvement of pregnancy rates over traditional IVF and thus challenged the commercial prospects of AUGMENT at its high price point.  As a result, the Company's stock price dropped a total of 23.33% over three consecutive trading days, from a close of $49.80 per share on Wednesday, March 25, 2015 to a close of $38.18 per share on Monday, March 30, 2015, on unusually high trading volume, and continued to fall the next two trading days.

121.    The stock would have continued to drop further, however, but for the Company's repeated affirmation of the 1,000 commercial treatment cycles, which the market appreciated was based on the Company's experience with a much larger data pool and the ongoing demand for AUGMENT, confirming the treatment's commercial viability.

- 51 -

122.     Indeed, analysts remained positive on the Company's outlook and the future prospects for AUGMENT and its continued commercialization because of Defendants' confidence in and repeated affirmation of 1,000-cycle target, such that they maintained their "Outperform" and/or "Buy" ratings:

(a)     "We currently estimate just over 1500 AUGMENT cycles during 2015 and maintain our AUGMENT revenue estimate of $23mm in 2015." Ladenburg Thalmann, OvaScience, Inc. Initial AUGMENT Data:  Pregnancy Successes Noted, Mar. 31, 2015;

(b)     "These new data are not ideal, but not inconsistent with expectations, in our view."  Wedbush Quick Note, OvaScience (OVAS – OUTPERFORM):  Addressing Friday's Fresh/Frozen Controversy - Follow Up Post Saturday's Poster Session & Positive Company Comments – Maintaining OUTPERFORM, Mar. 30, 2015.

123.     On April 6, 2015, Southern Investigating Reporting Foundation published an article questioning the Company's March 2015 clinical data and the efficacy of AUGMENT:

So what spooked investors?  A good place to start was OvaScience's release itself. The company claimed that 17 women had received the embryo transfer and 9 became clinically pregnant for a 53 percent success rate. But reading the release more closely shows that 26 women got the treatment and, of them, 7 were able to maintain a pregnancy for just under a 27 percent success rate.

\*          \*          \*

[G]iven the absence of a control group, or a group of women who didn't receive OvaScience's treatment, discerning whether these results are troubling or promising is unknowable. Since it's not a formal study, calculating results that might ordinarily depart from industry norms, like ignoring the full amount of women receiving the treatment, is perfectly feasible. The results can then be interpreted in a host of different ways which Dipp seized on, proclaiming at the end of the release: "Our AUGMENT treatment is having a positive impact on pregnancy rates in a variety of women who are struggling with infertility.

Notwithstanding the difficulty posed by the absence of a control group, the Centers for Disease Control's archive of assisted reproductive technology statistics suggests at least a broad idea of what the press release's reported effects mean.

The median age of the women receiving OvaScience's treatment in the Toronto clinic was 33 years old, with an average of two previous IVF treatment cycle failures.

According to the CDC in 2012 — the most recent year available for data — of the women studied who were 35 and under who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33 percent were expected to deliver a live birth.

*      *      *

Concerns about the efficacy of OvaScience's treatment program pale in comparison to the controversial history of the science — and scientists — behind the company.

124.    This in-depth analysis and comparison of AUGMENT results to CDC data challenged the efficacy of AUGMENT and its core science and continued to call into question the commercial prospects of this expensive treatment.  As a result, the Company's stock price dropped 4.56% in a single trading day, falling from a close of $35.06 per share on Thursday, April 2, 2015 to a close of $33.46 per share on Monday, April 6, 2015 (the next trading day after market was closed on April 3, 2015 in observance of Good Friday), on unusually high trading volume, and continued to fall over the next two trading days.

125.    The stock would have continued to drop further, however, but for Defendants' repeated affirmation that they expected and were on track to achieve the 1,000 treatment cycles, which the market appreciated was based on the Company's experience with a much larger data pool and the ongoing demand for AUGMENT, confirming the treatment's commercial viability.

126.    On August 27, 2015, after less than nine months with the Company, OvaScience announced that Harding would resign as CCO of the Company effective the very next day, on August 28, 2015.

127.    Yet, at the time of his hiring, the Company flaunted the appointment of Harding as the Company's efforts to support "OvaScience's expanding global commercial operations," including AUGMENT.

128.     As described below, Harding's sudden departure after just 9 months was a prelude to Defendants' ultimate revelations that it had failed to achieve its stated goal of 1,000 commercial treatment cycles in 2015 and the treatment was not, in fact, commercial viability.

129.     Then, on September 28, 2015, more fully revealed the truth regarding AUGMENT, the number of cycles performed and its commercial prospects, the Company issued a news release titled "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment," which it filed with the SEC the next day on Form 8-K, shocking investors with the news that "***the Company does not expect to meet the 2015 goal of 1,000 AUGMENT$^{SM}$ treatment cycles***."

130.     Defendants attempted to blame OvaScience's failure to achieve the 1,000 commercial treatment cycle target on "evolving market dynamics in the fertility space, including recent merger and acquisition activities at the key commercial IVF clinics where the AUGMENT treatment is offered" as having "hindered the Company's ability to drive major volume that was anticipated in the fourth quarter."

131.     Indeed, Defendant Dipp stated:

> We are adapting our regional commercial operations and infrastructure as well as addressing an even more dynamic global IVF landscape.  In addition, ***we recently became aware of M&A activities in our key clinics***.  We believe these factors will prevent us from achieving our goal as we had anticipated the majority of AUGMENT treatment cycles would initiate in the fourth quarter.  While disappointing in the short-term, the expanding clinic networks may enable more patients to have access to the AUGMENT treatment.  With the positive patient experience to date, including multiple healthy births, ***we remain confident in the commercial potential of the AUGMENT treatment and our future fertility treatments***.

132.     The Company hosted a conference call on September 29, 2015, the very next day to provide an update on its corporate goals for the AUGMENT treatment.  Defendant Dipp made the opening remarks during which she revealed that the Company "***do[es] not to expect to meet the goal of a 1,000 augment-treatment cycles established at the end of 2014***."  She stated, in part:

- 54 -

At this point in time, more than 200 patients with poor prognoses have undergone, or are currently in, AUGMENT treatment, and approximately **35 of these are commercial patients with majority of commercial patients occurring is September**.

We have been successful in building a high-quality, technical operation and manufacturing globally for the augment treatment, however, we realize that we need to enhance our commercial operations and infrastructure to better position the company for commercial success.

In addition, **the [IVF] market is changing even more rapidly than we initially anticipated, and we recently learned of merger and acquisition activities at each of our main clinics, and this will prevent us from cycle-volume in the fourth quarter that we previously anticipated**.

133.   During the question and answer session that followed the Company's prepared remarks, Defendant Dipp responded to analysts who asked for more clarification and details regarding the Company's revelation that it **had only conducted approximately 35 commercial cycles** to date despite the Company's prior promises of greater achievements, and questioned the Company's expectations going forward:

**Paul Matteis** - *Leerink Swann - Analyst*

I have a couple, so.  My first one is just on looking at the ramp over the next, say, 18 to 24 months.  I know that this is new territory for everybody and there's no good comps and your burning a lot as you go, but you talked about expecting to do major volume in 4Q, so I guess **does that major volume move into 1Q of 2016**?  I mean, right now -- right now analysts have about 16 million in sales next year, so there's obviously an expectation that major volume is going to happen pretty imminently.

Do you see that as realistic, or should we be more patient on our end?

**Michelle Dipp** - *OvaScience, Inc. - CEO*

Thanks Paul, I appreciate the question.

So in a word, **I would say we'd ask you to be more patient**.  At this point in time it's really difficult to project the timing; we don't want to get ahead of ourselves.  As you said, we're building the business and we're bringing a new treatment to a market that hasn't seen major innovation in quite a long time.  And as we've just recently stated with the recent M&A activity, this is a very dynamic market.  But let's not forget that it's also a market that is large and growing.

\*       \*       \*

- 55 -

So, you know, our mission is unchanged, we'll continue to deliver but, to your point, you know, *we're not at this point in time going to be projecting the timing of the ramp*.

**Paul Matteis** - *Leerink Swann - Analyst*

OK. And I think you said that -- so you said about 35 -- correct me if I'm wrong, I -- I think you said about 35 commercial cycles so far this year, and most in September. *With all the changes going on do you still, month over month this year, expect some linear growth or does the trajectory in the very near-term change*?

**Michelle Dipp** - *OvaScience, Inc. - CEO*

*It's really difficult to project it at this point in time, mainly the short-term is really difficult to predict mainly because of the M&A, so just that, we are expecting a, you know, a short-term delay because of the inconvenience*.

134.    Other analysts questioned the Company's stated reasoning, requesting elaboration on

the "M&A dynamic" and its effect on AUGMENT cycles, some incredulous of the revelation, given

that earlier in the month the Company was reiterating the 1,000-cycle forecast:

**Tycho Peterson** - *JPMorgan - Analyst*

Michelle, I'm just wondering if you can elaborate a little bit more on the M&A dynamic, I mean, it feels like the adoption of augment at this stage is really dependent on, you know, individual physician rather than broader idea systems. So just wondering, you know, *why this is so disruptive and -- and also maybe why, you know, you didn't see this coming*.

*I can just -- even earlier this month we talked about reiterating the thousand cycle forecast.*

**Michelle Dipp** - *OvaScience, Inc. - CEO*

So ultimately, and you know, one of the things that we always try to keep in the front of our mind is, we think this is really great for patients. So patients will have more access to the augment treatment through these expanded clinic networks. And our initial decision with the inquirers or with those who are merging with the clinics have been positive, and they plan to also offer augment.

And as you can imagine, you know, some of these inquirers we may have been speaking with completely independent of the M&A, *so we've always known that the [IVF] market is a dynamic market; you've seen a lot of consolidation in the market, but what we did not participate is that all of the currently commercial clinics would be in this position at the same time*.

- 56 -

*So that, you know, that is -- that was not anticipated. And sort -- it -- we've learned of this very recently.*

**Tycho Peterson** - *JPMorgan - Analyst*

Okay, but can you address the point?  I mean at this stage it's really about the individual docks, right, then the broader [IVF] systems.  I mean, if you got buying from the physicians I'm just wondering why, you know, some of the consolidation is -- is -- is disruptive as it is.

**Michelle Dipp** - *OvaScience, Inc. - CEO*

Yes, I mean, the individual doctors at the original clinics, and then there's also interest from doctors at the acquiring clinics, but bear in mind in some cases our clinics are actually moving, so they're moving to new sites.  So in some cases we may have to move our lab.  *But quite frankly it's just that any M&A, whether it's [IVF] clinics or anything else, the integration process always takes times and it always, you know, moves the focus away, you know, from -- from the business for a short period of time.*

135.    Still unsatisfied with the Defendants' responses, analysts continued to ask the

Company about the number of cycles it had performed to date, and whether there were any others in

the pipeline:

**Rohit Vanjani** - *Oppenheimer - Analyst*

So you said there were 35 commercial cycle, most in September.  *Can you speak to how many cycles were committed to for 2015 either through prepayment or insurance reimbursement in the UAE, and will those cycles still happen in 2015?*

**Michelle Dipp** - *OvaScience, Inc. - CEO*

I mean, when we stated the thousand goal, so just to take you back, the thousand goal that we stated last year was to be able to demonstrate our ability to establish global operation that consistently deliver high-quality treatment.  We feel that we've been very successful at achieving this.

And we stated the goal early on in our business, we've learned a lot in a short period of time, but yes, we did have a plan with the clinics to ramp significantly in the fourth quarter, so you may remember that we spoke al of about the ramp taking place not only in the second half, but also the majority of the ramps taking place in the fourth quarter.

And a lot of that, as we stated in our last Q, was in fact due to what you're describing.  So program as well as reimbursement.  *But in terms of, you know, what percentage of those we think we can deliver on; it is difficult at this point in time*

*for us to be able to project how many of those we'll still be able to do.  We're still continuing to work with the clinics, but again, since they're, you know, in this integration process it is tough for us to project at this point in time*.

136.    And, when further questioned about the Company's post-M&A relationships with these clinics and whether "augment [sic] will definitely be offered in the new merged-entity clinic," Defendants were unable to provide a response, stating only that it "look forward to providing . . . more detail. . . when we have it," despite having repeatedly promised a specific 1,000-cycle target.

137.    On this news, the Company's stock price dropped 40.98% in a single trading day, falling from a close of $14.52 per share on September 28, 2015 to a close of $8.57 per share on September 29, 2015, on unusually high trading volume, and continued to fall the next trading day.

138.    Analysts updated their financial models, ratings and price targets following the Company's revelations.  For example, on September 29, 2015, J.P. Morgan dropped its price target by $25 to $15 per share (from $40 to $25) "to account for a significantly slower AUGMENT ramp relative to our prior expectations."

139.    Ladenburg Thalmann issued a report on September 30, 2015 entitled, "Poor AUGMENT Commercial Execution Underscores Platform Risk:  Target to $14" wherein it reduced its price target to approximately $14 per share from nearly $50, reporting "[t]his announcement sheds light on a recent lack of transparency, as the company has chosen not to conduct quarterly results calls despite being in the throes of AUGMENT's launch (and on the verge of a second), and noted in an 8-K filing the recent departure of its recently-hired chief commercial officer."

140.    Furthermore, although Defendants finally revealed the truth that they were not going to reach 1,000 cycles, they continued to lie about the true reason why they had not come close to that number of cycles.  Defendants blamed their failure on "merger and acquisition activities," that prevented them from reaching the volume they anticipated in the fourth quarter of 2015.  This made little sense.  Defendants essentially suggested that, as of August 11, 2015 – even assuming they had

initiated all of the approximate 35 commercial cycles for the year – they had a commitment to perform an additional 965 cycles before the end of the year, but that commitment suddenly disappeared as of September 28th because of "mergers and acquisition" activity.

141.     However, if mergers had logistically delayed clinics from performing more than 900 commercial cycles that had previously been planned for the last three months of 2015, then those cycles still should have taken place in 2016.  If, as Defendants suggested, AUGMENT was effective and in demand, such extensive demand (more than 900 planned cycles) for this fertility treatment, targeted to women with many failed IVF cycles, would hardly have disappeared because of merger activity.  Yet, when asked about whether the missed treatments would still happen and  how many treatments the Company had planned for the first quarter of 2016, Defendant Dipp could not provide any meaningful information to investors, instead asking them "to be more patient . . . we're not at this point in time going to be projecting the timing of the ramp" and stating "[b]ut in terms of, you know, what percentage of those we think we can deliver on: it is difficult at this point in time for us to be able to project how many of those we'll still be able to deliver on."  Ultimately, there was no ramp of treatments, because OvaScience recognized revenue for *only 129* commercial AUGMENT treatments in total for *2015 and 2016* and effectively discontinued the treatment in 2017.  Thus, merger activity among clinics, which existed even at the start of the Class Period, was not a recent phenomenon nor the driver of Defendants' failure to achieve 1,000 commercial cycles in 2015.

## VII.   POST-CLASS PERIOD REVELATIONS

142.     After the close of the Class Period, the truth concerning the commercial viability of AUGMENT continued to be revealed.

143.     On January 6, 2016, the Company announced that Defendant Dipp would be stepping down as CEO and replaced by Stock, effective July 1, 2016.  Defendant Dipp was given the title of Executive Chairman of the Board in connection with this change.

144.    On February 25, 2016, the Company admitted that it had begun offering a discounted rate for the AUGMENT treatment of approximately $7,000, as compared to the $15,000 to $25,000 per treatment cost it had originally established.[6]

145.    President and Chief Scientific Officer Tzianabos resigned from the Company on March 31, 2016.

146.    On May 5, 2016, the Company announced that despite earlier assurances of its growing global presence, it had **narrowed** the focus of its commercial markets to just Canada and Japan.  Moreover, the Company disclosed that, in 2015, it recognized revenue from only 22 of the approximate 35 commercial cycles it had initiated.

147.    The Company's spate of management changes continued on September 6, 2016 when Defendant Young left the Company.

148.    On December 21, 2016, Defendants issued a press release titled, "OvaScience Announces Business Update," which it filed with the SEC on December 23, 2016 on Form 8-K.  The press release revealed, among other things, that CEO Stock and COO Chapman "who were brought on board to lead a global commercial expansion of AUGMENT, have chosen to step down to seek new opportunities" and that the Company would be "reduc[ing] its workforce by approximately 30 percent."  In addition, Defendants revealed that although the Company "will continue to offer the treatment to patients at partner clinics in Canada and Japan," it was "[r]evising [its] AUGMENT [s]trategy" and now intended to "limit the growth of its commercial infrastructure in those countries."  Defendant Dipp explained that:

> While we have made progress on building the infrastructure to commercialize AUGMENT and remain confident in its potential, the near-term financial return has not been sufficient for us to continue to invest at the levels we believe are necessary for a large commercial expansion.

---

[6]    Bloomberg Transcript, final, OvaScience Inc. Q4 2015 Earnings Call, Feb. 25, 2016 at 2.

149.     Following this news, a JMP analyst report on December 22, 2016 stated, "[s]ince the shortfall in the previous expectation of 1,000 AUGMENT treatment cycles for FY15, there has been little evidence of a turn in the company's commercial prospects; therefore, we await further evidence for a turn in commercial adoption of the AUGMENT procedure before becoming more constructive on the shares."

150.     As a result of this news, OvaScience stock plummeted over **54.88%** from $2.97 per share on December 21, 2016 to $1.34 per share on December 22, 2016 on extremely high trading volume.

151.     By March 2, 2017, the Company disclosed that the revenue it recognized for 2016 related to only 107 AUGMENT treatments – indicating that the Company had recognized revenue for ***only a total of 129*** cycles for 2015 and 2016 combined – just slightly more than a tenth of what was originally promised for 2015.

152.     On June 21, 2017, the Company placed the final nail in AUGMENT's coffin, when it issued a press release announcing that "it will discontinue ongoing efforts related to the AUGMENT treatment outside of North America."  Moreover, it stated that "[i]n conjunction with this decision, OvaScience will restructure its organization to better align with these strategic priorities, including reducing its workforce by approximately 50 percent."  This further evidenced the inefficacy of the treatment, the lack of demand for it, and its commercial inviability.

153.     Also on June 21, 2017, the Company announced that Defendant Dipp would be stepping down from the Board and her role as Executive Chair and moving to Company advisor after September 1, 2017.  On the same day, CFO Couturier resigned, after serving in the position for just over seven months.

## VIII.   LOSS CAUSATION

154.   During the Class Period, as detailed herein, Defendants' fraudulent scheme artificially inflated the prices of OvaScience securities and operated as a fraud or deceit on Class Period purchasers of those securities.  When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the prices of OvaScience securities fell as the prior artificial inflation came out.  The truth was not revealed to the market all at once, but rather, the truth began to emerge, and the risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of Defendants' Class Period statements.  As a result of their purchases of OvaScience securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws as the truth was revealed.

### A.      March 26-28, 2015 Revelations

155.   The truth began to emerge on March 26, 2015, when the Company issued a press release reporting AUGMENT clinical results presented by Dr. Casper at SRI's annual meeting.  The press release disclosed that only nine clinical pregnancies resulted from 26 women who received the AUGMENT treatment (a rate of only 35%), although the Company misleadingly highlighted a higher percentage (53%) based on a subset of those women (17 of 26) who completed treatment cycles with an embryo transfer, and failed to disclose that miscarriages (*i.e.*, spontaneous abortions) occurred in two of the nine clinical pregnancies, meaning only seven of the 26 women, or 27%, had ***ongoing*** clinical pregnancies.

156.   On the following day, Friday, March 27, 2015, Defendants conducted an "AUGMENT KOL" (Key Opinion Leaders) conference call wherein Dr. Casper and Dr. Oktay discussed their clinical experiences with AUGMENT.  Dr. Casper admitted that, of 11 total patients who became pregnant, four of those pregnancies ended as spontaneous abortions or "chemical"

pregnancies (likely based on chromosomal abnormalities), yet he continued to misleadingly emphasize nine pregnancies, rather than the seven ongoing pregnancies.  Dr. Oktay reported only 2 of 8 clinical pregnancies.

157.    On Saturday, March 28, 2015, the Company issued another press release highlighting the AUGMENT clinical results presented by Dr. Oktay at SRI's annual meeting, again showing that only 2 clinical pregnancies occurred in a total of 8 women who received the AUGMENT treatment.  The press release added that of the two clinical pregnancies, only one was an ***ongoing*** clinical pregnancy (*i.e.*, one of eight patients, 12.5%).

158.    Based on the clinical data revealed to the market on March 26-28, 2015, investors began to question AUGMENT's efficacy and commercial potential.  As a result, the Company's stock price dropped 23.33% over three consecutive trading days, from a close of $49.80 per share on Wednesday, March 25, 2015 to a close of $38.18 per share on Monday, March 30, 2015, on unusually high trading volume.  The stock continued to fall over the next two trading days (March 31-April 1, 2015) as the market digested the new information, its impact on AUGMENT's commercial viability, and its impact on the Company's financial position.

159.    The decline would have been more dramatic had Defendants disclosed the number of commercial cycles the Company had initiated by March 2015 or admitted that the Company was not on track to achieve 1,000 commercial cycles in 2015.  Instead, Defendants failed to disclose these facts and attempted to put a positive spin on the clinical results, while repeatedly assuring investors in the ensuing months that OvaScience was on track to reach 1,000 commercial cycles of AUGMENT in 2015.

### B.    April 6, 2015 Revelation

160.    The truth continued to emerge on April 6, 2015, when the Southern Investigative Reporting Foundation published an article titled, "Irreproducible Results, Inc.," which raised serious

doubts about the efficacy of AUGMENT and the quality and quantity of information released by the Company about AUGMENT.  The article cited data from the CDC showing that the AUGMENT clinical results presented by Dr. Casper in March 2015 that were no better than the IVF treatments without AUGMENT for patients in overlapping age groups.  The article further observed that Dr. Casper's AUGMENT results were not based on a formal study utilizing a control group (*i.e.*, a group of women who did not receive the AUGMENT treatment), and therefore "discerning whether these [AUGMENT] results are troubling or promising is unknowable. . . . The lack of data would be odd for most companies touting a revolutionary treatment for one of humanity's most vexing issues, but OvaScience is different:  Its website lacks presentations from analyst days or investor conferences, there are no speeches from its executives or scientists and, per above, there are no formal studies." The article also discussed "the controversial history of the science – and the scientists – behind [OvaScience]."

161.    The facts revealed in the article stoked additional market concerns about the efficacy and commercial potential of AUGMENT.  As a result, OvaScience's stock price dropped 4.56% in a single trading day, falling from a close of $35.06 per share on Thursday, April 2, 2015 to a close of $33.46 per share on Monday, April 6, 2015 (the next trading day after the market was closed on April 3, 2015 in observance of Good Friday), on unusually high trading volume.  The stock continued to fall for two trading days thereafter (April 7-8, 2015) as the market digested the new information, its impact on AUGMENT's commercial viability, and its impact on the Company's financial position.

162.    The decline would have been more dramatic had Defendants disclosed the number of commercial cycles that the Company had initiated by April 2015 or admitted that the Company was not on track to achieve 1,000 commercial AUGMENT cycles in 2015.  However, Defendants failed

to disclose those facts and, in the ensuing months, assured investors that the Company was on track to reach 1,000 commercial AUGMENT cycles in 2015.

### C.     September 28-29, 2015 Revelations

163.     The truth continued to emerge after the market closed on September 28, 2015, when the Company issued a press release titled, "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment."  In the press release, OvaScience explicitly revealed for the first time that it "does not expect to meet the 2015 goal of 1,000 AUGMENT$^{SM}$ treatment cycles," contrary to Defendants' assurances throughout the Class Period that such goal would be achieved.

164.     The following day, on September 29, 2015, the Company held a conference call to discuss the news revealed in the press release.  During the call, Defendant Dipp reiterated that the Company did not expect to achieve 1,000 commercial AUGMENT treatment cycles in 2015, and elaborated on the Company's progress toward that goal.  Defendant Dipp revealed that the Company had only undertaken a total of only 200 cycles (commercial or non-commercial) since the launch of AUGMENT and that only 35 of those cycles (approximately) were commercial cycles, the majority of which were still in process as of September 2015.  In other words, with only three months remaining in 2015, Defendants had reached only 3.5% of the 1,000 commercial cycle goal they misleadingly confirmed as late as August 2015.

165.     As a result of these revelations, OvaScience stock plummeted 40.98% in a single trading day, falling from a close of $14.52 per share on September 28, 2015 to a close of $8.57 per share on September 29, 2015, on unusually high trading volume.  The stock continued to fall the following trading day (September 30, 2015) as the market digested the new information, its impact on AUGMENT's commercial viability, and its impact on the Company's financial position.

166.     As a result of their purchases of OvaScience securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss, *i.e.*, damages, under the federal

securities laws.  By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of OvaScience's business and prospects.  Defendants' false and misleading statements had the intended effect and caused OvaScience securities to trade at artificially inflated levels throughout the Class Period.

167.     When the truth about the Company was disclosed to the market in a series of revelations during the Class Period, the price of OvaScience securities declined.  These declines removed the inflation from the price of OvaScience securities, causing real economic loss to investors who had purchased OvaScience securities during the Class Period.

168.     The declines in the price of OvaScience securities after the revelations came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in OvaScience securities negate any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

169.     The economic losses, *i.e.*, damages, suffered by Plaintiff and the other members of the Class were a direct result of Defendants' fraudulent scheme to artificially inflate the prices of OvaScience securities and the subsequent significant declines in the value of OvaScience securities when Defendants' prior misrepresentations and fraudulent conduct were revealed.

## IX.     PRESUMPTION OF RELIANCE

170.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact which Defendants had a duty to disclose.  Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding, *inter alia*, the true number of

AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT.

171.    Plaintiff also is entitled to a presumption of reliance under the fraud-on-the-market doctrine for Defendants' material misrepresentations because the market for OvaScience's publicly traded common stock was open, well-developed, and efficient at all times.  As a result of Defendants' materially false and misleading statements, OvaScience's publicly traded common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired OvaScience's publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to OvaScience, and have been damaged thereby.

172.    At all relevant times, the market for OvaScience securities was an efficient market for the following reasons, among others:

(a)    OvaScience's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, OvaScience regularly made public filings with the SEC, including its Forms 10-K, Forms 10-Q, and related press releases;

(c)    OvaScience regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d)    OvaScience was followed by several securities analysts employed by major brokerage firms, such as Oppenheimer, JMP Securities, Leerink, and Credit Suisse, among others,

who wrote research reports that were distributed to each brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

173.    As a result of the foregoing, the market for OvaScience's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of OvaScience's common stock.

174.    Under these circumstances, all purchasers of OvaScience's publicly traded common stock during the Class Period suffered similar injury through their purchase of such at artificially inflated prices.  As a result, a presumption of reliance applies.

175.    At the times they purchased or otherwise acquired OvaScience's publicly traded common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.  As a result, the presumption of reliance applies.

176.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    the misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's publicly traded common stock; and

(e)    Plaintiff and other members of the Class purchased the Company's securities between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that such facts were misrepresented.

## X.      NO SAFE HARBOR

177.    The federal statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pled in this Complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

178.    The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were substantially similar before, during, and after the Class Period, with boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless.  Indeed, the supposed risk warnings provided by Defendants during the Class Period included repetitious, boilerplate statements such as:

- Our short operating history may make it difficult for you to evaluate the success of our business to date and to assess our future viability.

- We have limited experience in marketing and selling our fertility treatments, and if we are unable to successfully commercialize our fertility treatments, our business and operating results will be adversely affected.

- Development of our fertility treatments may not be successful.  If we are unable to commercialize our fertility treatments or experience significant delays in doing so, our business will be materially harmed.

- We currently rely and will in the future rely on selected international IVF clinics to continue to commercialize, gain experience and generate data on the AUGMENT treatment and the OvaPrime treatment.  We will also rely on third parties to conduct any necessary clinical trials for other potential fertility treatments.  Such third parties may not perform satisfactorily, including failing to meet volume expectations, quality standards or deadlines for the completion of such studies or trials.

- 69 -

179.     The failure of these statements to inform the market of the true risks and actual operational experiences of the Company is evident from the market's reaction to the revelation of Defendants' prior untrue and/or misleading statements.

180.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, as detailed above in the Substantive Allegations, the particular speaker had actual knowledge that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of OvaScience who had actual knowledge that those statements were false or misleading when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

181.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rule of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of OvaScience between December 17, 2014 and September 28, 2015, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

182.     Because OvaScience has millions of shares of common stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous

that joinder of all members is impracticable.  According to OvaScience's most recent SEC filings, as of July 31, 2017, OvaScience had approximately 35,686,489 million shares of common stock outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

183.   Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

184.   Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

185.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

186.   Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)      whether Defendants violated the federal securities laws as alleged herein;

(b)      whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)      whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)      whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)      whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)      whether the market prices of OvaScience securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)      whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE COMPANY AND DEFENDANT DIPP

187.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Company and Defendant Dipp.

188.     During the Class Period, OvaScience and Defendant Dipp carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (a) deceive the investing public, Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of OvaScience publicly traded common stock; and (c) cause Plaintiff and other members of the Class to purchase OvaScience publicly traded common stock at artificially

inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, OvaScience and Defendant Dipp took the actions set forth herein.

189.    OvaScience and Defendant Dipp: (a) employed devices, schemes, and artifices to defraud; (a) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for the Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  OvaScience and Defendant Dipp are sued as primary participants in the wrongful and illegal conduct charged herein.  Defendant Dipp is also sued as a controlling person of OvaScience, as alleged below.

190.    In addition to the duties of full disclosure imposed on OvaScience and Defendant Dipp as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance so that the market price of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

191.    OvaScience and Defendant Dipp, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information regarding,

among other things, true number of AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT, as specified herein.

192.    OvaScience and Defendant Dipp employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of OvaScience's value, performance, financial growth, and commercial viability of their core treatment, which included, among other things, the making of, or the participation in the making of, untrue statements of material facts about the true number of AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT and omitting to state material facts necessary to make the statements not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of OvaScience common stock during the Class Period.

193.    Defendant Dipp's primary liability arises from the following facts, among others:  (a) Defendant Dipp was a high-level executive at the Company during the Class Period; (b) Defendant Dipp, by virtue of her responsibilities and activities as a senior executive officer, was privy to, and participated in, the creation, development, and reporting of the Company's sales, marketing, projections, and/or reports; (c) Defendant Dipp enjoyed significant personal contact and familiarity with, was advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the true number of AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT at all relevant times; and (d) Defendant Dipp was aware of the Company's

dissemination of information to the investing public which she knew or recklessly disregarded was materially false and misleading.

194.    OvaScience and Defendant Dipp had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. OvaScience and Defendant Dipp's material misrepresentations and/or omissions were made knowingly or with deliberate recklessness and for the purpose and effect of concealing adverse information regarding the Company from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendant Dipp's misstatements and omissions throughout the Class Period, Defendant Dipp, if she did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

195.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of OvaScience common stock was artificially inflated during the Class Period.   In ignorance of the fact that the market price of OvaScience publicly traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by OvaScience and Defendant Dipp, or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to, or disregarded with deliberate recklessness by, OvaScience and Defendant Dipp during the Class Period, Plaintiff and other members of the Class acquired OvaScience publicly traded common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines referenced above.

- 75 -

196.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true number of AUGMENT treatment cycles the Company had performed and the Company's success in globalizing and commercializing AUGMENT, which were not disclosed by OvaScience and Defendant Dipp, Plaintiff and other members of the Class would not have purchased or otherwise acquired their OvaScience publicly traded common stock during the Class Period; or, if they had purchased or otherwise acquired such during the Class Period, they would not have done so at the artificially inflated prices which they paid.

197.    By virtue of the foregoing, OvaScience and Defendant Dipp have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

198.    As a direct and proximate result of OvaScience and Defendant Dipp's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines discussed above, when the artificial inflation was removed from the price of OvaScience stock.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST DEFENDANT DIPP AND DEFENDANT YOUNG

199.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants Dipp and Young.

200.    Defendants Dipp and Young acted as controlling persons of OvaScience within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations and/or

- 76 -

intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, Defendants Dipp and Young had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Defendants Dipp and Young were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201.    In addition, Defendants Dipp and Young had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

202.    As set forth above, OvaScience and Defendant Dipp violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, Defendants Dipp and Young are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants Dipp and Young's wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines discussed above, when the artificial inflation was removed from the price of OvaScience stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.      Declaring that this action is a proper class action and certifying Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel for the proposed Class;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Such other and further relief as the Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  August 25, 2017                     ROBBINS GELLER RUDMAN
                                              & DOWD LLP

                                            *s/ Jack Reise*
                                            JACK REISE

                                            JACK REISE (*pro hac vice*)
                                            STEPHEN R. ASTLEY (*pro hac vice*)
                                            ELIZABETH A. SHONSON (*pro hac vice*)
                                            SABRINA E. TIRABASSI (*pro hac vice*)
                                            CONSTANTINE P. ECONOMIDES (*pro hac vice*)
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)
                                            jreise@rgrdlaw.com
                                            sastley@rgrdlaw.com
                                            eshonson@rgrdlaw.com
                                            stirabassi@rgrdlaw.com
                                            ceconomides@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
trigs@rgrdlaw.com

*Lead Counsel for Plaintiff*

LAW OFFICE OF ALAN L. KOVACS
ALAN L. KOVACS (BBO #278240)
257 Dedham Street
Newton, MA 02461
Telephone: 617/964-1177
617/332-1223 (fax)
alankovacs@yahoo.com

*Local Counsel for Plaintiff*

CRIDEN & LOVE, P.A.
MICHAEL E. CRIDEN
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: 305/357-9000
305/357-9050 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

    I, Jack Reise, hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing and papers

copies will be sent to those indicated as non-registered participants on August 25, 2017.

*s/ Jack Reise*

JACK REISE