UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FADI DAHHAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> OVASCIENCE, INC., et al, <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> *    Civil Action No. 1:17-cv-10511-IT |

MEMORANDUM & ORDER

May 28, 2021

TALWANI, D.J.

Lead Plaintiff Freedman Family Investments LLC's Second Amended Complaint [#72] added Longwood Fund, L.P., Longwood Fund GP, LLC, and Richard Aldrich as Defendants in this securities fraud class action. Lead Plaintiff contends that these three Defendants are derivatively liable under Section 20(a) of the Securities Exchange Act of 1934 for being controlling persons of Defendants OvaScience, Inc., and Michelle Dipp. The Motion to Strike the Second Amended Complaint [#93], filed by Defendants OvaScience, Inc., Michelle Dipp, and Jeffrey E. Young, and the Motion to Dismiss the Second Amended Complaint [#96], filed by Defendants Longwood Fund, L.P., and Longwood Fund GP, LLC, argue that the claim against the three new Defendants is untimely. The court concludes for the reasons set forth below that the pleadings and other allowable documents do not rebut Lead Plaintiff's claim that Lead Plaintiff discovered the facts constituting the alleged Section 20(a) violation less than two years prior to filing the Second Amended Complaint [#72]. Accordingly, the Motion to Strike [#93] and the Motion to Dismiss [#96] are DENIED.

I.   RELEVANT PROCEDURAL HISTORY

This action was initiated on March 24, 2017. Complaint [#1]. Over the course of the litigation, the court appointed Freedman Investments LLC ("Freedman Family") as Lead Plaintiff and granted class certification. Mem. & Order [#16]; Order on Class Certification [#99].

Freedman Family's First Amended Complaint [#27] alleged that Defendants OvaScience, Inc. ("OvaScience"), Michelle Dipp, and Jeffrey Young (collectively, the "Original Defendants") violated the Securities Exchange Act of 1934 (the "Exchange Act"). Count I alleged that OvaScience and Dipp artificially raised the market price of OvaScience's stock by disseminating false and misleading information and failing to disclose material facts, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Count II alleged that Dipp and Young were derivatively liable under Section 20(a) of the Exchange Act as they were "controlling persons" of OvaScience during the relevant period. The Original Defendants moved to dismiss both claims, see Defs.' Mot. [#30], and the court denied the motion. See Mem. & Order [#44].

Under the court's Scheduling Order [#49], "deadlines to file motions seeking leave to add new parties or to amend the pleadings to assert new claims or defenses will be controlled by Fed. R. Civ. P. 15." In December 2019, while discovery was ongoing, Lead Plaintiff notified the court that information obtained through discovery sometime between March and November 2019 raised the prospect of Section 20(a) liability for Longwood Fund, L.P., and its general partner, Longwood Fund GP, LLC (collectively, the "Longwood Fund") and its founding member, Richard Aldrich (together, the "New Defendants"). See Pl.'s Emerg. Mot. [#69]. Because the five-year repose period for the claim would run later that month, Lead Plaintiff requested that the court adjudicate a forthcoming motion seeking leave to amend on an expedited basis. The court

proposed, and the parties agreed, that Lead Plaintiff instead would file its Second Amended Complaint prior to the statute of repose running but that the complaint would remain subject to a motion to strike on the ground that it did not satisfy the Rule 15 standard for amending a complaint. See Elec. Clerk's Notes [#71]. Lead Plaintiff then filed the Second Amended Complaint [#72], restating the first two Counts and adding Count III against the New Defendants, on December 10, 2019.

Two weeks later, the Lead Plaintiff and the Original Defendants submitted a joint request to stay proceedings so that they may engage in mediation. See Jt. Mot. [#73]. On the parties' subsequent request, the court lifted the stay and set a briefing schedule for the Original Defendants' anticipated motion to strike. Joint Status Report [#79]; Elec. Order [#80]. The Original Defendants then filed the Motion to Strike the Second Amended Complaint [#93] and the Longwood Fund filed the Motion to Dismiss the Second Amended Complaint [#96].[1]

The parties subsequently requested a further stay for mediation, and the case remains stayed for mediation except as to the pending motions. See Jt. Status Report [#121]; Jt. Status Report [#128].

The pending motions contend that Count III is untimely as pled and thus subject to dismissal on the pleadings. As set forth below, the court concludes that the new Section 20(a) claim is timely as pled.

---

[1] In addition, Defendant Aldrich filed a Motion for Joinder [#108], requesting to join in the arguments made by the Longwood Entities and the Original Defendants as they apply equally to him. The court recently allowed Aldrich to join the other Defendants' motions. See Elec. Order [#129].

## II.   RELEVANT FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT

Counts I & II of the Second Amended Complaint [#72] incorporate, without substantive revision, Counts I & II from the First Amended Complaint [#27]. The court has previously summarized the allegations set forth in the First Amended Complaint as follows:

> OvaScience is a fertility company launched in 2011. Am. Compl. ¶ 2 [#27]. It has developed to the point of commercialization only one potential treatment. Id. That treatment, known as AUGMENT, involves "harvesting mitochondria from [a woman's immature egg cells (also called "egg precursor cells" or "EggPC cells")] and injecting them into her egg at the time of [in vitro fertilization ("IVF")] in order to supplement the energy level in the egg and to address problems caused in the development of newly formed embryos by inadequate energy in the cell division process." Id.
>
> OvaScience first sought to launch AUGMENT in the United States. Id. ¶ 3. When it began its U.S.-based study in February 2013, OvaScience stated that it would commercialize the treatment only if it showed "positive efficacy and safety." Id. ¶¶ 3, 35–36.
>
> OvaScience subsequently received a letter from the Food and Drug Administration ("FDA") advising OvaScience to file an investigational new drug application for AUGMENT. Id. ¶ 37. "Instead of facing that [review and approval process] and pursuing clinical data evidencing AUGMENT's efficacy," OvaScience "discontinued its U.S.-based clinical study and transferred its study overseas." Id. ¶ 38. It developed a plan that involved partnering with IVF clinics in other international regions, first providing free treatment cycles, and then turning them into commercial centers for the treatment. Id. ¶ 39. In January 2014, OvaScience stated that it would introduce these programs "for physicians to gain experience using AUGMENT and to generate data." Id. ¶ 39. OvaScience announced a plan to initiate 40 to 60 AUGMENT cycles in 2014, that these initial cycles would be free, but with the goal of ultimately charging for AUGMENT by the end of 2014. Id. ¶ 41.
>
> At its first Investor Day on December 17, 2014, Defendants announced that AUGMENT had performed 150 cycles by the end of 2014 and had "transitioned some of its IVF clinics to commercial centers." Id. ¶ 14. Treatment added $15,000 to $25,000 to the cost of each IVF cycle, and involved an invasive procedure, id. ¶ 58, but Defendants nonetheless stated that they expected 1,000 paying patients in 2015. Id. ¶¶ 45-47. In response to this news, OvaScience stock increased from a closing price of $29.38 on December 16, 2014, to $47.85 on December 19, 2014, a 62.87% increase in value. Id. ¶ 48.

4

> OvaScience completed a secondary public offering of the company's stock on January 13, 2015. Id. ¶¶ 6, 77. Through the offering, OvaScience sold 2,645,000 shares of common stock at $50.00 per share, raising $132.25 million. Id. ¶ 77.
>
> On March 17, 2015, Defendants released abstracts containing the first AUGMENT clinical data. Id. ¶ 50. The fact that Defendants had released some data was encouraging to investors, who had not expected metrics at that time. Id. ¶ 51. OvaScience's stock price on March 25, 2015, closed at $49.80. Id. ¶ 53.
>
> Defendants then issued two additional press releases on March 26 and March 28, and held a public conference call on March 27 regarding the actual data. Id. ¶¶ 50, 117. The results revealed data for only 34 patients from two clinics, even though OvaScience had offered free AUGMENT cycles to 150 patients at that point. Id. ¶ 51. While Defendants highlighted a purported pregnancy success rate of 53% for the Canadian patients, that rate was based on a subset of women who had developed viable embryos for transfers, and did not include those who did not develop any viable embryos. Id. ¶ 52. The real pregnancy success rate was approximately 27% of the Canadian patients, and 23.5% for all 34 patients (including the non-Canadian patients). Id. ¶¶ 52, 117. By contrast, the success rate of IVF without AUGMENT for a similar patient population is 33%. Id. ¶¶ 55–56. OvaScience's stock price dropped to $38.18 by March 30, 2015. Id. ¶ 120.
>
> Through August, Defendants continued to reassure the market that OvaScience was on track to sell 1,000 cycles in 2015. Id. ¶¶ 58–59. But between January and August, 2015, Defendants sold, at most, 17 AUGMENT cycles. Id. ¶ 66.
>
> On September 29, 2015, Defendants revealed that OvaScience had only had approximately 35 commercial patients in 2015, and that the majority of those treatments occurred in September 2015. Id. ¶¶ 62, 66. OvaScience's stock price dropped by 40.98% on the day of the announcement, and fell further the following trading day. Id. ¶ 63.

Order Class Certification 2–4 [#99]; Mem. & Order 2–4 [#44].

Count III in the Second Amended Complaint asserts derivative liability against the New Defendants under Section 20(a) of the Exchange Act. Namely, Lead Plaintiff alleges that Longwood Fund and Aldrich exercised control over Dipp and OvaScience, and that they exerted this control to make material misrepresentations and omissions to investors in order to inflate the market price of OvaScience stock. Second Am. Compl. ¶¶ 82–124 [#72].

Specifically, the Second Amended Complaint alleges that, in 2010, Aldrich, together with Dipp and Cristoph Westphal, co-founded the Longwood Fund and operated the Longwood Fund

5

as its members. Id. ¶ 22. The investing strategy for the Longwood Fund was to create and invest in science-based companies that develop novel solutions for important medical problems. Id. ¶ 82. However, the Longwood Fund was not merely a passive investor in these companies; instead, the Longwood Fund would take an active management role in the companies it invested in. Id. ¶¶ 82–83.

One of the companies that the Longwood Fund founded and managed was OvaScience. The Longwood Fund cofounded OvaScience in April 2011 along with Dipp, Aldrich, Westphal, and two others. Id. ¶ 85. The Longwood Fund installed its own members as OvaScience's leadership team, including placing Dipp in the role of the OvaScience's CEO and Aldrich in the role of Board Chairman. Id. ¶ 86. Because of their dual roles as members of OvaScience's leadership and members of the Longwood Fund, Dipp, Alrich and the Longwood Fund owned a majority of OvaScience's shares and maintained control of a majority of its board seats. Id. ¶¶ 88–89.

Lead Plainiff alleges that the Longwood Fund, Aldrich, and Dipp exercised day-to-day control over the direction of OvaScience. Specifically, the Longwood Fund, Aldrich, and Dipp made all hiring decisions related to OvaScience's key executives and Dipp and Aldrich held one-on-one weekly meetings to talk through everything from hiring teams, setting goals, and other issues regarding the direction of OvaScience. Id. ¶ 90 n.17; ¶ 91. As a result of these consultations, Aldrich would be able to comment on and approve communications from management before they were sent to the OvaScience board so that the board members who were not associated with the Longwood Fund would not have access to the relevant information about OvaScience. Id. ¶ 90 n.17.

6

Dipp did not separate her roles or duties as CEO of OvaScience and as a founding member of the Longwood Fund. For example, for the first two years while she was with OvaScience, Dipp did not receive cash compensation from OvaScience; instead her cash compensation came from the Longwood Fund. Id. ¶ 92. Dipp and Aldrich would also conduct OvaScience business using Longwood Fund email addresses and would intermingle OvaScience business decisions with Longwood Fund business decisions. Id.

Based on these allegations, Lead Plaintiff asserts that the New Defendants and Dipp controlled OvaScience at every level, including OvaScience's day-to-day functions. Relevant here, Lead Plaintiff alleges that the influence of the New Defendants' control extended to deciding the final content of SEC filings, press releases, and conference calls that communicated material information about AUGMENT and OvaScience to investors. Id. ¶¶ 93, 94–124.

### III. RELEVANT LEGAL STANDARD

Under Fed. R. Civ. P. 15(a)(2), leave to amend shall be "freely given when justice so requires." Foman v. Davis, 371 U.S. 178, 182 (1962) (citing Fed. R. Civ. P. 15(a)(2)). While Rule 15 presents a liberal standard, it is bounded in two important ways. First, leave to amend should not be granted where there has been "undue delay, bad faith or dilatory motive on the part of the movant." Id. Second, leave to amend is not warranted where it would be futile, which is to say where the amended complaint "would fail to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Crowl v. M. Chin Realty Trust, 607 F. Supp. 2d 245, 246 (D. Mass. 2009) (citing Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001)). Here, neither the Original Defendants nor the New Defendants argue undue delay, bad faith, or dilatory motive. They argue instead that the Section 20(a) claim brought against the New Defendants is futile as barred by the statute of limitations.

Where, as here, a defendant asserts an affirmative defense as a basis for dismissal on a Rule 12(b)(6) motion, "the facts establishing that defense must: (1) be 'definitively ascertainable from the complaint and other allowable sources of information,' and (2) 'suffice to establish the affirmative defense with certitude.'" Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008) (quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)).

IV. DISCUSSION

28 U.S.C. § 1658(b) provides that the Section 20(a) claim "may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." Defendants argue that the Section 20(a) claim against Longwood Fund and Aldrich is untimely based on the pleadings because Lead Plaintiff alleged in the First Amended Complaint that OvaScience "'revealed the truth' about AUGMENT on September 28, 2015," and that Lead Plaintiff had therefore "either discovered or should have discovered the facts supporting the alleged Exchange Act violations on September 28, 2015, at the latest." Defs.' Mot. Strike 3 [#94]. Furthermore, Defendants argue that the relationship between the New Defendants and OvaScience was publicly available and discoverable by the time OvaScience "revealed the truth" in 2015. Id. at 6. Thus, Defendants argue, not only did the limitations period for the underlying claims against OvaScience lapse by two years after the September 28, 2015 reveal, but so did any claim against the New Defendants as "controlling persons" of OvaScience. Id. at 3; see also Defs.' Mot. Dismiss 1 [#97] (making the same argument as to when the two-year period commenced).

As set forth more fully below, Defendants' argument makes two mistakes of law. First, Defendants mistakenly apply an "inquiry notice" standard for the point when the two-year limitations period began to run on the underlying Exchange Act claim against OvaScience.

8

Second, Defendants improperly assume that, because Lead Plaintiff had discovered (or should have discovered) that the New Defendants had an *ability to control* OvaScience as early as 2015, that therefore Lead Plaintiff had discovered (or should have discovered) that the New Defendants *actually controlled* OvaScience by that same time. Once these mistaken premises are put to the side, there is no basis for the court to conclude, on the pleadings and other allowable documents, that the Second Amended Complaint is untimely.[2]

First, Defendants are mistaken in their assertion that September 28, 2015, marks the point when the two-year limitations period began to run on the underlying claim against OvaScience. As alleged in the First Amended Complaint, on September 28, 2015, OvaScience first disclosed that it did not expect to meet its goal of 1,000 AUGMENT treatment cycles in 2015. See First Am. Compl. ¶ 129. At best, this disclosure may have marked the point of "inquiry notice" as to OvaScience, that is, the point when the facts discovered would lead a reasonably diligent plaintiff to investigate OvaScience further. However, as the Supreme Court explained in Merck & Co. v. Reynolds, 559 U.S. 633 (2010), the point of "inquiry notice" does not start the two-year clock. Instead, because the plain text of the statute provides that the two-year period does not run until "'discovery of the *facts constituting the violation*,'" id. at 648 (quoting 28 U.S.C. § 1658(b)(1)), the Court held that the two-year clock does not begin at the point when the plaintiff started (or should have started) to look for facts constituting the violation, but when the plaintiff actually discovered (or should have discovered) the facts constituting the violation.

---

[2] Defendants also argue that the otherwise untimely Section 20(a) claim cannot be saved by relating the amendment back to the date of filing of the original complaint under Fed. R. Civ. P. 15(c)(1). Because the court finds the Second Amended Complaint survives the pending motions without reference to the relation-back provision, the court does not reach this argument.

For example, in Merck, the Supreme Court rejected Merck's argument that the two-year period started at the point when the FDA released a warning letter stating that Merck had "minimized" a study's findings that Merck's drug caused potentially serious cardiovascular problems. As the Court explained, "the FDA's warning letter . . . shows little or nothing about the here-relevant scienter, *i.e.*, whether Merck advanced [their erroneous explanation for the cardiovascular problems] with fraudulent intent." Id. at 653–54. Because the fact that a statement was misleading or false does not "automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error," the Court reasoned that scienter had not yet been discovered at the time the FDA letter was released. Thus, while the FDA's letter may have provided a plaintiff with reason to investigate Merck further (that is, "inquiry notice"), it did not start the two-year statute of limitations. Id. at 650. In its decision, the Court recognized that requiring the discovery of *facts* constituting the offense could possibly "give life to stale claims or subject defendants to liability for acts taken long ago" but that the statute's unqualified five-year repose period would ameliorate any such concerns. Id. at 650.

Here, just as the FDA Letter in Merck did not automatically speak to whether Merck deliberately lied to or misled investors, OvaScience's 2015 revelation that it did not expect to meet its goal of 1,000 AUGMENT treatment cycles did not, by itself, imply that OvaScience's earlier statements were false or misleading. Indeed, when Defendants moved to dismiss the First Amended Complaint on the basis that the complaint failed to adequately plead scienter, the court found that scienter had been adequately pleaded but relied heavily on information not disclosed until 2017. See Mem. & Order 12 [#44] (pointing to the 2017 discontinuance of AUGMENT as critical for inferring scienter from OvaScience's earlier statements). Accordingly, Defendants'

10

argument that, based upon the pleadings, the 2015 disclosure started the two-year limitations period for the underlying Section 10(b) violation is contrary to law.³

Defendants' second mistake compounds the error. Defendants argue that not only did Lead Plaintiff discover (or should have discovered) the facts constituting the underlying claim against OvaScience no later than 2015 (as discussed above, that is incorrect), but that Lead Plaintiff had or should have discovered *by that same time* that the New Defendants were "controlling persons" of OvaScience. Specifically, Defendants point to two documents Lead Plaintiff cites in the First Amended Complaint. These are: (1) a 2012 SEC Form 10 disclosing that, in 2012, Dipp, Aldrich, and Westphal held key roles in both the Longwood Fund and OvaScience and also disclosing the number of OvaScience shares held by the Longwood Fund and its members; and (2) a 2015 article published by the Southern Investigative Reporting Foundation ("SIRF") reporting on the Longwood Fund's connections with OvaScience and noting, inter alia, that Dipp and the Longwood Fund had previously been "under the spotlight for launching companies whose heavily touted prospects have been called into question."

As discussed above, under Merck, Lead Plaintiff's two-year statute of limitations to bring a derivative Section 20(a) claim against the New Defendants did not begin to run until Lead Plaintiff had discovered (or should have discovered) the facts constituting the Section 20(a) violation. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable

---

³ For the purposes of the analysis contained herein, the court considers that a plaintiff has "discovered" the facts constituting the offense when he has uncovered sufficient facts to bring a complaint that would not be subject to dismissal on a Rule 12(b)(6) motion and would comply with his obligations under Rule 11. See City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011) ("the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss").

11

> jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2000). In the First Circuit, to be considered a "controlling person" for the purposes of Section 20(a), the alleged controlling person must not only have the general power to control the company but must also actually exercise control over the company. Aldrige v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1270 (1st Cir.1991)). In Aldridge, for example, the Circuit found that the "actual control" element was not satisfied where the defendant was a controlling shareholder with the power to elect two-thirds of the company's directors. Id. As the Circuit explained, "[u]nless there are facts that indicate that the controlling shareholders were actively participating in the decisionmaking processes of the corporation, no controlling person liability can be imposed." Id. at 84 (citing 15 U.S.C. § 78t(a) (2000)).

Since Aldridge, courts in this district have consistently required Section 20(a) claims to include allegations of "actual control" in the pleadings. See, e.g., In re Credit Suisse-AOL Sec. Litig., 465 F. Supp. 2d 34, 59 (D. Mass. 2006) (holding that "control-person relationship" requires, inter alia, allegations that "the alleged control person actually exercised control over the general operations of the primary violator") (quoting In re Centennial Tech. Litig., 52 F.Supp.2d 178, 186 (D. Mass. 1999)). For example, in Sanders v. AVEO Pharm., Inc., the court found allegations that a defendant had co-founded a company, had previously served on the company's scientific advisory board, and had remained a director and major shareholder to be insufficient since these factual allegations did not support an inference that the defendant had "actual control" of the company's decisionmaking process. No. 13-cv-11157-DJC, 2015 WL 1276824, at *11 (D. Mass. Mar. 20, 2015).

Here, while the 2012 SEC Form 10 and the 2015 SIRF article would have certainly provided Lead Plaintiff with notice that it should investigate the Longwood Fund's involvement with OvaScience, the documents do not constitute the facts of a Section 20(a) violation as there is no evidence in either document that the Longwood Defendants *actually controlled* OvaScience's operations.[4] Indeed, based upon the allegations in the pleadings (and the documents referenced therein), the facts known to Lead Plaintiff about the New Defendants' involvement at the time the First Amended Complaint was filed parallel the type of facts alleged in Aldridge and Sanders; that is, while Lead Plaintiff had discovered evidence suggesting a close relationship, what had been discovered did not imply a hierarchical relationship with the New Defendants at the top. The allegations in the Second Amended Complaint are categorically different as they suggest (at least according to the Complaint) that the Longwood Defendants were running the show. And because evidence of "actual control" constitutes a necessary element of the violation, the court cannot conclude, based on the pleadings and other allowable documents, that the Section 20(a) claim against the New Defendants is untimely as a matter of law.[5]

---

[4] The Original Defendants also point to allegations made by a different set of plaintiffs in another class action complaint filed in this court. See Complaint in Westmoreland Cty. Emp. Ret. Sys. v. OvaScience, Inc., et al., No. 17-cv-12312-IT, ECF No. 1 (Nov. 22, 2017). That complaint alleged that Aldrich was a controlling person of OvaScience, id. ¶ 172, and alleged that Longwood "profited handsomely" by selling its OvaScience shares prior to public disclosures that brought down the price of OvaScience stock, id. ¶¶ 118–21. However, as the Supreme Court explained in Merck, unless the pleadings in the separate action "contained any specific information" directed to the elements of the claim as opposed to "complaints alleged only in general terms," then they are not the facts constituting the violation. 559 U.S. at 654. Here, none of the allegations in the Westmoreland complaint contain specific information that go towards the New Defendants' "actual control" of OvaScience.

[5] The court notes that the standard for establishing Section 20(a) liability in this circuit is not yet settled. As the First Circuit noted in Aldridge, there is a split among the circuits as to whether an element of Section 20(a) liability is the defendant's "culpable participation" in the fraud; the First Circuit explicitly declined to reach the question and has still not reached it in the nearly

13

V.     CONCLUSION

For the reasons set forth above, OvaScience, Inc., Michelle Dipp, and Jeffrey Young's Motion to Strike the Second Amended Complaint [#93] and Longwood Fund, L.P. and Longwood Fund GP, LLC's, Motion to Dismiss the Second Amended Complaint [#96] are DENIED.

IT IS SO ORDERED.

Date: May 28, 2021                                                    /s/ Indira Talwani
                                                                      United States District Judge

---

twenty years since. See 284 F.3d at 84–85; see also Frank Kaplan, Control Person Liability—Is Pleading and Proof of "Culpable Participation" Required and What Does That Requirement Mean, 135 Banking L.J. 398 (2018) (collecting and analyzing cases across the circuits). In the meantime, some judges in this district have evaluated Rule 12(b)(6) motions directed towards Section 20(a) claims under the more stringent standard. See Akamai Techs., Inc. v. Deutsche Bank AG, 764 F. Supp. 2d 263, 266 (D. Mass. 2011); Special Situations Fund III, L.P. v. Am. Dental Partners, Inc., 775 F. Supp. 2d 227, 246 (D. Mass. 2011). Here, even assuming, for the purposes of argument, that the 2012 SEC Form 10 or the 2015 SIRF article could support an inference of actual control, it is not clear that they support an inference of culpable participation in the fraud.

14