# EXHIBIT 1

Dipp, Michelle - Vol. I.txt

0001

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )
) File No. HO-12935-A
OVASCIENCE, INC. )

WITNESS: Michelle A. Dipp
PAGES: 1 through 263
PLACE: Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
DATE: Tuesday, March 25, 2019

The above-entitled matter came on for hearing, pursuant to notice, at 9:27 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

0002

APPEARANCES

On behalf of the Securities and Exchange Commission:
HELAINE SCHWARTZ, ESQ.
LISA DEITCH, ESQ.
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

On behalf of the Witness:
JOHN F. SYLVIA, ESQ.
JULIANNA I. HANLON, ESQ.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

ALLAN J. ARFFA, ESQ.
WALTER G. RICCIARDI, ESQ.
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Page 1

Dipp, Michelle - Vol. I.txt

(212) 373-3203 - Arffa
(212) 373-3350 - Ricciardi
aarffa@paulweiss.com
wricciardi@paulweiss.com

0003

C O N T E N T S

| WITNESS | EXAMINATION |
|---|---|
| Michelle A. Dipp | 5 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 153 | 11/6/18 Subpoena | 7 |
| 154 | 7/7/17 Subpoena | 8 |
| 155 | Background Questionnaire | 9 |
| 156 | 2014 10-K | 43 |
| 157 | FDA Untitled Letter | 72 |
| 158 | Letter to Drs. Mezer, Baltocky, and Oktay from Dipp | 98 |
| 159 | Series of Email | 105 |
| 160 | Series of Email | 107 |
| 161 | Letters and Articles | 111 |
| 162 | Series of Email | 115 |
| 163 | 6/6/16 Email | 121 |
| 164 | 11/26/14 Press Release | 147 |
| 165 | 12/17/14 Press Release | 155 |
| 166 | Series of emails from Fishel | 160 |
| 167 | 12/22/14 Email from Fishel to Jones | 169 |
| 168 | 1/30/15 Email from Fishel | 171 |
| 169 | 3/9/15 Email to Dipp | 177 |
| 170 | Email from McNeely to Dipp | 183 |

0004

C O N T E N T S (Continued)

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 171 | 10/5/15 Email from Fishel to Dipp | 187 |
| 172 | 3/8/16 Series of Email | 191 |
| 173 | 12/16/14 Letter from Dipp to Morimoto | 228 |
| 174 | 3/9/15 Email to Dipp | 232 |

Page 2

Dipp, Michelle - Vol. I.txt

0005

P R O C E E D I N G S

MS. SCHWARTZ: Let's go on the record. It is March 26, 2019. We are at the home office of the Securities and Exchange Commission, and it is 9:25.

Dr. Dipp, please raise your right hand. Do you swear to tell the truth, the whole truth and nothing but the truth?

MS. DIPP: I do.

Whereupon,

MICHELLE A. DIPP

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. SCHWARTZ:

Q Please state your full name and spell your name for the record.

A Michelle Alexis Dipp. M-I-C-H-E-L-L-E A-L-E-X-I-S D-I-P-P.

Q Are you known by any other names?

A No.

Q Okay. I am Helene Schwartz. And with me is Lisa Deitch. We are officers of the Commission for the purposes of this proceeding. This is an investigation by the U.S. Securities and Exchange Commission in the matter of OvaScience, file number HO-12935, to determine whether there

0006

have been violations of certain provisions of the federal securities laws. However, the facts developed in this investigation might constitute violations of other federal or state or civil or criminal laws.

Prior to the opening of the record, you were provided with a copy of the formal order of investigation. And this document will be available for your examination during the course of this proceeding.

Dr. Dipp, have you had an opportunity to review the formal order?

A Yes.

Q Prior to the opening of the record, you were provided with a copy of the Commission's supplemental

Page 3

Dipp, Michelle - Vol. I.txt

information form. A copy of that notice has been marked as Exhibit Number 1. Dr. Dipp, have you had an opportunity to read Exhibit Number 1?

A Yes.

Q Do you have any questions concerning this notice?

A No.

Q Are you represented by counsel?

A Yes.

MS. SCHWARTZ: Okay. Would each counsel please identify himself or herself with the name, the firm name, the address, and your phone number?

MS. DEITCH: And whether you are representing Ms.

0007

Dipp, Dr. Dipp, and in what capacity.

MR. SYLVIA: So John F. Sylvia of the firm Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, One Financial Center, Boston, Massachusetts, (617) 542-6000. And I am joined by my colleague Julianna Hanlon at the same address. And I am representing Dr. Dipp in her personal capacity.

MR. ARFFA: I am Allan Arffa, A-R-F-F-A, from Paul, Weiss, Rifkind, Wharton and Garrison, LLP. We are at 1285 Avenue of the Americas, New York, New York 10019-6064. The number there is (212) 373-3000. And we are also here representing the witness.

MR. RICCIARDI: Allan's partner, Walter Ricciardi, also at the same address and phone number. And we are also representing Dr. Dipp.

MS. SCHWARTZ: Are you representing -- Mr. Ricciardi, are you representing Dr. Dipp in her personal capacity?

MR. RICCIARDI: Yes.

MS. SCHWARTZ: And, Mr. Arffa, same question.

MR. ARFFA: Same thing, yes, that is true.

MS. SCHWARTZ: Okay.

(SEC Exhibit No. 153 was marked for identification.)

BY MS. SCHWARTZ:

Q I had marked as Exhibit 153 a subpoena dated

0008

November 6, 2018. I am going to show that to the witness now.

A Thank you.

Q Have you seen a copy of Exhibit -- have you seen Exhibit 153 before?

A (Examining.) Yes.

Q And is this the subpoena that is calling for your appearance here today?

A Yes.

Page 4

Confidential OVAS_1211391

Dipp, Michelle - Vol. I.txt

(SEC Exhibit No. 154 was marked for identification.)

BY MS. SCHWARTZ:

Q I am going to show you what I had marked as Exhibit 154. This is a subpoena dated July 7, 2017 to you. If you could take a look at Exhibit 154?

A (Examining.) Yes.

Q And this subpoena calls for documents, correct?

A Yes.

Q And have you produced all document called for by Exhibit 154?

A Yes. Either I have provided them or I have asked counsel to provide them on my behalf.

Q Before we go any further, I would like to go over a few ground rules. To create a clear record, it is important that we speak clearly and that only one of us speaks at a time. Also, the court reporter cannot record a nod or a shake of your head. So you have to answer verbally. And, finally, the SEC controls the record. So if you want to go off the record, you need to ask me or Ms. Deitch. Do you understand these ground rules?

A Yes.

Q And whenever we go off the record, all conversations which occur off the record will be summarized by the staff when the record is reopened. At that time, the staff will request counsel to confirm the accuracy of the staff's summary. Okay?

A Okay.

Q Dr. Dipp, is there any reason you cannot testify accurately and truthfully today?

A No.

Q Did you take any medications or substances that might impair your ability to testify?

A No.

Q I am going to have marked as Exhibit 155 a background questionnaire.

(SEC Exhibit No. 155 was marked for identification.)

BY MS. SCHWARTZ:

Q And here is that.

A Do you want these back or do I keep these?

MR. SYLVIA: You can just keep them in front of you.

THE WITNESS: Oh, okay.

MS. SCHWARTZ: Yes. Here you go. Here is Exhibit 155.

Page 5

Dipp, Michelle - Vol. I.txt

THE WITNESS: Thank you.

MS. SCHWARTZ: And here's some copies of 155. I don't know how many I have. I don't have many to share.

THE WITNESS: We can share.

MR. SYLVIA: That is okay.

MS. SCHWARTZ: I mean, you know what? It is really warm in here. So make yourselves comfortable.

MR. SYLVIA: I think part of it is this is blowing.

MS. SCHWARTZ: Yes. I know. Lisa has already mentioned that.

MR. SYLVIA: Can we turn it off and then turn it on when you need it or is that not -- because I think that is --

MS. SCHWARTZ: Let's go off the record for a minute.

(A brief recess was taken.)

MS. SCHWARTZ: We went off the record for just a moment to discuss making it a little cooler in here, in the room here. And there were no conversations that related to the investigation. Is that correct?

MR. SYLVIA: That is correct.

BY MS. SCHWARTZ:

Q So we are going to talk about this questionnaire, which has been marked as Exhibit 155. And before the record, you mentioned that there may be some corrections that you would like to make to Exhibit 155. Why don't you tell me what those are before I start my questioning on this?

A Yes. There are three corrections that we would like to make. One relates to the dates --

Q Sure.

A -- of when I served as CEO and when I served as a board member, and one relates to just changing the word "founder" to "cofounder."

Q So why don't you tell me which question it is, and then I will --

A Yes, that is an excellent point.

Q Okay.

A I know it's my employment history. Oh, here it is. So it's Question 35, "State your employment activities." And below "General Atlantic," it's "OvaScience," and "Founder and CEO." It's the wrong year. So it should be April of 2011.

MR. SYLVIA: Right.

MS. SCHWARTZ: Okay.

THE WITNESS: And I believe the July of 2016 is correct, but the -- my time as executive chair ended in September of 2017, and there is one -- and so that's everything for the dates.

Page 6

Dipp, Michelle - Vol. I.txt

MS. SCHWARTZ: Okay.

THE WITNESS: And then -- let me see. I think -- oh, here it is. I beg your pardon. Same question, Number 35, under "Title," it should be "Cofounder and CEO," not "Founder."

MS. SCHWARTZ: Okay.

BY MS. SCHWARTZ:

Q Anything else?

A No. That is everything.

Q How was Exhibit 155 prepared?

A This was prepared with help from counsel as well as my financial adviser.

Q And did you prepare it?

A I reviewed it, but I did not type it or -- but I was involved in providing the information.

Q And is the information accurate and truthful?

A Yes. With those corrections to the dates, yes.

Q So currently, you are a managing director at General Atlantic?

A Yes.

Q Could you tell me what you do there?

A Yes. I invest in science companies, so I basically look at science that comes out of academic centers, universities, and then also companies and decide whether or not there's an interesting use of the science, typically for the sake of patients, so in a clinical aspect. And then we decide whether or not we should fund that scientific research.

Q And who is "we"?

A Oh, sorry. We, the firm, we, General Atlantic.

Q So do you have a certain amount of money that you manage or you just look at opportunities?

A No, no. It's, you know, one fund, but I don't specifically manage a specific part of the fund.

Q Are you registered as an investment adviser or an associated --

A No.

Q -- person?

A No.

MR. SYLVIA: Let her finish her question.

THE WITNESS: Okay.

BY MS. SCHWARTZ:

Q So do you ever deal with public companies?

A No. We invest in private companies. However, sometimes those private companies do go public. So in that capacity, we could have some dealings with them.

Q And I know it is in here, but remind me, when did

Page 7

Dipp, Michelle - Vol. I.txt

you go over to General Atlantic?

A About a year and a half ago. It was October of 2017.

Q And since that time, have any of the companies that you advise gone public?

A No.

Q Are you working now with any company that you know wants to go public?

A No, not currently.

Q But that possibility exists in what you do at General Atlantic, correct?

A Yes.

Q Okay.

BY MS. DEITCH:

Q Do you currently have any involvement with any public companies?

A No.

BY MS. SCHWARTZ:

Q What is Longwood?

A Longwood is a healthcare venture capital firm.

Q And tell me about your participation or involvement in Longwood.

A Sure. So we started Longwood. I started it with two other partners back in 2010. And, again, it was to invest in science. It was backed initially by GlaxoSmithKline, the U.K. pharmaceutical company, and I was one of the partners or investors at Longwood.

Q And who were the other two folks?

A Rich Aldrich and Christoph Westphal.

Q And so what were your duties at Longwood and vis-a-vis the other gentlemen who you were working with there?

A Sure. I mean, all three of us effectively performed the same role. We spent a lot of time at academic institutions. Because we were based in Boston, we would spend a lot of time at the universities there, so typically Harvard or Boston University or MIT, looking at some of the new technologies coming out of the labs. And then we would either start companies based around that science or we would invest in companies that already existed, again that were science-based companies. And typically, again, these are companies which are either trying to treat a disease in patients or help patients in some way.

Q And you left Longwood in September 2017?

A Yeah. I left Longwood in August, so -- of 2017.

Q And why did you leave?

A So I was being approached by some of the larger

Page 8

Confidential OVAS_1211392

firms who are global and who do different types of deals where they intersect with IT and life sciences, and I'm very interested in the use of software, machine learning and AI, or artificial --

MR. SYLVIA: Intelligence.

THE WITNESS: Intelligence. Thank you. For -- you know, for drug discovery, and that's something that General Atlantic and some other firms have some experience in. So I got approached by a handful of firms. I talked to my then partners about it and decided to interview at some of the other firms.

BY MS. SCHWARTZ:

Q And which other firms were those?

A That -- with whom I spoke aside from General Atlantic?

Q Correct.

A A16z.

Q A, the number 16, and then the letter z?

A Yes.

Q Any others?

A Yes, Blackstone.

Q Any others?

A No.

Q And then you also spoke to General Atlantic at that time?

A Yes.

Q And you decided to go with them?

A Yes.

Q Tell me about Longwood's investment in OvaScience.

A Sure.

Q What were the circumstances leading up to that?

A Yes. So it started out with us looking at the science at Harvard. It came out of the lab of a professor by the name of Jonathan Tilly. And we followed that science for quite some time until there was a publication in a scientific journal called Nature. And at that point in time, they were describing that there were these immature egg cells not only found in mice and rats, but then also they had found them in human ovaries. And so at that point in time, we felt that the science was advanced enough to invest in it and to start a company around it, and so we did. And we invested in it alongside one other firm, a Boston-based firm by the name of Bessemer.

Q And overall was it a profitable investment for Longwood?

A For the firm -- so the way that we exited that

company was the distribution of shares. So the firm did not actually sell the stock. And so every LP, which are the investors in the firm, would have received stock. And so it just depended on whether or not -- but when those LPs actually sold their stock. So for some investors, it would have been a profitable return, and for others, it would not have been. I personally never sold shares. So for me, it was not profitable.

Q And why was that? Why didn't you ever sell shares?

A Well, I was very confident in our ability to make OvaScience even more valuable. And so I, you know, I decided not to sell my shares.

Q What about the other gentlemen who were at Longwood with you? Mr. Westphal? Do you know whether he profited from the investment in OvaScience?

A I don't know whether he sold shares or not. What I do know is that Longwood did distribute all of the shares. So I know that we each received only shares, not cash, so I don't know whether Christoph Westphal or Rich Aldrich sold, and I don't know when they would have sold. So that would have also determined that -- you know, the time at which they sold would have also determined whether or not it was profitable.

Q And how was the timing of the distributions decided?

A So there was a process that the firm used in conjunction with the firm's counsel as well as the company's counsel. And so they had to do it when there was not, for example, a blackout period. So the CFO of Longwood in conjunction with Longwood's counsel would determine that based on whatever the company's policy was.

Q So the decision to make a distribution in March of 2015, how was that made?

A That was made solely by Christoph Westphal. So we -- as a firm, we had a Chinese wall if we were invested in any publicly traded companies, and that's because both Rich Aldrich and I were on the board of OvaScience. So we wouldn't know when the decision was being made to sell shares. And the other partner, who wasn't on the board, would make that decision and execute that transaction with our CFO and counsel.

Q And wasn't Mr. Westphal on the board at some point of OvaScience?

A Not of OvaScience.

Q Never?

A Never on the board of OvaScience, I believe.

Q Okay. And were all of Longwood's holdings reported on the appropriate SEC forms --

A Yes.

Q -- as far as you know, the Schedule 13Ds?

A Yes, I believe they were.

Q And did you report your holdings in OvaScience on Schedule 13Ds?

A I believe that I did.

Q And you were a holder of 5 percent or more of the shares of OvaScience for most of the time that you were at the company. Isn't that true?

A I am not sure of the exact amount that I held over, you know, a certain period of time, but I am confident that we always reported the number of shares accurately to the best of our ability.

Q Okay. And that means, when you say, "we," I mean you personally also?

A Well, it wasn't -- I mean it wasn't me personally. It was always -- you know, our counsel and our CFO. Our counsel for Longwood and our CFO would have always reported the Longwood shares. And then the company counsel would have reported my shares that I received later as CEO of OvaScience. So when we started the company, I was meant to be the interim CEO. And so I actually didn't have a CEO employment agreement and so didn't have compensation for the first two years, but then there was a CEO agreement put into place. And so at that point in time, that's when the company's counsel would have also been filing my personal ownership.

BY MS. DEITCH:

Q Did you review those filings?

A Yes.

Q Okay.

BY MS. SCHWARTZ:

Q So I took a look at some Form 4s that were filed by you --

A Okay.

Q -- or your name is on them.

A Yes.

Q And so it looks like you disposed of shares, you know, a number of times to "satisfy minimum statutory withholding requirements upon vesting of time-based RSUs." Are you aware of that?

A I think that this is a -- I think you are referring to a standard policy that's put in place so that if you are given RSUs, you don't pay, you don't have that tax

consequences of those RSUs. So that was the only thing that was disposed of, but I never received any cash for any shares that I sold. But this was a standard process that we had in place for our officers.

Q What was the value of those disposed shares? Do you know?

A I don't know.

Q And how were those transactions approved? I mean, well, let me ask you, were those transactions approved?

A Those transactions and that policy was approved by the board of OvaScience and the audit committee of OvaScience.

Q And was that disclosed in SEC filings that the company would pay taxes or the tax amount on any RSUs that you received?

A I don't know whether or not it was in filings, but it was certainly -- I believe that it was disclosed. It's a standard policy that most public companies have in place for their officers.

BY MS. DEITCH:

Q So that was to pay your personal tax liability when you received the restricted stock units?

A What happens with restricted stock is, even if you don't sell the stock, if the value of the stock goes up, you still have to pay taxes -- I believe I am getting this right -- on that gain. And so you basically sell enough shares to pay the taxes on that gain, but you don't actually net anything, so you still hold the shares, but you are not paying those taxes for that gain out of pocket.

Q Do you know if those sales are on the open market?

A I don't know. I believe the company actually executes this for you. So I personally didn't sell those shares. This is something that the company I believe does on your behalf.

Q And who at the company was charged with doing that?

A I believe that was our CFO, Jeff Young.

Q Okay.

BY MS. SCHWARTZ:

Q So did the company, then, you know, pay the taxes on your behalf and that is included in your whatever you got, W-2s or something, from the company or did you actually pay, make those payments, to the government?

A I don't know. I don't recall personally making those payments. So I think it is something that the company handles for you, but I can't be sure about that.

Q So back on the Exhibit 155, can you explain your

Dipp, Michelle - Vol. I.txt

degrees?
A Sure.
Q I am not familiar with the BMBCH.
A Yes.
Q What is that?
A Yes. Oxford confers -- so I went to Oxford University, who conferred their degrees in Latin. So it's the -- BMBCH is the Latin version of M.D. And so they still use the Latin version of it, same for D.Phil. It's the Latin version of Ph.D. So --
Q So let's see. Just fill that in a little bit for us here.
A Sure.
Q So you went to Oxford undergrad?
A Yes.
Q And what was your degree?
A So that is a Bachelor of Science.
Q And what was your major?
A So my major there was physiology.
Q And then you? What happened next?
A And so then I did -- or I started a Ph.D.
Q In what?
0024
A That's in pulmonary physiology.
Q And did you get that degree?
A Yes, I did.
Q And you received that degree in September 2001?
A Yes.
Q A Ph.D. in pulmonary physiology.
A Yes.
Q And then you went --
A Then to medical school.
Q -- further. Okay.
A Yep.
Q And is that like medical school here in the U.S.?
A Yes, it is.
Q Okay.
A Six years.
Q It was six years? And you received a degree?
A That's just an M.D. I mean, in this case, I got a bachelor of medicine and surgery. So I trained as a general surgeon.
Q Did you ever practice as a general surgeon?
A I did for a short period of time.
Q How long?
A For one year.
Q Are you licensed now to practice medicine?
A I am not. I used to be licensed in the U.K., but I

Page 13

Dipp, Michelle - Vol. I.txt

0025
stopped taking -- I guess you -- like my board equivalents. And so I'm no longer licensed to practice medicine.
Q And when you practiced medicine, did you see patients?
A Yes.
Q For how long? For about a year, you said?
A Yes.
BY MS. DEITCH:
Q Did you do an internship and residency?
A No. In the U.K., it's a little bit of a different system, but -- so no, I didn't do the equivalent of an internship and residency.
Q Where did you practice medicine when you did surgery?
A So multiple different hospitals in the U.K., but the majority of it is the John Radcliffe Hospital in Oxford.
BY MS. SCHWARTZ:
Q Do you currently have any holdings of Millendo Therapeutics?
A Yes, I do because I didn't sell my OvaScience shares. So those got converted into Millendo when Millendo bought OvaScience.
Q And how many shares do you own?
A I don't know.
Q Is it 5 percent or more?
0026
A I don't believe so.
Q So how did you become the CEO of OvaScience?
A So I became the CEO of OvaScience. I mean, it started out, the plan was for me to be interim CEO, and we were going to do a CEO search. And the board and I thought it would be a good idea for me to remain CEO until we found the right person to run the company.
Q And did you prepare for the job as CEO?
A Well, I was very well mentored by others who had had operating roles, you know, the chairman, Rich Aldrich, who had been the CBO, chief business officer, of a large company called Vertex and also other members of the board with operating experience.
Q Did you take any classes or do -- I don't know -- anything on your own accord from -- I'm not quite -- let me withdraw that. Did you speak to -- who did you say, Mr. Aldrich?
A Yes.
Q Did you speak to Mr. Aldrich about becoming the CEO of OvaScience?
A Yes.

Page 14

Dipp, Michelle - Vol. I.txt

Q And did you speak to him about how to prepare for the job?
A Yes. We met.
Q And what did he tell you?
0027
A Yes, we would meet weekly to talk through everything from hiring teams, setting goals, those types of things. And it wasn't just Mr. Aldrich. We also had a board of directors who also had extensive operating experience.
Q Who? Anyone in particular?
A Mary Fisher, who was the CEO of a company at the time that she was also on the board and had previously also been a CEO.
Q And other than talking to these people, did you do anything else to prepare for becoming the CEO of OvaScience?
A Over time, we had management coaches for the executive team who would perform 360 reviews, those types of things.
Q What does that mean? I'm sorry.
A So we generally had people come in and coach us as it related to the best way to set goals for the company, the best way to communicate with our teams, those types of things.
Q Did you have any training or did you endeavor to find out how best to deal with the investing public?
A Yes, we did. So I didn't have -- I didn't go to business school or do a formal course, but yes, we did have our counsel, our external counsel, train us as it related to the law and communications and best practices around that. We also had, again, you know, people who were on the board
0028
who were familiar with public company boards.
Q And who -- what law firm and who at that law firm did the training that you mentioned?
A So it was Mintz, Levin. And the person who did the training was Bill Hicks.
Q And how many sessions or how often did he do this?
A Oh, we had many sessions. So I believe that Bill came into the company either twice a year or quarterly to continue to train the company as it related to best practices as a public company. But when we were -- at the point in time when we were actually going public, it was a different firm. I forget the name of the firm, but they were the ones that took us through. It was essentially like a weeklong process that -- where they explained everything to us and what our roles and responsibilities would be.
Q Did you have any other training or experience, other than what you mentioned?

Page 15

Dipp, Michelle - Vol. I.txt

A Not to my recollection.
Q So you served as the CEO. You also served as executive chair. Is that correct?
A Yes.
Q And what does that mean?
A So executive chair, that was basically as I transitioned out of the CEO role. So when we brought on Harold Stock, who was CEO, I think we announced that he was
0029
the CEO in January of 2017. I transitioned into the executive chair role. And so that just meant I was chairman of the company.
Q And chairman of the board?
A Chairman of the board, yes.
Q And you also served as an adviser. Is that correct?
A Yes.
Q What is that?
A When I transitioned out of the chairman role, Harold wanted to ensure that we basically had all of the historical background of the company. And so I was an adviser of the company.
Q And were you still on the board at that time?
A No, I don't believe that I was on the board at that time.
Q Okay. You became executive chair according to Exhibit 155 on 7/2016?
A Yes, Harold and I --
Q Is that right? And then you corrected that date when we went on the record. You see, you know what Bates stamps are, these goofy numbers?
A Yes, yes.
Q All right. So look at Dipp 31.
A Yes.
0030
Q Do you see? I am just looking at, trying to get my head around the different titles here.
A Yes. So --
Q So you were executive chair --
A Yes.
Q -- from 7/2016 through 9/20/17. Is that correct?
A Yes, that's correct. And what happened was, Harold Stock was announced as CEO in January of 2016, I believe, but there was --
BY MS. DEITCH:
Q We are just asking for your best memory. Okay?
A A six-month -- there was a six-month overlap between Harold and me because we wanted him to get to

Page 16

Confidential OVAS_1211394

Dipp, Michelle - Vol. I.txt

transition in smoothly. So that's why you see him announced six months earlier.

MS. SCHWARTZ: Okay.

BY MS. SCHWARTZ:

Q And what was your compensation when you were CEO?

A I didn't receive cash compensation. It was just equity.

Q And you said, you stated you never exercised any of those options?

A That's right.

Q I mean, those units. Is that correct?

A I never sold any of them, yes, that's correct,

0031

except for, it appears, for tax purposes.

Q And how were others compensated at OvaScience? Was it based on the achievement of goals?

A They were compensated. They had a base salary, which was not based on the achievement of goals. They had a bonus, which was based on the achievement of goals. And they had equity grants, which I don't believe were goal-based, but there might have been -- there might have been a mix of cash and equity that was a bonus. I don't recall exactly, but there was certainly some bonus component for meeting goals.

Q And who determined whether OvaScience achieved its goals?

A The compensation committee of the board made a recommendation to the full board.

Q And was that -- sorry.

A That's okay.

Q Was that based on any information you provided to either the compensation committee or anyone else?

A It was based on information that was provided typically, actually, by our CFO to the compensation committee, but it was the entire management team that would provide that information to the board.

Q Including you?

A Yes.

Q And why did you step down as CEO?

0032

A Because we had found a CEO. And that was -- you know, that had really been the goal since we started the company, was to find someone other than me to be the CEO. I mean, my -- I was still a partner at an investment firm, which was Longwood, during that time, and I wanted to go back to investing full-time.

Q I hate to go back and forth, but I have some more questions on Exhibit 155.

A That's okay. Yes.

Page 17

Dipp, Michelle - Vol. I.txt

Q I forgot about these.

A Okay.

Q So you have an appendix at the end.

A Okay.

Q And the appendix is -- I am looking at page Dipp 33, I guess, you know, your holdings in privately held companies.

A Yes.

Q Okay. So we talked about General Atlantic. And explain to me, what are these LLCs listed under there? What is the nature of your ownership in those?

A Sure. That's just the way the -- that's just the corporate structure of General Atlantic. So we, you know, own, I guess, certain percentages of each of those LLCs as part of the overall umbrella of General Atlantic. It's a partnership.

0033

Q Okay. And so these are the ones that you have some ownership in?

A That's correct.

Q These are like the funds. These are the names of the whatever. I know what you mean.

A Yes. Okay.

MS. SCHWARTZ: All right. Ask the --

MS. DEITCH: No, no, no. Just let --

MS. SCHWARTZ: Go ahead.

BY MS. DEITCH:

Q Can you explain what they are?

A Sure. So let me give you an example. The co-investment fund is, you know, us co-investing alongside the main fund. And, then, General Atlantic LLC would be the main fund. So there are just different parts of the same fund, and that's what's -- everything that's listed here is all the different parts of -- that make up General Atlantic.

BY MS. SCHWARTZ:

Q Are there other funds at General Atlantic that are not listed here?

A Not that I'm aware of. I believe we have listed all of them.

Q Okay. Now, tell me about Axial Biotherapeutics. What is that?

A Yes, this is an investment through Longwood, and so

0034

that is an investment that we made. I was chairman of that company and also cofounder of that company. And so I own shares in that company separate to what I would own as part of Longwood.

Q So when you left Longwood, did you divest your

Page 18

Dipp, Michelle - Vol. I.txt

holdings, your Longwood holdings, in the different investments?

A No. No. I did not. So Long -- and that's why Longwood is listed as well, so basically I either own shares in Longwood through Longwood Fund -- and then Axial is listed as well because I own shares personally outside of -- as though I were a partner in Longwood.

Q Okay. And how many shares do you own personally in Axial Biotherapeutics?

A I don't know, but I can get you that information.

Q Dollar amount?

A I don't know.

Q Why did you make that investment?

A Oh --

Q Personally.

A Oh, I'm sorry. I maybe --

Q I want to understand --

A Yes.

Q -- whether you have an investment or you hold shares or, you know, whether you made an investigation an

0035

Axial Biotherapeutics.

A No.

Q So I need to know that either --

A I see.

Q -- either on a personal level or -- now you tell me it is through Longwood. And, even though you are not with Longwood anymore, you still have some of the investments that Longwood made.

A Yes. Sorry if I'm not being clear. I didn't personally invest in Axial separate to Longwood.

Q Okay.

A But any time we were cofounders of a company, the person who led that would sometimes get more of what's called the founder shares in that company. So I do have founder shares in that company, in addition to option or other -- you know, other stock. But it's all through -- every -- everything for Axial is through Longwood. I don't -- I didn't personally invest in Axial separate to Longwood.

Q Okay. And is Axial a public company?

A No. They are private.

Q And do they want to go public?

A Not that I'm aware of.

Q And are there any folks who were at OvaScience at Axial?

A Oh, Jeff Young just recently joined Axial as their

0036

CFO.

Page 19

Dipp, Michelle - Vol. I.txt

Q Anyone else?

A David Donabedian is the CEO, but he's not at OvaScience. He's at --

MR. SYLVIA: If you talk like that, he's going to take it down. So you have to either speak up or nothing.

THE WITNESS: Not -- it's very possible but not to my recollection.

MS. SCHWARTZ: Okay.

BY MS. SCHWARTZ:

Q Then I am continuing to look at Dipp 33, the Longwood Fund. You retain a blind interest of funds 1 through 3? What does that mean?

A I don't have any ability to vote on whether or not we invest or exit something. So I don't have any -- it's as though I'm an LP in Longwood. I don't have any decision-making authority.

Q What is RA Capital Partners, LP?

A That's a hedge fund in Boston.

Q And who runs it?

A Peter Kolchinsky and Raj Shah.

Q And did Mr. Aldrich have anything to do with that company?

A It's named after him, yes. So RA does stand for Rich Aldrich. He seeded that fund when it started. I

0037

believe it started like 20 years ago. And Rich I believe is still an LP. I'm actually not an LP currently in it. I ended up selling that when I joined General Atlantic.

Q Why?

A Just to avoid any conflict because they invest in both private and public healthcare companies. So if I was looking to invest in a private company, there could be a conflict as an LP of another fund.

Q What is El Paso Management Group?

A Oh, that's just my family's ownership of a family pecan farm in El Paso.

Q I'm sorry. A what farm?

A Pecan.

Q Oh, pecan.

A Yeah.

Q We say pecan.

(Laughter.)

BY MS. SCHWARTZ:

Q What is Aztec Acres Partnership?

A Same type of thing. I think that might be the equipment leases on that farm.

Q What is Triarii?

A Yeah, Triarii.

Page 20

Confidential

OVAS_1211395

Dipp, Michelle - Vol. I.txt

Q Were you happy with his performance?
A Yes.
Q And did you also meet with him once a week alone?
A Yes.
Q And did you also meet with Ms. McNeely once a week alone?
A Yes.
Q And was there anyone else who we left out?
A I believe that you have referred to all of my direct reports. It's possible that I have forgotten someone.
Q And when Mr. Harding reported to you directly, was he at the management meetings?
A Yes. And it wasn't uncommon for him to join the management meetings to give part of the commercial update as

0068

well.
Q And did you also meet with Mr. Harding one on one?
A When he reported to me, yes, less so when he reported to Arthur, although we also sometimes would meet one-on-one as well.
Q And did he keep you informed of the status of the commercial prospects for the company?
A Yes.
Q And did he keep you informed on the biopsies and the pipeline for patients and that kind of information?
A Yes, he did.
Q And did you ever have any problem with the information that he provided to you?
A No.
Q Did you also report to the board?
A Yes, I did report to the board.
Q And how often?
A So I did not have -- I mean, I had a one-on-one meeting with the chairman of the board, Rich Aldrich, once a week, and then we had quarterly board meetings. It was common for me to talk to members of the board regularly, especially because we would have compensation committee meetings, nominating and governance committee meetings, and audit committee meetings.
Q Did you attend all of the board meetings?

0069

A I believe I attended all of the board meetings, yes.
Q And when you attended, did you stay for the entire meeting or would you just stay for certain topics?
A I was -- I mean, I believe I was at most, if not all, of the board meetings. There were times when I stepped in and out, but I was there for the majority of the meeting.

Page 37

Dipp, Michelle - Vol. I.txt

Q What is AUGMENT?
A AUGMENT. AUGMENT is the addition of mitochondria from immature egg precursor cells into eggs with the goal of improving IVF success rates.
Q Did the company introduce AUGMENT globally?
A Yes.
Q In when? When was that?
A So in 2014, we started to do AUGMENT on a preceptorship basis and then ultimately started to transition to commercial.
Q Why wasn't AUGMENT introduced in the United States?
A The -- you know, it's interesting. IVF took a long time to come to the U.S., and the U.K. were the first to introduce IVF. And so we were --
MR. ARFFA: IVF is what?
THE WITNESS: Oh, sorry. In vitro fertilization is IVF.
And so we were hopeful that we would be able to

0070

offer AUGMENT to patients in the U.S., and we started to do a study. And we received a letter from the FDA, even though we actually hadn't met with the FDA, questioning the study that we were doing on AUGMENT. So we thought that it was better to go outside of the U.S. and then bring it to the U.S., similar to the way that IVF was brought to the U.S.
BY MS. SCHWARTZ:
Q So were there clinical trials in the U.S.?
A We tried to start one, but the clinical trial didn't actually start.
Q Was it put on hold?
A The -- so it's interesting. The FDA did not actually put the trial on clinical hold. We received something called an "untitled letter," which was a bit ambiguous. So we, the company, decided to stop the clinical trial.
Q Isn't it true that the WIRB put a clinical hold on the clinics offering AUGMENT in 2013?
A Oh, WIRB. So that's the IRB. It is possible. I don't recall exactly. It is possible that the IRB put a clinical hold. I don't recall, but I do recall the FDA letter, which was not a clinical hold.
Q Do you recall that there was a clinical hold put on the clinics by the WIRB in 2013 and then there was an exception for a few patients who were already biopsied, but

0071

then the company decided not to provide AUGMENT to these clinics until the regulatory issues were resolved? Does that ring a bell?

Page 38

Dipp, Michelle - Vol. I.txt

A I don't recall the exact details of the WIRB clinical hold, but that is very -- that's very possible that patients were biopsied but then ultimately didn't receive the AUGMENT treatment.
Q So you are saying you don't recall that?
A I don't --
Q But it's possible?
A Yeah. I don't recall the exact details of the WIRB clinical hold.
Q Who was Allison Lawton?
A Allison was the chief operating officer of the company.
Q Early on?
A Yes.
Q And did she report to you?
A She did, yes.
Q And what was the letter that you got from the FDA?
A We received an untitled letter from the FDA. I believe it referenced the study that we are talking about, and we decided -- that was really our main reason to decide to go outside of the U.S.
MS. SCHWARTZ: Let me mark as Exhibit 157 -- this

0072

is Bates stamped OVASE149747 to 149749.
(SEC Exhibit No. 157 was marked for identification.)
MS. SCHWARTZ: This is Exhibit 157.
THE WITNESS: Thank you.
BY MS. SCHWARTZ:
Q So is this the letter that you were referring to before?
A (Examining.) Yes.
Q And in the letter, were you aware that the FDA was informing you and OvaScience that it had concerns about the study?
A We were aware that the FDA was asking us to submit an IND, but we actually hadn't met with the FDA at this point in time and hadn't provided the FDA with information about AUGMENT.
Q That is not my question, though. I am just saying, in this letter, were you aware that I guess it is Celia Witten, the director of cellular tissue and gene therapies was writing to the company, saying that they had expressed "concerns based on the review of the protocol, the investors' brochure and informed consent document that you, OvaScience, submitted to the Western Institutional Review Board for your AUGMENT study. The documents were collected during our inspection of February 13th-14th, 2013"? Were you aware of

Page 39

Dipp, Michelle - Vol. I.txt

0073

that?
A I was aware of this letter. I was not aware of the documents being collected during that time.
Q But it came to your attention that they were collected?
A By this letter, yes.
Q And then, as you said, the FDA says, "We need to review a complete IND to assess fully your protocol, informed consent form, and investigative brochure. In general, it appears that your clinical protocol is not adequately designed to ensure the safety of the study subjects or offspring that may result from the" -- and here you have to -- I have to apologize "autologous mitochondrial transfer product AUGMENT.
"As just one example, despite the fact that this is a first in-human study of a technique that has the potential to create lifelong changes in children born as a result of this procedure, your study fails to provide longer-term follow-up of any potential children. In addition, the informed consent document does not adequately advise patients of the risks of your study.
"Moreover, the protocol and investors' brochure contain general statements about proof of concept and safety that are not well-supported by the publication and cited data."

0074

Were you aware of that in this letter?
A Yes, I was aware of that in this letter.
Q So were you aware that the FDA contacted WIRB and that a clinical hold was put on the study in the United States?
A I am aware of the letter. I didn't recall the clinical hold that they put on, WIRB.
Q Are you aware that OvaScience decided not to provide AUGMENT, though --
A Yes.
Q -- in the United States?
A Yes, absolutely.
Q So why was that?
MR. ARFFA: Wait for the question.
THE WITNESS: So we decided that based on this letter, we felt that we were regulated under a certain regulation, which is referred to here, 1271, and we still believed that we were regulated in that way because we were autologous. And I won't list the other criteria, but based on this letter, we decided that it would be better to go outside of the U.S. and then in the meantime also try to do a

Page 40

Confidential OVAS_1211400

Dipp, Michelle - Vol. I.txt

parallel track with the FDA because at this point in time, we still hadn't even met with the FDA. So we didn't think it was going to be -- you know, we thought it was going to be a long -- a longer process. So we were probably better off
0075
going outside of the U.S., getting clinical data, doing studies there, and then bringing back, bringing those data back to the U.S.

BY MS. SCHWARTZ:

Q Here's my question. If the company was comfortable with the product, with the AUGMENT product, why didn't you make it available to the few women who had already been biopsied here in the U.S.?

A So we were very comfortable with the product. We felt very confident in the safety and also the efficacy. And the reason why is it's actually been done before. So we didn't come up with the idea of AUGMENT. It had been done in the 1990s. And, in fact, many IVF clinics all over the world either add mitochondria to eggs from the woman's own extra eggs if she has them or they add it from donor egg mitochondria. So another woman, typically who's much younger, they get the mitochondria from her eggs, and they inject those mitochondria into the woman's eggs during IVF. And so those data were published back in the 1990s. And the babies that were born from that -- I mean, there's been long-term follow-up on those. So we felt very confident in the safety and efficacy, but we didn't -- if we did biopsy patients in the U.S., we didn't want to run afoul of the FDA, who's very clear that they don't believe that we fall under 1271, which was our belief.
0076
Q And did the FDA also tell you in this letter and then also in a letter dated April 9, 2013 that it appeared that AUGMENT was more than minimal manipulation?

A Yes.

Q So did you, did the company, continue to communicate with the FDA?

A At this time, yes, we were submitting requests to meet with the FDA, which I believe were denied.

Q Isn't it true that the company picked up communications again with the FDA in 2016?

A Yes.

Q Okay. So from 2014 to 2016, did the company communicate with the FDA? So that would have been the time that the company decided to go global. Did you decide to hold off on meeting with the FDA until you had data?

A Yeah, for the most part. I mean, I don't recall -- I mean, there might -- we had regulatory consultants who --

Page 41

Dipp, Michelle - Vol. I.txt

and it's possible that we were having intermittent communications with the FDA, but there certain wasn't -- certainly wasn't anything substantial in that time period until we tried, you know, to communicate again. And we did have, I believe, a meeting in 2016.

Q And did you have a meeting in March 2017?

A I believe that we did.

Q And what was the result of that meeting?
0077
A I'm not -- they invited us to apply for something else, which we decided not to. We could go to -- we could go for a final yes/no decision, and I don't think we went forward with that.

Q In March 2017, did the FDA inform OvaScience that the manufacturer of the AUGMENT appeared to involve "more than minimal manipulation of the donor ovarian tissue"?

A Yes.

Q And that the "additional processing step to extract and purify the mitochondria may result in an extracted product, and extracted human products are not HCTPs"? Did they tell you that?

A Yes. That was the main disagreement, is we felt very strongly that we were minimally manipulated because they were standard cell separation techniques, and they felt that it was not.

Q And that the "purified mitochondria appears to be a 351 biologic subject to licensure under the Public Health Service Act." Is that correct?

A That's correct.

Q And were there follow-up meetings with the FDA after they provided you with their opinion?

A I don't believe so. I don't believe that we decided to then follow up and apply for a biologic status.

Q Did you try to meet one-on-one with the
0078
commissioners of the FDA?

A I certainly reached out by email to the commissioner to ask to meet.

Q And what happened?

A I did not receive -- oh, I think I may have received a response from the office but not -- we didn't have a phone call or a one-on-one meeting. I think that's what led to this broader meeting.

Q And why didn't the company want to go and try to go for that biologic license or approval?

A Because we felt very strongly we weren't a biologic. I mean, this was literally taking an ovarian biopsy from the woman herself, taking her own ovarian cells,

Page 42

Dipp, Michelle - Vol. I.txt

using standard cell separation techniques to get her own mitochondria, not adding any drug or anything else to that, and we felt strongly that we had a treatment that can help patients. It's already been demonstrated in the '90s. It's not like the addition of mitochondria to eggs is -- has been debated. And so we felt like we were -- you know, we had a treatment. It's safe, and it works. And we weren't manipulating the cells or the mitochondria in any way.

And that was not just my belief as CEO and our belief as a management team but also the belief of scientific experts, regulatory experts, our regulatory counsel. So we sought, you know, advice from people that had a lot more
0079
experience than we did, both in terms of reproductive health as well as the regulations. And they all believed that we were under the this minimal manipulation rule.

Q Yet, the FDA had told you on a number of occasions that they disagreed with this?

A Yes.

Q Okay. So why didn't OvaScience go the IND route in 2013?

A Because we weren't a drug. So we neither felt that we were a drug or a biologic.

Q Was the company anxious to commercialize the product?

A We were anxious to get the product to patients, but we actually didn't start out with commercialization. We started out with the trial that we had proposed to WIRB.

Q So you are talking about the trial in the U.S.?

A Yes.

Q Okay. So why didn't you just then continue to do the trial in the United States under the IND rules?

A So we actually applied for -- and I don't remember the exact type C, type A, but those types of meetings, but we did apply for those types of meetings with the FDA. The challenge is, if you are applying to be a drug, they'll ask you things like the chemical structure and we are not -- we had a really hard time filling in the form for a drug because
0080
that's not what this is, right? This is essentially a surgical procedure. So our meeting application was rejected.

Q And so what happened after that?

A So we decided to go outside of the U.S.

Q And how was AUGMENT going to be made available to people outside the U.S.?

A Through IVF clinics in other countries based on their regulations.

Q And was there something called an ACE, AUGMENT

Page 43

Dipp, Michelle - Vol. I.txt

Centers of Excellence program? Was that going to be the marketing of the drug, of -- sorry -- AUGMENT?

A Yes. And you, know, we really liked that phrase. That was something that the commercial team came up with. And it was simply because we were training those clinics to do AUGMENT. And so once a clinic was trained, they would be labeled an ACE clinic.

Q And what did a clinic need to do to become an ACE clinic?

A They needed to complete a preceptorship program.

Q And what was that?

A "Preceptorship" was the word that we used for training the doctors. And so the AUGMENT treatment process is essentially a series of multiple steps that takes place over about six to nine months. Part of it happens before IVF, and then part of it happens during the IVF process. So,
0081
you know, before IVF even begins, you know, the patient would come in, they would meet with the doctor. The doctor would determine whether or not they are suitable for AUGMENT based on the patient's history.

Then if the patient was interested, they might schedule another appointment. They would come back. They would get a physical examination, blood tests, a scan, usually an ultrasound, sometimes a CT scan, again, to make sure she was appropriate for a biopsy but also for AUGMENT. Then usually around the third visit, the patient would get scheduled for her biopsy. And, you know, the biopsy would be taken by either that IVF doctor or from, you know, a surgical center nearby.

And the important part from our perspective as it related to the training -- I mean, these doctors already knew how to do biopsies. We weren't literally training them to do the biopsy, but we needed to ensure that the biopsy they were providing us actually didn't damage the cells that we were isolating in any way. So we would ask them for a biopsy that was six by six by one millimeter, and we would ensure that the cells were alive, that we could get enough cells out of that biopsy tissue, that type of thing. So that was really the training piece.

Then the rest of AUGMENT is, you know, us taking that biopsy, separating out the cells to get these egg
0082
precursor cells, separating out the mitochondria and then once the woman has started the IVF process, she goes through at least, you know, a month where she's getting hormone stimulation. When they get to the point -- she may have to repeat that, you know, another time if they don't get enough

Page 44

Confidential OVAS_1211401

eggs. Once they get to the point where they have removed eggs from the woman's ovaries, that's the point in time where the mitochondria gets injected into the egg alongside the sperm.

The embryos grow for about a week, and then ultimately the embryo is implanted. So that whole thing is around, you know, anywhere from six to nine months, and our training process is mainly that, is that biopsy piece at the front end where we are trying to make sure that the doctor has taken the -- you know, we are getting the appropriate cells from that biopsy.

Q Was the purpose of the preceptorship to obtain patient experience and training before making it commercially available?

A Yes.

Q And what were the costs of the preceptorship, and who was going to carry them?

A The costs of the preceptorship varied based on the clinic. I don't recall the exact costs of --

Q Did OvaScience pay for the preceptorships?

0083

A Yes.

Q That is what I meant.

A Yes.

Q Okay. And which clinics conducted preceptorships for AUGMENT?

A Oh, there were quite a few that conducted preceptorships for AUGMENT. So in Canada, it was TCART and First Steps.

Q When did TCART do a preceptorship?

A In the -- in November and December of 2014 or they started it in November of 2014.

Q And the other company?

A So First Steps was another clinic in Canada.

Q When was that?

A I believe the same time period.

Q What is your belief based on?

A I recall the doctor who was with that clinic, Marjorie Dixon, doing AUGMENT at around the same time.

Q Was there an agreement that was signed between OvaScience and the clinic doing the preceptorship, a preceptorship contract?

A Yes.

MR. ARFFA: I just want to be clear because you did cut her off as she was listing. So she's not through. So the record is clear with all of the clinics, she just

0084

mentioned two so far.

THE WITNESS: Yeah, there are more.

MS. SCHWARTZ: Right. Okay.

MR. ARFFA: Okay. I just want the record to be clear.

THE WITNESS: Do you want me to list the other clinics?

BY MS. SCHWARTZ:

Q Just -- so I'm sorry. And I was going to go to all of the clinics. I just wanted to like have for the record that there was actually a contract that was signed; is that right, called a preceptorship agreement?

A Yes.

Q Okay. And so was there an agreement with First Steps back in 2015?

A I don't recall whether there was an agreement with First Steps. I believe that there was. I do recall that there was an agreement with TCART for the preceptorship.

Q And where else were preceptorships conducted?

A We also did preceptorships in the Fakih IVF clinic and also at the same time period, so end of 2014. And then as we transitioned into 2015, we had preceptorships in Turkey with a clinic called Gen-Art, in Japan with IVF Japan, in Spain with EV. And I may be forgetting others, but it's possible that there are -- oh, the U.K. with Dr. Fishel CARE

0085

Clinic.

Q Was there a preceptorship at the U.K.?

A With CE, yes.

Q Was AUGMENT ever offered in the U.K., either through a preceptorship or commercially?

A In the U.K.? I don't -- I believe that we did have a preceptorship agreement signed and it was offered, yes, to patients.

Q And what is your belief based on?

A Based on my discussions with Dr. Simon Fishel and also emails that I had with him as it related to them wanting to -- you know, them having a wait list of patients. He was one of the most bullish doctors because the U.K. is where they had the first IVF baby born, and he was part of that team. So he was very keen to be able to be the first in the U.K. to offer AUGMENT.

Q Was AUGMENT ever offered?

A Yes. He -- well, he saw patients and he spoke with patients about it. I believe -- I recall that he did biopsies. I don't know if he ever completed the AUGMENT process.

Q What is your basis for saying that he spoke to patients?

A Because I believe that he saw patients and offered them AUGMENT. I mean, we had phone conversations about that,

0086

and we had people on the ground at his clinic. We had three cell processors that we hired at the lab that we set up in the U.K.

Q Are there any other sites where AUGMENT was offered through a preceptorship?

A It's possible. I might be forgetting some, but those were the main ones that I recall.

Q Had you approached other clinics or physicians in these or other countries to offer AUGMENT and then for whatever reason, they declined?

A I don't remember the ones where we tried to offer them and declined, but it was certainly the case that David and his team would have been in contact with a whole list of, you know, let's say, another 10 clinics. So, for example, I remember he was talking to clinics in Australia and other places, and those were, you know, in the pipeline. So there were certainly many more clinics and countries.

Q Were the preceptorships for AUGMENT completed at these sites?

A So completed to the extent that they had done the requested number of biopsies and we had validated that it was okay to switch to commercial, yes, but it wasn't uncommon for us to have -- like have overlap. So they would offer it commercially at the same time as a preceptor patient would be finishing IVF because of the six- to nine-month time period.

0087

Q So the preceptorship was going on --

A Yes.

Q -- until when?

A The preceptorship would go on -- I mean, it could be two years before you got, you know, however, let's say, 10 or 20 patients through the end of preceptorship. So it wasn't uncommon for us to start, for that clinic to start seeing commercial patients at the same time as preceptorship patients were finishing their IVF.

Q Wasn't it -- did AUGMENT also offer -- I'm sorry. The company also offered AUGMENT commercially. Is that correct?

A Yes.

Q Okay. And was there an agreement for a commercial separate from an agreement for preceptorship?

A Yes, I believe there was.

Q And were you familiar with the terms of the commercial agreements?

A I wouldn't have been familiar with the exact terms

but usually the basic terms, like the price and that type of thing, yes.

Q Wasn't it true that in order to offer AUGMENT commercially, the preceptorship had to be completed?

A No.

Q No?

0088

A So there was overlap between the -- so I don't know what's exactly stated in the commercial agreement, but there certainly -- what I can tell you, there is overlap between the preceptorship and the, you know, commercial agreements or when they are seeing commercial patients. Certainly in practice you have both going on at the same time because it takes -- you know, it's multiple steps and it -- around nine months for the AUGMENT treatment process.

Q Do you know if notification was required by OvaScience to the IVF center that the preceptorship was completed, you know, to their mutual liking?

A I don't know whether or not we provided notification to the clinics. It probably was in the agreement that we were supposed to provide that, but, really, what happened in practice was they signed a commercial agreement. We didn't necessarily notify them that their preceptorship was complete or okay, and it was just implicit that because they were signing the commercial agreement, that we were okay and they were okay to move forward on a commercial basis.

Q Was there a different informed consent for the preceptorship versus the commercial?

A For the patient?

Q Yes.

A I'm not sure.

0089

Q Did the company keep the informed consents, OvaScience keep informed consents?

A I don't know whether we kept the informed consents or the IVF clinics kept those.

Q For the commercial AUGMENT treatments, how was revenue going to be recognized?

A So I believe there was a revenue recognition delay. And so, as I was describing to you before, there's this AUGMENT treatment process with multiple steps. And so the auditors did not agree that we should be able to recognize revenue when we receive the biopsy, but I believe it was when the mitochondria actually got injected into the egg. So, instead of it being, you know, three or so months into the -- three to six months into the process, it was more like six to nine months into the process. So there was a revenue