# EXHIBIT 17

```
                         Tzianabos, Arthur - Vol. I.txt
0001
  1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
  2
  3    In the Matter of:    )
  4                         )  File No. HO-12935-A
  5    OVASCIENCE, INC.     )
  6
  7    WITNESS:   Arthur Tzianabos
  8    PAGES:     1 through 272
  9    PLACE:     Securities and Exchange Commission
 10               100 F Street, N.E.
 11               Washington, D.C. 20549
 12    DATE:      Friday, November 30, 2018
 13
 14        The above entitled matter came on for hearing,
 15    pursuant to notice, at 9:40 a.m.
 16
 17
 18
 19
 20
 21
 22
 23
 24             Diversified Reporting Services, Inc.
 25                      (202) 467-9200
0002
  1    APPEARANCES:
  2
  3    On behalf of the Securities and Exchange Commission:
  4         HELAINE SCHWARTZ, ESQ.
  5         LISA DEITCH, ASSISTANT DIRECTOR
  6         Securities and Exchange Commission
  7         Division of Enforcement
  8         100 F Street, NE
  9         Washington, DC 20549
 10         (202) 551-4826
 11
 12    On behalf of the Witness:
 13         JOHN F. SYLVIA, ESQ.
 14         Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
 15         One Financial Center
 16         Boston, MA 02111
 17         (617) 542-6000
 18
 19         WILLIAM R. BAKER, III, ESQ.
 20         Latham & Watkins LLP
 21         555 Eleventh Street, N.W., Suite 1000
                              Page 1
```

OVAS_1211700

                         Tzianabos, Arthur - Vol. I.txt
24   on an email, in meetings, both?
25        A    It was a combination of email or meetings that
0038
 1   we had multiple times a week going over this because this
 2   was a major focus for the company obviously.
 3        Q    And who typically was at the weekly meeting?
 4        A    Michelle's senior staff but also inclusive of
 5   Chris Meyer.  So it was Ryan Barrett.  It was Jeff Young.
 6   It was myself.  It was Theresa McNeely, head of
 7   communications.  And that's all I recall.
 8        Q    And Ryan Barrett was what?
 9        A    The legal counsel, internal.
10        Q    And so I'm correct in understanding that those
11   folks were kept in the loop as to how many, you know,
12   Augment cycles had been completed, how many
13   preceptorships, how many commercial, who was in the
14   queue.  Am I right?
15        A    That's correct.
16        Q    Okay.
17             BY MS. DEITCH:
18        Q    Can I ask you, on the goal for 2015 of the
19   thousand cycles of Augment, is that a thousand commercial
20   cycles or just -- or would that include free cycles and
21   preceptorships?
22        A    I believe it was commercial cycles.
23             BY MS. SCHWARTZ:
24        Q    So also -- so now I just want to know.  So you
25   got a bonus in 2015.  You got a bonus for achieving --
0039
 1   for your achievement of your 2015 goals of 127,500.  So
 2   it was less than the year before.
 3        A    Correct.
 4        Q    Is that because you didn't achieve all of your
 5   goals?
 6        A    My recollection was that the board had set the
 7   corporate goals at 60 percent.  And m came to me and
 8   said, "I believe you've hit all your goals, so I can give
 9   you a hundred percent of your bonus."  And I said, I
10   believe, "No, give me what everybody else is getting."
11   And I believe that was why the reduction there.
12        Q    When did you leave OvaScience?
13        A    March 31, 2013 -- 2016.
14        Q    And why did you leave?
15        A    I was in strong disagreement with the direction
16   of the company and the board and the appointment of
17   Harold Stock as the new CEO.
18        Q    Can you explain that?
19        A    I believed that -- I had believed for a long
                              Page 21

Confidential                                                          OVAS_1211720

                          Tzianabos, Arthur - Vol. I.txt
20    time that the company ought to be doing clinical trials
21    to prove the efficacy of Augment and take a U.S. path.
22              When Michelle went from CEO to chairman,
23    executive chairman of the company, and Harold Stock was
24    brought in as -- from the board to be CEO, he was very
25    much a commercial person.  And I could -- my feeling was
0040
 1    we don't need commercial; we need to come off of this
 2    approach of going commercial until we have unequivocal
 3    evidence that Augment worked.
 4         Q    Did you ever reduce that to writing, your view?
 5         A    I did not reduce it to writing.  It was made
 6    very clear to the board at our December board meeting
 7    that I was leaving and why.  And it was made very clear
 8    to Michelle and to Harold.
 9         Q    So that's December 2015?
10         A    That's correct.
11         Q    Okay.  So I just want to -- you know, I want to
12    look at the -- understand what you just said.
13              So it was your opinion that there should have
14    been clinical trials in the U.S.?
15         A    That's correct.
16         Q    And why weren't there clinical trials in the
17    U.S.?
18         A    So when I was hired September 4, 2014, four
19    days later the company received an untitled letter from
20    FDA.  When I interviewed with the company, I asked about
21    FDA interactions.  I was told that we aren't interacting
22    with the FDA.
23              BY MS. DEITCH:
24         Q    I'm sorry?
25         A    I was told we were not interacting with the
0041
 1    FDA.  So it was much to my surprise to then be in
 2    possession of an untitled letter from the FDA, which was
 3    obviously indicating that we had interactions with FDA.
 4         Q    So who told you that OvaScience was not
 5    interacting with the FDA?
 6         A    Michelle.
 7         Q    And was that before you were hired?
 8         A    That's correct.
 9         Q    But in connection with hiring you?
10         A    That's correct.
11         Q    And can you just tell us what it means to be
12    interacting with the FDA?  Is that a technical term, or
13    just you mean trying to get something approved?
14         A    Communication with them.
15         Q    And is this trying to get OvaScience approved
                              Page 22

OVAS_1211721

Tzianabos, Arthur - Vol. I.txt

16  for use in the United States?
17      A    That's correct.  So after we received the
18  untitled letter, I went to understand from Allison
19  Laughton, who was then the COO of the company, what the
20  strategy was in the U.S.  And the strategy was to go down
21  an HCT 361 pathway, which is a special pathway that
22  allows for autologous treatments, so in other words,
23  taking a tendon from one part of your body and putting it
24  in another part of your body.  It was felt that
25  OvaScience and Augment fell under that provision.
0042
1       Q    Okay.  Can we just go back to when you were
2   applying -- or being recruited for the job?
3       A    Mm-hmm.
4       Q    Can you describe the conversation or
5   communications between you and Ms. Dipp about this --
6   interacting with the FDA?
7       A    It was essentially my asking her, "Are we going
8   in the U.S., and are we interacting with the FDA?"  She
9   said, "We plan to go in the U.S.  We haven't really
10  interacted with FDA."  And she said, "However, we're
11  going to go down this HCT 361 pathway which allows
12  autologous tissue to be transplanted from one area of
13  that same person to another area of that same person.
14  And that seemed to make sense to me, so I accepted that
15  and then ultimately took the job.
16      Q    And then about how long after you took the
17  job -- what month did you start?
18      A    September, early September of 2013.
19      Q    2013.
20           About how long after that did you become aware
21  of the untitled letter from FDA?
22      A    Approximately a week later.
23      Q    And what was the gist of the untitled letter?
24      A    I was not part of their initial discussions
25  when the letter was received.  Ultimately I was made
0043
1   aware of the letter.  And the gist was we don't believe
2   this is going to be HCT 361.  We believe that you should
3   be filing an investigational new drug application, which
4   would mean that it would be regulated as a biologic drug.
5       Q    So did you have a subsequent conversation with
6   Ms. Dipp about the -- you know, the untitled letter and
7   the interactions with FDA?
8       A    Yes.  I told her I was very displeased with the
9   revelation.
10      Q    And so what was the -- was there a decision on
11  moving forward, how it was going to -- how OvaScience

Page 23

Confidential

OVAS_1211722

                         Tzianabos, Arthur - Vol. I.txt
12  would move forward on this?
13      A    It was decided that the company would pursue
14  ex-U.S. opportunities where the regulatory bodies were
15  very different and in some cases even nonexistent around
16  autologous use of egg precursor cells.  And then the
17  company set about understanding what regions of the world
18  we could enter into and develop Augment.  And the U.S.
19  was de-prioritized at the time.
20      Q    So how would that lead to eventually coming
21  back to the United States?
22      A    Yes.  So in that time frame it was actually
23  common, even for biologics -- and we did this at Shire.
24  If the U.S. did not agree with your development strategy,
25  often you would pursue the MEA.  And now known -- it's
0044
 1  EMA, which is the European Medical Association.  They're
 2  the regulatory body in Europe.  And you would do your
 3  trials ex-U.S.
 4          And once the FDA saw -- and I experienced this
 5  myself at Shire -- efficacy in those trials, they were
 6  much more amenable to a discussion in the United States.
 7  And a lot of times patient advocacy groups and patients
 8  would be pushing FDA to have access to that kind of
 9  medicine.  So that was actually a fairly common strategy
10  in drug develop.
11      Q    Did OvaScience ever go through the EMA to have
12  trials?
13      A    There is no regulatory body that really governs
14  the entire EMA region for fertility.  Each country has
15  their own set of governance or lack of governance
16  depending on that region.
17      Q    Are you talking about the clinical -- getting
18  the clinics off the ground, or are you talking about some
19  other kind of trial?
20      A    I'm talking about getting the clinics off the
21  ground and offering Augment in that region.
22          BY MS. SCHWARTZ:
23      Q    Was anyone else present when Ms. Dipp told you
24  that OvaScience had not been in communication with the
25  FDA?
0045
 1      A    No.
 2      Q    And when did she tell you this?  Was it
 3  person-to-person or on the phone?
 4      A    It was over the phone sometime in the August
 5  time frame in 2013.
 6      Q    Did you ever have any follow-up conversations
 7  with Ms. Dipp about the fact that she had said to you,
                         Page 24

OVAS_1211723

Tzianabos, Arthur - Vol. I.txt

```
 8  "We were not communicating with FDA," and then after you
 9  joined the company, obviously the company had been in
10  communication with the FDA?
11      A    As I said, I made it clear to her that I was
12  displeased with not being made aware.
13      Q    And what did she say?
14      A    She said, "Sorry," and, "I thought you were
15  aware.  I though Allison Laughton would tell you that,"
16  who was the COO of the company at the time.
17      Q    Were there any other circumstances or occasions
18  where Ms. Dipp said something to you and then later on
19  you found, you know, that it wasn't true or that it there
20  was an issue with what she said?
21      A    There were multiple times that --
22      Q    Let's go through them then.
23           (Pause.)
24           BY MS. SCHWARTZ:
25      Q    Go ahead.  I'm sorry.  So I'm asking you to
0046
 1  recount instances where Ms. Dipp may have not been
 2  forthright with you.
 3      A    There was a common practice of Michelle with
 4  not only me but multiple members of her team being told
 5  one thing and then another thing was true.  And many
 6  of -- much of this was -- were little things.  But once
 7  in a while it was a major thing.
 8      Q    Okay.  So what I want to do is just talk
 9  about -- so when you say -- I guess, you experienced
10  this.  And then you said other people on the team?
11      A    Yes.
12      Q    Okay.  So let's just talk about you.
13      A    Okay.
14      Q    What was said to you that you had an issue
15  with?
16      A    Multiple times I was told about a conversation
17  that was had with somebody in the company about something
18  that was going on in the company.  And then when I went
19  to then track that down, turned out not to be the case.
20  So there was a pattern in my mind.
21      Q    Can you give an example of what the subject
22  matter was or the timing or if it's a little bit more
23  than that?
24      A    I'm trying to think of something that is more
25  than a he said/she said.
0047
 1      Q    We can come back to that if you think that
 2  might be a good idea.
 3      A    Okay, let me think about it.  And while we're
```

Page 25

OVAS_1211724

```
                            Tzianabos, Arthur - Vol. I.txt
 4   talking about things that I can't remember right now,
 5   P.J. Anand was the other acquaintance.
 6        Q    Okay.  What about -- so you don't remember
 7   anything specific that Ms. Dipp said to you that you --
 8        A    Well, there would be conversations along the
 9   lines of "Theresa McNeely said that you did this."  And I
10   would say, "Well, that's not the case."  And I would go
11   to Theresa and say, 'Did you say this,' and she said, "I
12   never said that."
13             So there is a pattern of her really controlling
14   each of her direct reports in a way that we didn't trust
15   each other, which was her management style.
16        Q    Did any of the comments from Ms. Dipp have to
17   do with Augment that you then had a issue with?
18        A    I can't recall specific.
19        Q    And you said that you were aware that this
20   happened with other people on the staff --
21        A    Yes.
22        Q    -- where Ms. Dipp said something to other
23   people on the staff and then those people would have a
24   problem with what she had said.
25             So what do you recall about those instances?
0048
 1        A    David Harding often would come to me and say,
 2   "Michelle said this."  And I know that -- you know, "Did
 3   she say that?"  And I would say, "No, she didn't to me,"
 4   so there would be those kind of conversations.
 5        Q    Anyone else other than Mr. Harding?
 6        A    Chris Meyer, Theresa McNeely.
 7        Q    What did Chris Meyer say?
 8        A    Very similar conversations.  "Michelle said you
 9   said this," and I would say, "I did not say this."
10        Q    Okay.  So did I ask you why you left the
11   company?
12        A    You did.
13        Q    And what did you say?
14        A    I said that I was in strong disagreement with
15   the direction of the company.
16        Q    All right.  Okay.  Right.
17             Is there anything else you want to add on to
18   your reasons about the disagreement of the direction of
19   the company?
20        A    I think --
21        Q    That was it?
22        A    That covers it.
23        Q    So you made your statement in December of 2015,
24   and then you left about three months later?
25        A    Three months.
                              Page 26
```

OVAS_1211725

Tzianabos, Arthur - Vol. I.txt
```
 2   expect to reach its goal of a thousand Augment treatment
 3   cycles in process by the end of 2015?
 4        A    Because we still believed that we could get one
 5   of these clinics to commit in a big way to reach that
 6   goal.  That was the commercial believe.  That was the
 7   belief up and through this press release.
 8        Q    Is that belief based on any actual clinic that
 9   was in -- that was performing --
10        A    It was Fakih.
11        Q    Augment cycles --
12        A    Fakih's clinic.
13        Q    Which clinic?
14        A    Dr. Fakih's clinic in the UAE.  We felt --
15        Q    And how many had it performed?
16        A    He had performed not many as I recall.  But he
17   was promising that --
18        Q    He had performed that one commercial biopsy --
19        A    Right.
20        Q    -- which -- you know, back in the fourth --
21   that was recognized for the -- in February 2015 by the
22   company.  That was -- they had problems at the lab there,
23   right, and they were waiting for the inspection.
24             And isn't it true that the thousand Augment
25   treatment cycles was predicated upon a significant uptake
0253
 1   in the UAE as a result of the new health insurance
 2   coverage and other -- and here I'm reading from the press
 3   release -- "programs that include driving first-line use
 4   of the Augment treatment"?  Wasn't that the only way that
 5   the thousand could be maybe achieved?
 6        A    That's what I was saying, yes.
 7        Q    But in fact, the UAE didn't -- you did not have
 8    -- the company did not have health insurance coverage.
 9   Or let me rephrase that.  The UAE did not have the health
10   insurance coverage.
11        A    And I was not aware of that.  My belief --
12        Q    Who knew about that?
13        A    I'm sorry?
14        Q    Who knew that they didn't have insurance
15   coverage?
16        A    I'm assuming Michelle, and I don't know of
17   anybody else.  Everybody else assumed.
18        Q    How did this release go out about the insurance
19   coverage and that you're going to get the thousand based
20   on the insurance coverage when there was no insurance
21   coverage?
22        A    That's a question for Michelle.
23        Q    Do you understand you were the president at
```
Page 137

Confidential

OVAS_1211836

                          Tzianabos, Arthur - Vol. I.txt
24   this time of the company -- at the company and you
25   reviewed this?
0254
 1        A    I understand.  It was a title that was given to
 2   me.  I was the R&D and the manufacturing person.  The
 3   decision to run commercial decisions around projections
 4   were made by Michelle and made by the commercial team.
 5        Q    I mean, did you -- were you aware that there
 6   was no written approval for the insurance coverage at the
 7   time?
 8        A    I was not aware that there was no written
 9   approval.  I was told there was approval and there was --
10   and we had it.
11        Q    Did you -- were you aware -- were you aware
12   that the company was waiting for a no-objection letter
13   from the DHA?
14        A    I was not aware of that.
15        Q    Were you aware that the DHA requested
16   additional information on August 8 regarding Augment?
17        A    I was not aware of that.  I was isolated at
18   this point in time from Michelle because she and I had
19   parted ways philosophically around the direction of the
20   company.
21        Q    So what did that mean, that you were --
22        A    That I was being isolated from information that
23    -- around insurance, around access, around commercial.
24   I --
25        Q    Did Mr. Young know about the insurance?
0255
 1        A    I don't know.
 2             BY MS. DEITCH:
 3        Q    And who had the contacts with the DHA?
 4        A    Michelle.
 5             BY MS. SCHWARTZ:
 6        Q    The company after that -- in September 28,
 7   2015, they made an announcement that they did not expect
 8   to meet the goal of a thousand Augment treatments.  Do
 9   you recall that?
10        A    I do.
11        Q    And what -- how did that come about?  What were
12   the circumstances leading up to that?
13        A    It was clear to us at the time that we weren't
14   going to hit the goal, that the UAE wasn't going to come
15   through, and that we weren't going to -- able to get
16   another site on board.  Japan was delayed.  TCART was
17   still going but not going fast, so we made that decision.
18        Q    I'm going to show you what's been marked as
19   December -- oh.  And were you aware that the company was
                          Page 138

OVAS_1211837