# EXHIBIT 19

```
 1             IN THE UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3
 4   FADI DAHHAN, Individually
 5   and on behalf of All
 6   Others Similarly Situated,
 7            Plaintiffs,
 8       vs.                          Case No.
 9   OVASCIENCE, INC., et al.,        1:17-cv-10511-IT
10            Defendants.
11   _____/
12
13
14         VIDEOTAPED DEPOSITION OF DAVID HARDING
15                  MIDDLETON, WISCONSIN
16                 FRIDAY, JUNE 21, 2019
17
18
19
20
21
22
23   Reported by:
24   DEBORAH HABIAN, RMR, CSR, CCR, CRR, CLR
25   JOB NO. 10056328
```

1   belief in the clinical evidence, also had a
2   pretty clear view on the total market sizes of
3   some of the markets that we were planning on
4   entering or commercializing and believed that
5   there was, you know, sufficient demand for the
6   product to support commercialization.
7           MS. SHONSON:  Let's mark this as 3.
8                   (Harding Exhibit 3 was marked
9                    for ID.)
10          MS. SHONSON:  Oh, I'm sorry.  Can we
11  put this aside.  I'll give you another one.
12          MR. SYLVIA:  Is this still marked as 3?
13          MS. SHONSON:  Yes.  That's fine.
14          MR. SYLVIA:  Okay.
15                  (Harding Exhibit 4 was marked
16                   for ID.)
17  BY MS. SHONSON:
18     Q.   Okay, Mr. Harding, I've just handed you
19  what has been marked as Exhibit 4, which is a
20  Form 10-K filed by OvaScience --
21     A.   Um-hum.
22     Q.   -- for the fiscal year ended
23  December 31st, 2012 with United States
24  Securities and Exchange Commission.
25          Have you seen this document before?

```
 1      A.  Not to my knowledge.
 2      Q.  Okay.  I'm really only going to draw
 3  your attention to one page in this very long
 4  document which is 11.  So you -- sometimes the
 5  page numbers are kind of in the middle.
 6          Okay.  And do you see where it says
 7  "AUGMENT" in bold letters at the top?
 8      A.  Yes.
 9      Q.  Okay.  And do you see where it says
10  "Initiated AUGMENT Study" --
11      A.  (Reviewing document.)
12      Q.  -- In bold letters?
13      A.  On page 11?  Let's see.
14          MR. SYLVIA:  (Indicating to document.)
15          THE WITNESS:  Oh, right here.
16          MR. SYLVIA:  In the bold.
17          THE WITNESS:  Oh, yes, I do.  I beg
18  your pardon.
19  BY MS. SHONSON:
20      Q.  Yes, these things are really small.
21  So, okay, could you please read for me
22  starting -- into the record as -- at -- with the
23  word "an" under "Initiated AUGMENT Study"?
24      A.  "An institutional review board, or IRB,
25  has approved the protocol for our AUGMENT Study
```

1   and, as of February 1, 2013, we have initiated
2   this study in two IVF clinics.  The protocol for
3   this study calls for the enrollment of up to 40
4   premenopausal female patients between the ages
5   of 38 and 42 who have failed at least two but
6   not more than five previous IVF attempts.  The
7   IVF clinic will take an ovarian biopsy from each
8   patient, from which we will obtain mitochondria
9   from the patient's own egg precursor cells.  We
10  will then add the patient's mitochondria to her
11  own egg during the ICSI fertilization process."
12       Q.  Do you mind continuing on, please?
13       A.  Okay.
14           "The patients will be divided into four
15  cohorts of 10 patients each.  Following
16  treatment of each cohort and through the
17  duration of each patient's pregnancy, we plan to
18  review the relevant safety and efficacy data of
19  all patients who have been treated, including
20  adverse events, miscarriages, premature births
21  or -- and congenital malformations, if any, as
22  well as fertilization rates, progression to
23  blastocyst, chemical pregnancy, gestational
24  sacs, and live births.  We will determine
25  whether to adjust the amount of mitochondria

1  given to the patients in subsequent cohorts.
2  Depending on the pace at which we enroll the
3  study, we expect to be able to analyze
4  preliminary pregnancy rate data in late 2013.
5  We expect to make our decision as whether to
6  proceed with the commercialization activities
7  for AUGMENT based on these preliminary data."
8      Q.  Okay.  And if you could just read the
9  next two sentences, and then we're --
10     A.  "The primary objective of the study
11 will be to evaluate the safety of AUGMENT in
12 women undergoing IVF who have had a history of
13 IVF failure.  The secondary objective of the
14 study will be to evaluate egg and embryo
15 quality, fertilization, implantation, pregnancy
16 and live birth rates."
17     Q.  Thank you.
18         Are you familiar with the study
19 referenced in this 10-K?
20     A.  I do not have any intimate knowledge of
21 it, no.
22     Q.  All right.  Now I'm going to hand you
23 Exhibit 3 --
24     A.  Okay.
25     Q.  -- which is right here.  (Tendering

```
 1   document to witness.)
 2           Okay, this, Mr. Harding, I've just
 3   marked as Exhibit 3 is a Clinical Study Report
 4   dated October 30th, 2014.
 5       A.  Um-hum.
 6       Q.  It's got a Bates range of OVAS_0045195
 7   through 0045229.
 8       A.  Um-hum.
 9       Q.  Have you ever seen this document
10   before?
11       A.  Not to my knowledge.
12       Q.  Okay.  If you would turn to, okay,
13   page 27 on the bottom, which is 0045221.
14       A.  (Witness complying.)
15           Sorry.  0045221?
16       Q.  Yes.  But it has a bold -- for ease of
17   reference it says "27."
18       A.  Okay.  Okay.
19       Q.  Okay.  There's a section labeled 9.1
20   "Subject Disposition."
21       A.  Um-hum.
22       Q.  Could you please read this paragraph
23   into the record for me?
24       A.  Sure.  "A total of 23 subjects were
25   screened for the study and 19 subjects were
```

1   enrolled.  'Enrolled' for the purposes of this
2   trial was defined as undergoing an ovarian
3   biopsy.  Of the 19 subjects enrolled, 9 were
4   treated with AUGMENT, 7 were placed on hold and
5   subsequently discontinued from the trial after
6   it closed, and 3 were terminated early due to
7   ovarian stimulation failure (n=2) and natural
8   pregnancy prior to IVF (N=1).  A complete
9   listing of final disposition for treated
10  subjects is included in Table 3 below."
11     Q.  So based on this description -- strike
12  that.
13          Does this description refresh your
14  recollection of the study referenced in the
15  10-K?
16     A.  It does not because I don't -- yeah,
17  this was before I officially started at the
18  company and I'm... (reviewing document) just
19  seeing this for the first time in my memory
20  here.
21     Q.  Okay.  So according to the Subject
22  Disposition, how many patients were actually
23  treated with AUGMENT?
24          MR. SYLVIA:  Object.  You're just
25  asking him to read what's on the page?  He's

David Harding                                                      Dahhan vs. OvaScience, Inc.

1   told you he has no knowledge of this study.
2           MS. SHONSON:  That's fine.
3           MR. SYLVIA:  Is that what you're asking
4   him to do, just to read --
5           MS. SHONSON:  I'm asking him to read --
6           MR. SYLVIA:  -- what's on the page or
7   are you asking for his knowledge?
8           MS. SHONSON:  I'm asking him based on
9   the Subject Disposition to tell me how many
10  people he sees that were treated with AUGMENT.
11          MR. SYLVIA:  So I'm correct, you're
12  asking him to read from what's on the document?
13          MS. SHONSON:  Can you please refrain
14  from speaking objections?
15          MR. SYLVIA:  No.  I'm asking you to
16  clarify so he understands you're asking the
17  witness a question about something he's already
18  testified he has no knowledge of.  So I want to
19  clarify for the record all you're asking him to
20  do is read what is on the page on Exhibit 3.
21          MS. SHONSON:  I'm asking him to read
22  this and answer the question based on what he
23  sees.
24  BY MS. SHONSON:
25      Q.  And if the question is not clear to

```
 1   you, you're free to let me know.
 2        A.   Nine patients completed the protocol,
 3   as I understand it.
 4        Q.   Okay.  And are you able to tell from
 5   the information on this page how many of those
 6   patients had a pregnancy?
 7        A.   (Reviewing document.)
 8             If I'm reading the table correctly,
 9   it's -- there were no pregnancies.
10        Q.   Okay.  And, now, where it says in the
11   table "Loss" as -- does that mean there was
12   initially a pregnancy based on the information?
13        A.   Oh, yeah, I beg your pardon.  Yes.
14   Yes, so that means there was a pregnancy.  I'm
15   sorry, yeah, there were two that did become
16   pregnant and the fetus was lost.
17        Q.   Okay.  All right, can you turn, please,
18   to page 29?
19        A.   (Witness complying.)
20        Q.   Do you see where it says at the bottom
21   of the page "Deaths and Serious Adverse Events"?
22        A.   Um-hum.
23        Q.   Can you read for me starting with the
24   word "Two" --
25        A.   Yeah.
```

David HardingDahhan vs. OvaScience, Inc.

1   Q.   -- on the bottom of this page up to the
2 first paragraph at the top of 30?
3   A.   "Two serious adverse events (SAEs)
4 occurred during the study.  Both subjects had
5 spontaneous abortions that were deemed to be
6 important medical events.  Subject 106 had a
7 spontaneous abortion of a fetus with Trisomy 18.
8 The subject had fetal cell DNA drawn and results
9 showed possible Trisomy 18.  Approximately 10
10 days later the subject had fetal demise and a
11 cystic hygroma was diagnosed when she presented
12 for chorionic villus sampling.  Two days later
13 the subject had a Dilation and Evacuation (D&E).
14 Pathology of the fetal tissue confirmed
15 Trisomy 18.  Subject 110 had a spontaneous
16 abortion with aneuploidy.  The subject presented
17 for a follow-up visit at approximately 8 weeks
18 gestational age.  Ultrasound demonstrated no
19 fetal pole and fetal heartbeat was absent.  This
20 was consistent with a spontaneous abortion.  A
21 Evacuation and Dilatation (D&E) was elected and
22 performed the following day.  Fetal tissue was
23 sent for chromosomal analysis, which showed
24 triploidy."
25   Q.   Do you believe this data demonstrated

```
 1   the safety of the AUGMENT treatment at that
 2   time?
 3           MR. SYLVIA:  Objection.
 4           THE WITNESS:  I -- yeah, I can't
 5   comment on that.
 6   BY MS. SHONSON:
 7       Q.  Why can't you comment?
 8       A.  I'm not a physician.
 9       Q.  Now, you said that -- earlier that
10   clinical evidence drove your belief that the
11   treatment could be commercialized.
12       A.  (Nodding.)
13       Q.  So it seems you've -- have you reviewed
14   clinical evidence before?
15       A.  Yes, I have.
16       Q.  But -- but you're not -- unable to
17   comment on this clinical evidence?
18           MR. SYLVIA:  Objection.
19           THE WITNESS:  (Reviewing document.)
20           This is the first time I'm seeing this,
21   so I really can't comment on it.
22   BY MS. SHONSON:
23       Q.  And in sitting here today, do you think
24   it supports the safety of the AUGMENT treatment
25   at the time?
```

1  you had seen that letter?
2      A.  I mean, I think at the time we
3  understood there was enough kind of back and
4  forth that, you know, it was going to take
5  awhile to get it resolved, and so we had sort of
6  moved our forecasting efforts to other venues
7  and other geographies.
8      Q.  The ones we discussed earlier?
9      A.  Yeah.
10     Q.  Okay.  So as of the date of your memo
11 that we were just discussing, there were only
12 four operating clinics; is that correct?
13     A.  That's correct.
14     Q.  Okay.  But three of them were not
15 operable.  Is that commercially?
16     A.  So Canada was in operation, Turkey was
17 kind of getting back up, and the UAE was
18 awaiting resolution and the UK lab did not open,
19 so...
20     Q.  So there were no treatments being
21 performed in the UK?
22     A.  None in the UK.
23     Q.  And you said the UAE lab was not
24 commercially viable.  So there were no
25 commercial treatments being performed there; is

David Harding                                                  Dahhan vs. OvaScience, Inc.

```
 1        Q.  -- this document, did you prepare this
 2   AUGMENT Patient Pipeline document?
 3        A.  Yes.  I or my team did, yes.
 4        Q.  AUGMENT patient pipeline, was that a
 5   tool used to measure demands?
 6        A.  Yes.
 7        Q.  Okay.  Was it the primary tool?
 8        A.  This was our primary -- yeah, this was
 9   our primary reckoning of demand in the pipeline
10   for this.
11        Q.  And was it the primary tool during the
12   Class period?
13        A.  Yeah, I don't know that this was what
14   we used right out of the gate, but, yes,
15   certainly during this period this was the tool
16   we were using.
17        Q.  Okay.  And a little bit earlier today
18   we talked about inquiries, and I believe you
19   told me that inquiries would either have been an
20   e-mail a phone or sort of a web type of contact;
21   is that correct?
22        A.  That's correct, yes.
23        Q.  And I believe you referred to inquiries
24   as the indicating leader for demand; is that
25   correct?
```

```
 1        A.   Yes.
 2        Q.   Okay.  So turning to this chart, it
 3   says "Inquiries Received" and it's -- there's a
 4   total and, you know, it's divided --
 5        A.   Yeah.
 6        Q.   -- by the clinics.  So is the inquiries
 7   received in the patient pipeline is how many
 8   inquiries each clinic has received --
 9        A.   That's correct.
10        Q.   -- as defined by a phone contact, an
11   e-mail or a web contact?
12        A.   Yes.
13        Q.   Okay.  And the total would be for all
14   of those clinics; is that correct?
15        A.   That's right.
16        Q.   Okay.  The next line down says
17   "Questionnaires Received".  What does it mean by
18   "questionnaires"?
19        A.   So not all patients were eligible for
20   AUGMENT and so, you know, it wasn't simply
21   enough to just make an inquiry, you had --
22   actually had to fill out a questionnaire, and
23   then, you know, the nurses or clinicians at that
24   clinic had to say, Okay, based on your
25   responses, you qualify for AUGMENT treatment.
```

1      Q.   Who developed the questionnaire?
2      A.   I'm sure it was some combination of the
3   marketing team plus our clinical advisors or our
4   chief medical officer.
5      Q.   And did each clinic use the same
6   questionnaire?
7      A.   I think it was pretty similar.  I mean,
8   I'm sure it was all adjusted for languages and
9   things like that, but -- you know, they each
10  probably put their unique spin on it, but in
11  essence it was largely the same thing.
12                  (Harding Exhibit 12 was marked
13                   for ID.)
14  BY MS. SHONSON:
15     Q.   Okay.  Okay, I have marked as
16  Exhibit 12 a document with the Bates range of
17  OVAS_0087982 through 0087996.  It's a document
18  that has an e-mail from -- first from Richard
19  Spector to Arthur Tzianabos and Katie Pare for
20  AUGMENT process mapping; is that correct?
21     A.   Yes.
22     Q.   And then it looks like she -- she
23  responded to Richard Spector and Arthur
24  Tzianabos and said "Hi, Arthur.  Please find
25  attached a slightly revised version that

```
 1   you know, biopsy -- a biopsy decision.
 2       Q.  And do you recall how much longer it
 3   was than you had anticipated?
 4       A.  I don't.
 5       Q.  Okay, turning back to bullet 1 for a
 6   second, at the beginning of the bullet, it says
 7   "Pipeline of new ACE clinics is strong, but pace
 8   of conversion and implementation needs to be
 9   accelerated."
10       A.  Yep.
11       Q.  What did you mean by "pace of
12   conversion and implementation needs to be
13   accelerated"?
14       A.  So these were specifically referring to
15   CARE, IVI, IVF Japan, and the other Canadian
16   clinics.  So, you know, these were all clinics
17   that -- you know, with which we had had
18   discussions and were very promising, but the
19   point was that we need to get them online as
20   soon as possible.
21       Q.  And did you need to get them online in
22   order to meet the thousand cycle --
23       A.  Yeah, that was -- that was an important
24   piece, yes.
25       Q.  Okay.  And in the second bullet when
```

1   you said that "inquiry flow at the top of the
2   funnel had been modest," did that mean demand
3   was not robust for the treatment?
4        A.  I would say that demand was robust.  It
5   maybe was not -- in my judgment at that time, it
6   wasn't as robust as I would have liked it to be.
7        Q.  And what do you base the fact the
8   comment that it was robust on?
9        A.  I -- again, it's looking at, you know,
10  total number of patient inquiries as an
11  indicator of, you know, how well we were
12  marketing and getting the word out.
13       Q.  And you thought it was robust?
14       A.  No, I'm saying it wasn't sufficiently
15  robust --
16       Q.  Oh, robust, yeah.  Sorry.
17       A.  -- at this point.
18       Q.  Okay.  Turning to page 0108575, this --
19  the top of this slide reads "Top issues to
20  resolve in patient conversion pipeline."
21           The first bullet says "How can we drive
22  more patients into the first stage of the
23  pipeline (initial inquiry )."  Why was that a
24  top issue?
25       A.  I mean, it's just like any business.

1    Right?  If you don't get people asking about
2    your product, you don't get -- you don't get to
3    sell them your product.  So you're always
4    filling that top of the pipeline.  Right?  And
5    top of the patient funnel is the most -- you
6    know, one of the most important things.  It's a
7    critical factor.  It's not the only factor, but
8    it's important to have initial demand.
9         Q.   And if you weren't able to drive more
10   patients into the first stage of the pipeline,
11   initial inquiry, would that have negatively
12   impacted the ability to meet the 1000 cycles in
13   2015?
14        A.   Yeah, I mean, in theory, yes.  Um-hum.
15        Q.   Okay.  And then, finally, turning to
16   the page market OVAS_0108577, there's a slide
17   titled "New approaches to pricing may be
18   necessary until initial clinical experiences are
19   published."  Please take a moment to review that
20   slide.
21        A.   Um-hum.  (Reviewing document.)
22             Yep.
23        Q.   Why would new approaches to pricing be
24   necessary at the first -- the title of the
25   slide?  Why would new purchase to pricing be

1    Q.  Okay.  And the "moderate conversion
2  rate," what does that refer to?
3    A.  Well, I -- you know, obviously, you
4  know, from 168 initial inquiries into 38
5  advanced screening, that's -- you know, you'd
6  like to have your yield quite a bit higher than
7  that.
8    Q.  In order to make the thousand cycles
9  going forward, would you have had to pick up
10 that yield?
11   A.  We needed to improve on all aspects of
12 the business.
13   Q.  To get to the 1000 cycles?
14   A.  Yeah.  I mean, it's very typical in an
15 early stage product launch, right, you put
16 something out there that's new to the market,
17 you've got to figure out ways to optimize the
18 business.
19   Q.  Okay, turning to the next slide
20 OVAS_0086134 --
21   A.  Yeah.
22   Q.  -- okay, there's a slide that says
23 "Potential Solutions to Address Challenges."
24   A.  Um-hum.
25   Q.  I think it's the one right before the