# EXHIBIT 29

```
0001
 1  THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3  In the Matter of:        )
 4                           )
 5  OVASCIENCE, INC.         ) File No. HO-12935-A
 6
 7  WITNESS:  David Harding
 8  PAGES:    1 through 281
 9  PLACE:    Securities and Exchange Commission
10            100 F Street, NE, Room 6
11            Washington, D.C.  20549
12  DATE:     Monday, July 23, 2018
13
14       The above-entitled matter came on for hearing, pursuant
15  to notice, at 9:55 a.m.
16
17
18
19
20
21
22
23
24          Diversified Reporting Services, Inc.
25                (202) 467-9200
0002
 1  APPEARANCES:
 2
 3  On behalf of the Securities and Exchange Commission:
 4       HELAINE SCHWARTZ, ESQ., Senior Counsel
 5       LISA DEITCH, Assistant Director
 6       Division of Enforcement
 7       Securities and Exchange Commission
 8       100 F Street, NE
 9       Washington, D.C.  20549
10       202-551-4826
11
12  On behalf of the Witness:
13       JOHN F. SILVA, ESQ.
14       Mintz Levin
15       One Financial Center
16       Boston, Massachusetts  02111
17       617-542-6000
18
19
20
21
22
23
24
25
0003
 1            C O N T E N T S
 2  WITNESS:                    EXAMINATION
 3  David P. Harding                 4
```

22        MS. SCHWARTZ: All right. Let's go off the record.
23  It's 1 o'clock.
24        (Whereupon, at 1 o'clock p.m., the examination was
25  recessed for lunch.)
0139
1             AFTERNOON SESSION
2        MS. SCHWARTZ: Let's go back on the record. We
3  were off the record for a lunch break. It's five minutes
4  after 2, and there were no conversations of substance
5  relating to the investigation, except that I did mention that
6  I will need to have some of those notes that you've been
7  referring to. We're going to need those and copy them. So
8  is that correct?
9        MR. SYLVIA: That's correct.
10       THE WITNESS: Yes.
11       MS. SCHWARTZ: Okay.
12           (SEC Exhibit No. 12 was marked for
13           identification.)
14       MS. SCHWARTZ: So I had marked as Exhibit 12. It's
15  -- it's not Bate-stamped. It's a three-page document that
16  Mr. Sylvia provided to me right before testimony, and I think
17  he said he'll be sending me Bates Numbers on it.
18       MR. SYLVIA: I will also send you Bates Stamps with
19  the other notes. You can have the copies today but just so I
20  have them for the record, I'll send them to you.
21       MS. SCHWARTZ: Oh, okay, okay.
22       BY MS. SCHWARTZ:
23   Q   So, anyway, so it's a three-page document and it's
24  dated August 20th, 2015. It's a Serious Ethical Concerns
25  about the Leadership of OvaScience's CEO, and then on the
0140
1  last page, it's signed by you, David P. Harding, and then
2  there's a Notary Public who, I guess, they certified this on
3  August 31st, 2015.
4        So tell me about Exhibit 12, Mr. Harding.
5    A   Yeah. When it was clear that I was going to
6  transition out of the company, I thought it was important for
7  me to document my thoughts and, you know, the concerns that I
8  had about Michelle in particular, so that I had a clear
9  record of -- of what had transpired and just wanted to have
10  this for my own personal records.
11   Q   Have you ever shown it to anyone?
12   A   No, except for Jack.
13   Q   And -- and have you ever done this before,
14  something like this before, --
15   A   No.
16   Q   -- where you've written notes to yourself and then
17  had them certified?
18   A   No, I have not.
19   Q   Okay. But you felt it was necessary to do that in
20  this instance?
21   A   Yes.
22   Q   And why was that?
23   A   I just felt that Michelle was acting in a way that
24  was unethical and I wanted to have it documented, so that,
25  you know, my concerns were recorded.

Confidential
OVAS_1211530

0141
1  Q  Mm-hmm. Okay. So we've gone over some of these
2  concerns --
3  A  Mm-hmm.
4  Q  -- and you've mentioned about the insurance issue
5  --
6  A  Yes.
7  Q  -- and the United Arab Emirates --
8  A  Yes.
9  Q  -- and -- and that's, I guess, what you're
10 referring to in Paragraphs 2 and 3 --
11 A  Yep.
12 Q  -- and Paragraph 4.
13 A  Mm-hmm.
14 Q  And so basically just high level, what was your
15 concern again, just so that we can --
16 A  My concern was that there was no physical
17 documentation that the insurance coverage from Daman was in
18 effect and at the same time, there were statements being made
19 in our public documents that this insurance was available and
20 so that was a -- that was a source of concern for me.
21 Q  Okay.
22    MS. SCHWARTZ: I'm going to also have marked as
23 Exhibit 13.
24    (SEC Exhibit No. 13 was marked for
25    identification.)
0142
1    BY MS. SCHWARTZ:
2  Q  This is the 10-Q the company filed for the Second
3  Quarter, for the Quarterly Period-Ended June 30th, 2015. It
4  was signed on August 10th, 2015, by Dipp and Jeff Young. I
5  hope I did this right.
6  A  Thank you.
7  Q  And that's Exhibit 13. Okay. So I'm going to call
8  your attention to the 10-Q. Is this the 10-Q you were
9  referring to in Exhibit 12 when you said that, you know, you
10 were concerned about statements?
11 A  Yes.
12 Q  Okay. So why don't you take a look at -- it's
13 going to be right here, Page 26 of 42, around there. It's
14 Page 14 of the document. I'm sorry. Page 15 or so of the
15 document.
16 A  Okay.
17 Q  Do you see that?
18 A  Yes.
19 Q  Are those the statements that you were referring
20 to?
21 A  Yes.
22 Q  And --
23 A  Yes.
24 Q  And what in particular?
25 A  My concerns were that we did not have any written
0143
1  substantiation that the insurance was in place. I was
2  assured on multiple occasions that it was and that verbally
3  we had obtained agreements from Daman to in fact, you know,

4  have this procedure covered and there were multiple e-mails
5  that supported that, but I never saw any physical
6  documentation.
7   Q   So what statements in Exhibit 13 were most
8  concerning to you?
9   A   The statements in and of themselves were not
10 concerning. It was only the fact that they were not backed
11 up by some piece of paper from the Daman Insurance Agency.
12  Q   And it was your understanding that -- that the
13 insurance agency had to provide written documentation, is
14 that correct?
15  A   Yes.
16  Q   Okay.
17     MS. SCHWARTZ: I'm going to mark as Exhibit 14.
18         (SEC Exhibit No. 14 was marked for
19          identification.)
20     BY MS. SCHWARTZ:
21  Q   This -- these are Bate-stamped OVASE16476 through
22 16482. It's, you know, an e-mail chain from David Heyman at
23 Fakih IVF.
24  A   Yep.
25  Q   The first page, which would be the last e-mail, was
0144
1  August 6th, 2015, and this is Exhibit 14. So, first, when
2  you read these e-mail chains, you start on the last page, the
3  last page, see the -- you know, the first e-mail, and I
4  guess, so if you look on the e-mail that was sent -- right
5  here.
6       The e-mail on the bottom half of the page that was
7  sent from Michelle Dipp on August 5th, --
8   A   Mm-hmm.
9   Q   -- you're cc'd on that.
10  A   Yes.
11  Q   Okay. What -- what was this e-mail chain about?
12  A   This was asserting to Dr. Fakih and Dr. Heyman that
13 we had at least a verbal agreement to move forward with the
14 payments from Daman.
15  Q   And you're cc'd on it?
16  A   Correct.
17  Q   Okay. And then there was a response --
18  A   Mm-hmm.
19  Q   -- from David Heyman, which is --
20  A   Yep.
21  Q   You see that --
22  A   I see that.
23  Q   -- and you're cc'd on that?
24  A   Yes.
25  Q   And he writes, "Dear Michelle: Thank you. We are
0145
1  hopeful that we will be receiving official written response
2  from HAAD, H-A-A-D, and thereafter from Daman --
3   A   Yep.
4   Q   -- regarding AUGMENT in the next 10 days," --
5   A   Mm-hmm.
6   Q   -- right? And there is a response to that, you're
7  also cc'd on that, on August 5th from Michelle. What does

```
 8  she say?
 9     A   She said there was -- well, Dr. Fakih asked for a
10  no objection letter from Dr. Maha.  She said it was not
11  necessary.
12     Q   And who's Dr. Maha?
13     A   Dr. Maha was an official at the Dubai Health
14  Authority, as I recall.
15     Q   Okay.  And, all right, I interrupted you.  So she
16  asked -- okay.  So what does she say?
17     A   She said it was not necessary to receive a no
18  objection letter.
19     Q   Okay.  And then --
20     A   And it doesn't require any further documentation
21  from HAAD.
22     Q   -- so Michelle Dipp is writing to the folks at the
23  IVF clinic --
24     A   Correct.
25     Q   -- in the UAE --
0146
 1     A   Yes.
 2     Q   -- and then there is -- and that's on August 5th at
 3  9:39 --
 4     A   Correct.
 5     Q   -- and then she also writes another e-mail, right?
 6     A   Mm-hmm.
 7     Q   There's no response.  So it's on the bottom of the
 8  first page of Exhibit 14.  She writes on August 5th, --
 9     A   Yep.
10     Q   -- 2015, "Dear Dr. David and Dr. Fakih:  It sounds
11  like there continues to be confusion on whether or not HAAD h
12  ad approved AUGMENT.  We have had HAAD," say that, H-A-A-D,
13  "approval since we started working with you.  Can I suggest
14  we schedule a call to address any concerns you might have?"
15     A   Yep.
16     Q   And what does Dr. Heyman say back to Michelle?
17     A   On the top of this Exhibit 14, it says, "As you
18  know, we have not received any objections to AUGMENT in the
19  UAE and our discussions have all been favorable.  However,
20  similar to the U.S., we cannot publish a claim such as "HAAD
21  approved or FDA approved" unless we have written document
22  stating the same.  So we would like to make a communication
23  and can do so as soon as we receive any one of the written
24  responses below:  approval or no objection from HAAD in Abu
25  Dhabi, approval or no objection from DHA in Dubai, or
0147
 1  agreement with Daman that sort of states the insurance
 2  coverage that specifically documents that Daman Insurance
 3  will cover the AUGMENT payment."
 4     Q   Okay.  And do you know if there was any follow-up
 5  between Michelle Dipp or anyone from OvaScience with the
 6  folks over at Fakih before the 10-Q was filed for the second
 7  quarter?
 8     A   There were apparently multiple conversations, both
 9  with the Health Authorities, with Fakih.  It was an ongoing
10  almost daily set of conversations.
11     Q   And as of August 10th, 2015, it's your testimony
```

12  that there was no written documentation?
13     A    I had not seen any.
14     Q    Did you hear that there was written documentation
15  --
16     A    No.
17     Q    -- stating that there had been HAAD approval for
18  insurance?
19     A    Yeah.  HAAD would not have stated the insurance
20  approval.  That would have come from Daman.
21     Q    Okay.  Why don't you just clarify for me what's
22  HAAD?
23     A    HAAD is the Health Authority, right, so the
24  governmental health authority --
25     Q    Okay.
0148
 1     A    -- of Abu Dhabi.
 2     Q    So there had been no approval or no objection
 3  letter from the Health Authority in Abu Dhabi?
 4     A    Correct.
 5     Q    And what is DHA?
 6     A    Dubai Health Authority, again that's the
 7  governmental regulatory body.
 8     Q    And there had been no approval and/or no objection
 9  letter from DHA?
10     A    Right.  Mm-hmm.
11     Q    And then what -- tell me what Daman is?
12     A    Daman is an insurance company.
13     Q    So did there have to be approval before any
14  agreement with Daman was entered into?
15     A    I don't believe that Daman required an approval
16  necessarily, but we were looking for a statement that they
17  would cover the AUGMENT treatment --
18     Q    Okay.  So --
19     A    -- and that's what Dr. -- I beg your pardon -- and
20  that's what Dr. Heyman was asking for, right, one of the
21  three of these things.
22     Q    And -- and was there an agreement with Daman as of
23  August 6th, 2015?
24     A    Michelle and Ryan stated that there was an
25  agreement.  I had just not seen any paper or electronic
0149
 1  evidence of it.
 2     Q    And also the 10-Q that I had marked as Exhibit 13,
 3  in addition to the statements about -- you know, about the
 4  healthcare insurance provider in the UAE, there's also a
 5  statement on the bottom of Page 26 out of 42.  "We continue
 6  to expect to achieve our goal of a thousand AUGMENT treatment
 7  cycles in 2015.  Our ability to achieve this goal will depend
 8  on continued use of the AUGMENT treatment in our partner
 9  clinics in new and existing regions, significant uptake in
10  the UAE as a result of the reimbursement by our national
11  healthcare provider, and other programs that include driving
12  first-line use of the AUGMENT treatment."  Okay.  What does
13  that mean, first-line use?
14     A    First-line use means that the patient does not have
15  to be a refractory patient, right.  They -- they can -- they

16 can use it if they have had any sort of fertility issues.
17 They don't have to go through previous, you know, failed
18 cycles in order to use AUGMENT. So if they had initial
19 concerns about their fertility, they could use AUGMENT
20 straight out of the gate and not have to go through multiple
21 failed cycles in traditional IVF before using AUGMENT.
22      Q   Jeff Young, Jeffrey Young, the CFO, was he involved
23 or in any of the communications between the UAE and
24 OvaScience regarding the issue with the HAAD approval or the
25 DHA approval or the Daman approval?
0150
1       A   I don't know specifically.
2       Q   Do you know whether he was made aware of the fact
3 that the folks at the UAE said that there had to be written
4 documentation regarding, you know, insurance approval from
5 the UAE?
6       A   I don't know specifically, but I would have to
7 assume in his role that that was an important piece of
8 evidence to support statements.
9       Q   Okay. Okay. Also in Exhibit 12, your letter,
10 starting at the bottom of the second page, --
11      A   Yep.
12      Q   -- "The lying is prevalent throughout the office
13 environment with Michelle routinely misstating the facts
14 regarding interactions and making up stories out of whole
15 cloth." What -- what was the basis for you saying that?
16      A   People would go into Michelle's office. They would
17 be told something. They would come out of those meetings
18 and, for example, there was something that Michelle said in
19 theory about me. The person who was, you know, in that
20 discussion would come to me and say, David, is this true, and
21 I said, no, it's completely false, and so there were just
22 stories being made up about people on a fairly routine basis
23 --
24      Q   What --
25      A   -- that were false.
0151
1       Q   What did she say about you?
2       A   I don't remember precisely, you know, the -- the
3 accusations or -- or statements, but, you know, all I
4 remember is that they were just untrue.
5       Q   Can you think of one thing that she said about you
6 that you took exception to?
7       A   I'm having a hard time recalling a very specific
8 example.
9       Q   Was it something personal, --
10      A   No.
11      Q   -- like an allegation against you?
12      A   Not necessarily, but it was -- it was things like,
13 hey, you know, David, you said that the following three
14 things were happening, and -- and -- you know, and invariably
15 those were not accurate, you know. There was some kernel of
16 truth somewhere in there but then it was sort of exaggerated,
17 but I don't recall specific, you know, stories at this point.
18      Q   Do you recall any stories regarding anyone else at
19 OvaScience?

Confidential
OVAS_1211535

```
20    A    What I recall is that this was kind of a common
21  office procedure where we would -- we would come out of
22  meetings with Michelle and, you know, kind of review what was
23  said about various individuals and then, you know, try to
24  triangulate what was actually factual, but I can't recall a
25  specific incident per se.
0152
 1    Q    Okay. I'm going to ask you, are you aware of any
 2  specific statements in any of the other SEC filings made by
 3  OvaScience that you, you know, you think were not true or --
 4  or that you had some issue with, other than this one, the
 5  insurance issue in the 10-Q?
 6    A    Yeah, yeah. That's the only one.
 7    Q    I'm going to go through some of the specific issues
 8  with some of the ACE clinics now. Okay? So like the first
 9  one I want to go through is the CARE Fertility in the United
10  Kingdom.
11         MS. SCHWARTZ: I'm going to mark as Exhibit 15.
12             (SEC Exhibit No. 15 was marked for
13             identification.)
14         BY MS. SCHWARTZ:
15    Q    A series of e-mails, beginning with
16  OVASCIENCE175353 through 175360. Okay. So, Mr. Harding, you
17  were cc'd, you know, on the top of this --
18    A    Yep.
19    Q    -- e-mail, Exhibit 15, on December 16th, 2014.
20    A    Yep.
21    Q    Do you recall this e-mail?
22    A    Now I do, yes.
23    Q    You do?
24    A    Mm-hmm.
25    Q    What's the gist of this?
0153
 1    A    We were getting ready to announce that CARE
 2  Fertility in the U.K. was going -- you know, was an official
 3  ACE center. We were attempting to get everybody aligned so
 4  that the press releases could line up, both on their side and
 5  our side. We would be ready to receive patient inquiries.
 6    Q    What was the status of the CARE Clinic on December
 7  16th?
 8    A    We had a letter of intent that had been signed with
 9  them and we were going to make that public that they would be
10  offering AUGMENT in the future.
11    Q    Did -- because if you look at the bottom of the
12  first page of Exhibit 15, December 16th, Simon Fishel, --
13    A    Yep.
14    Q    -- who is he? You mentioned him earlier.
15    A    Simon was the head of CARE Fertility.
16    Q    Mm-hmm.
17    A    Physician.
18    Q    He writes to Ryan and Ryan is the general counsel
19  for --
20    A    Correct.
21    Q    -- OvaScience. "We still have to do the joint
22  draft to the HFEA. The chair of our IRB will be sending the
23  assigned letter of support that I will forward on to the HFEA
```

```
 8              (SEC Exhibit No. 19 was marked for
 9                 identification.)
10          BY MS. SCHWARTZ:
11     Q    So these are a series of e-mails and you're on the
12  top one.
13     A    Okay.
14     Q    Okay.  So this -- have you seen these before?
15     A    Yes.
16     Q    Yeah.
17     A    Obviously if I was copied on them, yes.
18     Q    What is the gist of this letter?  Is Dr. Casper
19  asking for additional compensation over and above his SAB
20  activity compensation and compensation for space and for
21  cycles initiated during the preceptorship?
22     A    Just give me a moment to read it, --
23     Q    Sure.
24     A    -- please.
25          (The witness reviewed the document.)
0174
 1          THE WITNESS:  Yeah.  So Dr. Casper was saying
 2  basically, look, I have done a lot of work to promote AUGMENT
 3  and, you know, I didn't receive some stock options a couple
 4  of years ago, would it be reasonable to ask for something
 5  more, given everything that I'm doing outside of my own
 6  practice to promote things.
 7          BY MS. SCHWARTZ:
 8     Q    And so what happened?
 9     A    So we were asked if -- if we could do a per diem
10  for any time that he spent outside of his normal clinical
11  practice, you know, speaking to other entities or -- or
12  things like that and as we mentioned earlier, you know, there
13  was a provision for providing a per diem payment or an hourly
14  payment for any time that he spent doing that.
15     Q    And what was that payment?
16     A    I would have to -- it was based on some reasonable
17  physician hourly or daily rate.
18     Q    And how -- how was the payment made?
19     A    I -- I don't know specifically.
20     Q    Do you know whether Mr. -- whether Dr. Casper had
21  submitted some kind of paperwork, expense report, or do you
22  know anything about -- about this, other than --
23     A    I believe he would have had to submit kind of --
24  some kind of documentation to justify that.
25     Q    And who approved that payment?
0175
 1     A    I think that would have been Jeff Young that would
 2  have had to approve that, and, you know, I probably had to
 3  sign off on his timesheets.
 4     Q    Whose timesheets?
 5     A    Any time that Dr. Casper had, you know, committed
 6  or documented.
 7     Q    Did you see timesheets for Dr. Casper?
 8     A    I'd have to think back and see the documents.
 9     Q    So on this Exhibit 19, you say to Michelle, "Yes,
10  as previously discussed."  What -- what does that mean?  I'm
11  sorry.  "As discussed previously."
```

```
12   A   As I recall, we had talked about, you know,
13 establishing, you know, kind of a per diem payment for
14 anything that he would do outside of his normal clinic
15 activities on behalf of promoting AUGMENT.
16   Q   And who, other than Dr. Casper, did OvaScience
17 enter into a similar arrangement with?
18   A   I'd like to see the documents, but my recollection
19 is that Dr. Oktay and possibly Dr. Fakih.
20   Q   Yeah. Do you know if those payments -- where --
21 where they came from, like which -- how they were made or how
22 they were recorded in the books and records of OvaScience?
23   A   Our -- our Accounting team would have to provide
24 that documentation, but I assume they were all made under
25 generally acceptable accounting principles.
0176
1    Q   Well, what's the basis for you saying that?
2    A   That we received, you know, some documentation of
3 the doctor's time and that there was a contract in place and
4 we -- you know, we were obligated to pay under those -- those
5 terms.
6    Q   So do you think that there was a written contract
7 about these sorts of payments to Dr. Casper and possibly
8 others for the per diem?
9    A   I'm pretty sure that there was, but I'd need to see
10 the documents.
11   Q   Okay.
12       MS. SCHWARTZ: I'm going to mark as Exhibit 20.
13           (SEC Exhibit No. 20 was marked for
14           identification.)
15       BY MS. SCHWARTZ:
16   Q   This is a two-page -- I'm sorry -- not two pages.
17 It's a two-page document, you know, front and back, Bate-
18 stamped 171308 to 171310, and it says Amendment Number 1 to
19 the Facilities Agreement, and it's Exhibit 20, and if you
20 look in the third page, 171310, is that your signature?
21   A   Yes, it is.
22   Q   Okay. So is this -- does this Exhibit 20, does
23 this have anything to do with the per diem to Dr. Casper or
24 is this something different?
25   A   Give me a moment to read it.
0177
1    Q   Sure.
2        (The witness reviewed the document.)
3        THE WITNESS: Yes, so this document was basically
4 to enable the use of TCART's facilities for other
5 reproductive centers to offer the AUGMENT treatment.
6        BY MS. SCHWARTZ:
7    Q   I'm sorry. What did you say? What was the first
8 thing?
9    A   So just setting the context, right, TCART had an
10 OvaScience lab within its facility. There were other
11 fertility centers within Canada that wanted to offer AUGMENT
12 but did not have the OvaScience laboratory facilities in
13 their -- in their premises. This was the agreement that
14 allowed for a payment to effectively process samples in the
15 TCART lab from outside bodies, from outside IVF clinics that
```