# EXHIBIT 33

# J.P.Morgan

June 12, 2015

STRICTLY CONFIDENTIAL

OvaScience, Inc.
215 First Street, #240
Cambridge, MA 02142

Attention:       Michelle Dipp, M.D., Ph.D.
                 Chief Executive Officer

Ladies and Gentlemen:

Pursuant to our recent discussions, we are pleased to confirm the arrangements under which J.P. Morgan Securities LLC ("J.P. Morgan") is engaged by OvaScience, Inc. the "Company") to act as its financial advisor in connection with the Company's strategic planning. For purposes hereof, the term "Company Group" shall mean the Company, together with its subsidiaries and affiliates.

Section 1. Financial Advisory Services.  During the term of this Agreement (as defined below), J.P. Morgan will:

(a) familiarize itself with the financial condition and business of the Company and review the Company's structural defenses, including its charter and by-law provisions;

(b) provide financial advice concerning the potential implementation by the Company of a shareholder rights plan (the "Rights Plan"), including the appropriate exercise price for the Rights Plan;

(c) periodically update the Company's senior management and Board of Directors regarding prevailing market conditions for mergers and acquisitions, with a particular focus on hostile activity and shareholder responses to various defensive strategies;

(d) assist the Company in preparing valuation analyses of the Company, using for such purpose information and assumptions provided by the Company, and assist the Company in identifying and evaluating the relative merits of various strategic and financial alternatives to a Transaction (as defined below);

(e) assist the Company in organizing a defense team of executive, financial, legal and other key personnel who would respond to any unsolicited offer for the Company; and

(f) assist the Company in evaluating, on a preliminary basis (and conditioned on the Company's compliance with the provisions of Section 3 below), the financial aspects of any proposal or offer (collectively, a "Proposal") the Company or any member of the Company Group may receive to sell or merge the Company or any member of the Company Group or any of their respective businesses, or to enter into any other form of business combination (each a "Transaction").

The Company and J.P. Morgan agree that the Standard Terms and Conditions attached hereto form an integral part of this Agreement and are hereby incorporated herein by reference in their entirety.

OvaScience, Inc.
June 12, 2015

Nothing herein shall be deemed to obligate the Company to enter into any Transaction.

Section 2. Other Assignments. Subject to J.P. Morgan providing the services contemplated in this Agreement, in the event that during the term of this Agreement or within one year following termination of this Agreement (the "Tail Period"), the Company (i) receives any Proposal to enter into a Transaction or (ii) otherwise determines to pursue a Transaction, the Company shall offer J.P. Morgan (which for purposes of this Section 3, shall include one or more of its designated affiliates) the right, together with the Other Advisor (defined below), to act as a financial advisor with respect to any such Proposal and as exclusive financial advisor, dealer manager, agent or counterparty, as applicable, with respect to a Transaction or any other transactions that may result from, or in anticipation of, the Company's receiving such a Proposal (including (i) any merger, sale, acquisition, divestiture, joint venture or other business combination, any direct or indirect repurchase by the Company of a significant amount of its securities (including, without limitation, by means of a derivative instrument), or (ii) any recapitalization of the Company, or any spin-off, split-off or other extraordinary dividend of cash, securities or other assets of the Company to shareholders of the Company (an "Alternative Transaction")).

The Company has informed J.P. Morgan that it may retain another financial advisor (the "Other Advisor") in connection with any Transaction or Proposal. The Company understands that J.P. Morgan and the Other Advisor are not and will not be deemed for any purpose to be acting as an agent, joint venture or partner of the other, and that J.P. Morgan does not assume responsibility, express or implied, for any actions or omissions of, or the performance of services by, the Other Advisor in connection with a Proposal or Transaction. Notwithstanding any other provision hereof, the Company may not appoint any Other Advisor to provide any of the services referred to above other than on business terms, including without limitation compensation, which are no more favorable to the Other Advisor than the terms offered for such services to J.P. Morgan.

If J.P. Morgan agrees to act in any such capacity, the Company and J.P. Morgan will enter into the appropriate form of agreement relating to the type of transaction involved and containing customary terms and conditions acceptable to the Company and J.P. Morgan, including provisions relating to the scope of J.P. Morgan's services, J.P. Morgan's compensation or other appropriate financial arrangements and an indemnification of J.P. Morgan. Unless specifically covered by a separate agreement setting forth such arrangement, the provisions of Section 1 of the Standard Terms and Conditions shall apply to each such transaction. The Company acknowledges that the foregoing is neither an express nor implied commitment by J.P. Morgan to act in any such capacity or to purchase or place securities, or to provide or be responsible to provide any financing or other financial services or enter into any other principal transactions, which commitment shall only be set forth in a separate written agreement in customary form for the type of services being provided.

Section 3. Expenses and Payments. The Company agrees to reimburse J.P. Morgan for, and J.P. Morgan will separately bill, its reasonable costs and expenses in connection with its engagement hereunder, as incurred, including travel costs, document production and other similar expenses, and reasonable fees and expenses of counsel and other professional advisors, and any irrecoverable value added or similar tax incurred thereon provided however that such costs and expenses (save for any contemplated under Section 1 of the Standard Terms and Conditions) shall not exceed in the aggregate $50,000 without the Company's prior written consent (not to be unreasonably withheld). All amounts payable under this Agreement are quoted exclusive of value added or similar tax and shall be paid in immediately available funds in U.S. dollars, without setoff and without deduction for any withholding, value-added or other similar taxes, charges, fees or assessments. If the Company is obliged by law to make any deduction or withholding from any such payment or J.P. Morgan makes any payment of any taxes,

OvaScience, Inc.
June 12, 2015

fees, expenses, assessments or other charges (other than taxes imposed on or measured by net income, franchise taxes, and branch profits taxes, in each case, imposed as a result of J.P. Morgan being organized under the laws of, having its principal office in or branch out of which work is being performed with respect to this agreement in, the jurisdiction imposing such tax), the amount due from the Company in respect of such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding or payment by J.P. Morgan, J.P. Morgan receives a net amount equal to the amount J.P. Morgan would have received had no such deduction or withholding or payment by J.P. Morgan been made. In the event of such deduction or withholding, the Company will deliver promptly to J.P. Morgan such tax receipts or other documentation as it may require.

Section 4. Term. This Agreement will be effective as of June 12, 2015 (the "Effective Date") and will expire on the date twelve months after the Effective Date, provided that, upon such expiry, the term hereof shall be automatically extended by twelve months. This Agreement may be earlier terminated with or without cause by the Company or by J.P. Morgan at any time and without liability or continuing obligation to the Company or to J.P. Morgan (except for any accrued expenses incurred by J.P. Morgan to the date of termination or expiration); provided that the provisions of Sections 2 (with respect to the Tail Period) and 3 hereof and Sections 1, 2 and 4 of the Standard Terms and Conditions shall survive any termination or expiration of this Agreement.

If the terms of our engagement as set forth in this Agreement are satisfactory, kindly sign the enclosed copy of this letter and return it to the undersigned. We look forward to working with the Company on this assignment.

Very truly yours,

J.P. MORGAN SECURITIES LLC

By: _____

    Name:  Henry Gosebruch
    Title:   Managing Director

Accepted and Agreed As Of
The Date First Written Above:

OVASCIENCE, INC.
By: _____
    Name: Jeffrey Young
    Title: Chief Financial Officer

Enclosure

OvaScience, Inc.
June 12, 2015

## STANDARD TERMS AND CONDITIONS

The following standard terms and conditions shall be incorporated by reference into the engagement letter dated June 12, 2015 between OvaScience, Inc. and J.P. Morgan Securities LLC to which these terms are attached (the "Engagement Letter"). Capitalized terms used below without definition shall have the meanings assigned to them in the Engagement Letter and any references herein to the "Agreement" shall mean the Engagement Letter together with these Standard Terms and Conditions.

### Section 1. Indemnification and Contribution.

(a) The Company agrees (i) to indemnify and hold harmless J.P. Morgan and its affiliates, and the respective directors, officers, agents, and employees of J.P. Morgan and its affiliates (J.P. Morgan and each such entity or person being referred to as an "Indemnified Person"), from and against any losses, claims, demands, damages or liabilities of any kind (collectively, "Liabilities") relating to or arising out of activities performed or services furnished pursuant to the Agreement, any Transaction or J.P. Morgan's role in connection therewith, and (ii) to reimburse each Indemnified Person for all reasonable expenses (including reasonable fees and disbursements of counsel) incurred by such Indemnified Person in connection with investigating, preparing or defending any investigative, administrative, judicial or regulatory action or proceeding in any jurisdiction related to or arising out of such activities, services, Transaction or role, whether or not in connection with pending or threatened litigation to which any Indemnified Person is a party, in each case as such expenses are incurred or paid. The Company will not, however, be responsible for any such Liabilities or expenses to the extent that they are finally judicially determined to have resulted primarily from J.P. Morgan's bad faith, gross negligence or willful misconduct. The Company also agrees that no Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company Group or any of its securityholders or creditors for or in connection with the Agreement, any Transaction or J.P. Morgan's role or services in connection therewith, except to the extent that any such Liabilities or expenses incurred by the Company are finally judicially determined to have resulted primarily from J.P. Morgan's bad faith, gross negligence or willful misconduct. In no event shall the Company or any Indemnified Person be responsible for any special, indirect or consequential damages incurred by the other; provided that nothing in this sentence shall be deemed to (i) relieve the Company of any obligation it may otherwise have hereunder to indemnify an Indemnified Person for any such damages asserted by an unaffiliated third party or (ii) relieve J.P. Morgan of any liability it may otherwise have hereunder to the Company for any such damages which the Company becomes legally obligated to pay to an unaffiliated third party.

(b) The Company shall not be liable for any settlement of any litigation or proceeding effected without its written consent. The Company will not, and will procure that the Company Group will not, without J.P. Morgan's written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any claim, action or proceeding relating to or arising out of activities performed or services furnished pursuant to the Agreement, any Transaction or J.P. Morgan's role in connection therewith, or participate in or facilitate any such settlement, compromise, consent to the entry of any judgment in or termination of any claim on behalf of the Company's Board of Directors, whether or not any Indemnified Person is an actual or potential party thereto, unless such settlement, compromise, consent or termination (i) includes an unconditional release of each Indemnified Person from any liabilities arising out of such claim, action or proceeding and (ii) does not include any statement as to, or any admission of, fault, culpability or a failure to act by or on behalf of any Indemnified Person. If the Company enters into any agreement or arrangement with respect to, or effects, any proposed sale, exchange, dividend or other distribution or liquidation of all or substantially all of its assets in one or a series of transactions, the Company shall provide for the assumption of its obligations under this Section 1 by the purchaser or transferee of such assets or another party reasonably satisfactory to J.P. Morgan.

OvaScience, Inc.
June 12, 2015

(c)  If the foregoing indemnification is unavailable or insufficient to hold an Indemnified Person harmless in respect of any Liabilities (and related expenses) referred to therein then, in lieu of indemnifying such Indemnified Person hereunder, the Company shall contribute to the amount paid or payable by such Indemnified Person as a result of such Liabilities (and expenses relating thereto) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and J.P. Morgan, on the other hand, of the financial advice rendered by J.P. Morgan and also the relative fault of each of the Company and J.P. Morgan, as well as any other relevant equitable considerations; provided, however, that except to the extent that any such Liabilities or expenses are finally judicially determined to have resulted primarily from J.P. Morgan's bad faith, gross negligence or willful misconduct, in no event shall the Indemnified Persons be required to contribute an aggregate amount in excess of the aggregate amount of fees actually received by J.P. Morgan under the Engagement Letter.

Section 2. Financial Advisory Role, Information, Reliance, Confidentiality, etc.

(a)  The Company understands that J.P. Morgan is acting solely as a financial advisor to the Company, is acting as an independent contractor and is not undertaking to provide any legal, accounting or tax advice in connection with its engagement under the Agreement and that J.P. Morgan's role in any due diligence will be limited solely to performing such review as it shall deem necessary to support its own advice and analysis and shall not be on behalf of the Company. The Company agrees that it shall not assert any claim that J.P. Morgan is acting as a fiduciary to the Company in connection with its engagement under the Agreement.

(b)  The Company agrees to provide to J.P. Morgan all information reasonably requested by J.P. Morgan for the purpose of its engagement under the Agreement and also to provide reasonable access to employees and directors of the relevant members of the Company Group. The Company also agrees that the Company shall notify J.P. Morgan, in writing, in the event it expects to treat the consummated Transaction as a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b), and the applicable category of "reportable transaction". J.P. Morgan shall be entitled to rely upon and assume, without any obligation of independent verification, the accuracy and completeness of all information that is publicly available and of all information that has been furnished to it by, or on behalf of, the Company Group or any party to a potential Transaction or Alternative Transaction or otherwise reviewed by J.P. Morgan, and J.P. Morgan shall not assume any responsibility or have any liability therefor. In providing any financial advice as described in the Engagement Letter, J.P. Morgan will rely on the commercial assessments of the Board of Directors of the Company with respect to any Transaction or Alternative Transaction.  The decision as to whether or not the Company pursues a Transaction or Alternative Transaction is one that can only be taken by the Company.  J.P. Morgan has no obligation to conduct any appraisal of any assets or liabilities or to evaluate the solvency of any member of the Company Group or any other party to a Transaction under any applicable laws relating to bankruptcy, insolvency or similar matters.

(c)  In order to enable J.P. Morgan to bring relevant expertise to bear on its engagement under the Agreement from among its global affiliates, the Company agrees that J.P. Morgan may share information obtained directly or indirectly from the Company Group hereunder with its affiliates who need to know such information in connection with J.P. Morgan's performance of its services hereunder, and may perform such services in conjunction with its affiliates, and that any J.P. Morgan affiliates performing services hereunder shall be entitled to the benefits and subject to the terms of the Agreement. The Company agrees that J.P. Morgan shall have the right to review and pre-approve any reference to it or its role as financial advisor under the Agreement in any public statement made by any member of the Company Group (such approval not to be unreasonably withheld).

(d)  J.P. Morgan's financial advice is intended solely for the benefit and use of the senior management and the Board of Directors of the Company (acting in their capacities as such) in considering

OVAS_1094163

OvaScience, Inc.
June 12, 2015

the matters to which the Engagement Letter relates, is not on behalf of, and shall not confer rights or remedies upon, any shareholder or creditor of the Company Group or any other person, and may not be used or relied upon for any other purpose. Except as otherwise required by applicable law or governmental or stock exchange regulation, the Company will treat J.P. Morgan's advice and the terms of the Agreement as confidential and will not disclose them to any third party (other than, on a confidential basis, to its counsel and other advisors in connection with a Transaction subject always to the terms of the preceding sentence, it being understood that the Company will be responsible for any breach by such counsel or advisors of the provisions of this sentence) in any manner without J.P. Morgan's prior written approval.

(e) Information provided by the Company to J.P. Morgan in connection with this Agreement will be kept confidential and will only be used by J.P. Morgan for purposes of its engagement hereunder, except information that (i) was in J.P. Morgan's possession prior to its disclosure by the Company; (ii) is publicly disclosed other than by J.P. Morgan in violation of the Agreement; (iii) is obtained by J.P. Morgan from a person other than the Company who, to the knowledge of J.P. Morgan, is not bound by a confidentiality obligation to the Company; (iv) the Company agrees may be disclosed; or (v) is required or requested to be disclosed under compulsion of law (whether by oral question, interrogatory, subpoena, civil investigative demand or otherwise), by order or act of any court or governmental or regulatory authority or body. J.P. Morgan may also disclose such information to those of its own and its affiliates' respective officers, directors, employees, representatives and professional advisors who need to know such information in connection with J.P. Morgan's performance of the services described in the Agreement (it being understood that J.P. Morgan will be responsible for any breach of this provision by such officers, directors, employees, representatives and professional advisors), and to potential parties to an Alternative Transaction who have executed confidentiality agreements with or for the benefit of the Company in a form reasonably satisfactory to the Company. J.P. Morgan's obligations under the first sentence of this paragraph shall terminate two years from the date hereof.

(f) Notwithstanding any other provision herein, the Company and each of its employees, representatives or other agents may disclose to any and all persons, without limitation of any kind, the U.S. income and franchise tax treatment and the U.S. income and franchise tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses, if any) that are provided to the Company relating to such tax treatment and tax structure insofar as such treatment and/or structure relates to a U.S. income or franchise tax strategy, if any, provided to the Company by J.P. Morgan or its affiliates.

Section 3. <u>Other Business Relationships</u>.

(a) The Company understands that J.P. Morgan and its affiliates (collectively, "Morgan") comprise a full service securities firm and a commercial bank engaged in securities trading and brokerage activities, as well as providing investment banking, asset management, financing, and financial advisory services and other commercial and investment banking products and services to a wide range of corporations and individuals. In the ordinary course of Morgan's trading, brokerage, asset management, and financing activities, Morgan may at any time hold long or short positions, and may trade or otherwise effect transactions, for its own account or the accounts of customers, in debt or equity securities loans or other financial instruments of the Company Group or any other entity with interests with respect to a Transaction or Alternative Transaction. Morgan recognizes its responsibility for compliance with applicable securities laws in connection with such activities.

(b) In addition, Morgan may have and may in the future have investment and commercial banking, trust and other relationships with parties other than the Company, which parties may have interests with respect to the Company Group, a Transaction an Alternative Transaction or any other party thereto. Without limiting the foregoing, the Company acknowledges that, in agreeing to provide the advisory services contemplated by the Agreement, J.P. Morgan reserves the right of Morgan to pursue

OVAS_1094164

OvaScience, Inc.
June 12, 2015

opportunities to arrange and/or provide new financing to other potential parties to a Transaction other than an Unrecommended Transaction (as defined below) specifically in connection with such Transaction; provided, that the foregoing restriction on financing for an Unrecommended Transaction will not apply to (A) any credit facilities to which Morgan is a party in effect as of the date hereof, (B) any new credit facility, amendment to an existing credit facility, or debt or equity securities offering the proceeds of which are not restricted, so long as Morgan is not aware that such proceeds will be used for the purpose of financing a third party (or any relevant subsidiary or affiliate thereof) specifically in connection with an Unrecommended Transaction, (C) any ordinary course sales and trading activity undertaken by employees who have not had access to the information received by J.P. Morgan under the Agreement or (D) any private banking or investment management services undertaken by employees who have not had access to the information received by J.P. Morgan under the Agreement. The Company acknowledges its understanding that the interests of Morgan in its capacity as arranger and/or provider of financing to such potential parties may differ from those of the Company with respect to the timing, pricing and terms and conditions of a Transaction and otherwise, and the Company expressly waives any conflicts of interest which may result from J.P. Morgan's multiple roles as advisor to the Company hereunder and as an arranger and/or provider (or an affiliate to such an arranger or provider) of financing to potential parties to a Transaction other than an Unrecommended Transaction.  For purposes hereof, the term "Unrecommended Transaction" shall mean any proposed Transaction consisting of (i) any tender or exchange offer for the capital stock of the Company made directly to the Company's shareholders without the prior approval or positive recommendation of the Company's Board of Directors, (ii) any potential Transaction in respect of which the proposed counterparty (or any relevant subsidiary or affiliate thereof) has made a public announcement of its intention or desire to acquire the Company if such announcement is made without the approval of the Company's Board of Directors, and/or (iii) any potential Transaction with respect to which the proposed counterparty (or any subsidiary or affiliate thereof) privately approaches one or more significant shareholders of the Company to solicit their support if such approach is made without the approval of the Company's Board of Directors. Notwithstanding anything contained herein, during the term of the Agreement, Morgan shall not act as M&A financial advisor to any party (other than the Company) in connection with any Transaction with respect to which J.P. Morgan has been retained as the Company's M&A financial advisor.  Although Morgan in the course of its other relationships may acquire information about the Company Group, any Transaction, Alternative Transaction or such other parties, Morgan shall have no obligation to disclose such information, or the fact that Morgan is in possession of such information, to the Company or to use such information on the Company's behalf. Furthermore Morgan may have fiduciary or other relationships whereby Morgan may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company or others with interests with respect to a Transaction or Alternative Transaction. The Company acknowledges that Morgan may exercise such powers and otherwise perform its functions in connection with such fiduciary or other relationships without regard to its relationship to the Company hereunder.

(c)   Specifically, the Company acknowledges its understanding that Morgan in its principal capacity, or portfolio companies in which Morgan has investments, or certain investment funds managed or advised by Morgan (collectively, the "Morgan Principal") may be potential parties to a Transaction. The Company acknowledges its understanding that the interests of the Morgan Principal may differ from those of the Company with respect to the advisability, timing, pricing and terms and conditions of any Transaction and otherwise, and the Company expressly waives any conflicts of interest which may result from J.P. Morgan's multiple roles as advisor to the Company hereunder and as the Morgan Principal or an affiliate thereof.  In addition, the Company acknowledges its understanding that no advice or recommendation rendered by J.P. Morgan hereunder shall be deemed a representation that the Morgan Principal (or Morgan in its capacity as manager of or advisor to the Morgan Principal) would agree, to the extent required, to participate in, or vote in favor of, any Transaction structured in accordance with such advice.

OVAS_1094165

OvaScience, Inc.
June 12, 2015

Section 4. <u>Miscellaneous.</u>

(a) The Agreement may not be assigned by the Company or J.P. Morgan without the prior written consent of the other. The Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter thereof, supersedes all prior agreements with respect thereto, has been duly authorized and executed by each of the parties hereto and constitutes the legal, binding obligation of each such party.

(b) The Agreement may only be enforced by the parties to it and, with the prior written consent of J.P. Morgan, by any Indemnified Person (for whom the provisions of the Agreement are intended to confer a benefit). Any amendment of the Agreement shall be in writing signed by each of the parties hereto and the consent of any Indemnified Person other than J.P. Morgan to any amendment, rescission or termination of the Agreement shall not be required. The Agreement may be executed in any number of counterparts, and by each party on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument. Delivery of a counterpart of this Agreement by e-mail attachment or telecopy shall be an effective mode of delivery.

(c) The Agreement and any claim, controversy or dispute arising under or related to the Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to principles of conflicts of law. Each of the Company and J.P. Morgan irrevocably and unconditionally submits to the exclusive jurisdiction and venue of any State or Federal court sitting in New York City over any action, suit, proceeding, claim or controversy (including without limitation any derivative claim) arising out of or relating to this Agreement, any transaction or any other matter contemplated hereby. Each of the Company and J.P. Morgan irrevocably and unconditionally waives any objection to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. J.P. Morgan and the Company (on its own behalf and, to the extent permitted by law, on behalf of its shareholders) each waives any right to trial by jury in any action, claim, suit or proceeding with respect to J.P. Morgan's engagement as financial advisor to the Company under the Agreement or its role in connection herewith.