# EXHIBIT 44

August 20, 2015

**Serious Ethical Concerns About the Leadership of OvaScience's CEO**

To whom it may concern:

Over the course of the last several months, there has been growing evidence that OvaScience's CEO, Michelle Dipp, has become increasingly erratic and is now mismanaging the company. More importantly, I believe that she has made outright lies and misrepresentations in quarterly company filings. While Ms. Dipp has shown a propensity for misrepresentations and exaggerations in the past, they did not reach the scale of the most recent Fiscal 2015 Q2 filing with the SEC.

The statement that OvaScience has obtained insurance reimbursement for the AUGMENT treatment in the UAE as represented in the Fiscal 2015, 2nd Quarter 10-Q filing with the SEC is, by all accounts, completely false. It is apparently true that Ms. Dipp and Corporate Counsel, Ryan Barrett, met with the Daman insurance agency during the week of July 24-30. I and my colleagues, Richard Spector and Colleen Burgess, were present in the UAE at the time (24-28) and had several interactions with Ryan and Michelle that seemed to confirm those interactions. To be clear, Richard, Colleen, and I never were present in meetings with Daman - we were doing separate meetings with physicians in the Fakih IVF clinics across the UAE. In fact, Ryan, Michelle, and I worked very late into the night one evening with other members of the corporate leadership team to prepare a revised presentation for the Daman insurance company. At the end of the week, Michelle declared that the insurance company had granted reimbursement for OvaScience's AUGMENT treatment and spoke about the inclusion and exclusion criteria for patients. According to Ms. Dipp, an insurance code for the treatment was said to be in process but coming soon.

Two weeks later, when Richard Spector again visited Dubai (with the strict objective of driving doctors to get patients for the AUGMENT treatment), there was still no evidence of any insurance code or even approval from the prevailing health authorities (Heath Authority of Abu Dhabi (HAAD) and Dubai Health Authority(DHA)) to perform the procedure. This was confirmed by and email exchange between Ms. Dipp and Dr. Michael Fakih and Dr. David Heyman (both of Fakih IVF). In the email exchange, Michelle urged the doctors to issue instructions to their offices and the clinicians that approval (or to be more precise a "no objection" letter) for the AUGMENT procedure had been granted by the proper authorities and that they should begin treating patients. Dr. Heyman responded that no such documentation had been issued by any agency and that until such documentation was produced, he would issue no such instructions to his clinicians. To date, no such documentation, either from the health authorities or from the insurance company has been received and the clinic refuses to actively promote the AUGMENT treatment (though they will accept direct patient inquiries).

The primary concern, of course, regards representations made to the public about achievements as of the date of the SEC filing on August 10, 2015. As of the date of the filing, there was apparently no documentation to substantiate the claim that OvaScience indeed had obtained insurance coverage in the UAE. Ms. Dipp repeatedly assured the OvaScience executive team that the coverage decision was in place. It may very well be that there was some sort of verbal agreement with the insurance company. However, there was apparently no

physical documentation that would substantiate the claim in the SEC filing of quarterly results. Upon my return from a weeklong vacation in California on August 13, I met specifically with OvaScience Chief Communications Officer, Theresa McNeely (head of Investor Relations), and Chief Financial Officer, Jeff Young. Both of these individuals indicated that they had not seen any documentation to support the assertion of insurance coverage. They had been given assurances by Michelle that the insurance coverage was in place. A subsequent phone conversation with OvaScience President, Arthur Tzianabos, on Thursday, August 13, or Friday, August 14, also confirmed that he had been assured by Michelle that the insurance coverage was in place. All parties were uniformly concerned that the SEC filing had been made without hard evidence of insurance coverage. The filing had been made solely on assurances from Ms. Dipp. While the insurance coverage may in fact be forthcoming, declarations based on verbal agreements and assertions surely do not meet the standard of proof required for a publicly traded company.

To be clear, I have nothing but the highest respect for Mr. Tzianabos, Ms. McNeely, and Mr. Young. They are highly ethical individuals who are similarly troubled by the lack of evidence to support the assertions in the quarterly filing.

On Monday, August 17, 2015, I was told by Arthur Tzianabos, that I was being transitioned out of the company. I do not believe that my being separated from the company was a direct result of any of these conversations. I simply want to acknowledge that this conversation took place. I also acknowledge that this letter can be viewed as a "sour grapes" reaction to being forced to leave the company. Therefore it was important for me to document the timeline of events leading up to the filing of the SEC document and to be clear that all of these interactions occurred prior to my discussion with Arthur on Monday, August 17.

While the misrepresentations in the filing are by far the most serious, Ms. Dipp has exhibited a tendency to fabricate and exaggerate the truth with great frequency. Vehement assertions to customers about the the volume of business and frequency of patient biopsies were just one of the blatant misrepresentations. At one point in April 2015, she asserted to our customers at TCART in Canada that other clinics were performing 10 patient biopsies per week. This at a time when there were few, if any, commercial biopsies being performed in our other two clinics. This had the effect of causing this clinic to question their effectiveness and caused the leadership of the clinic to reprimand their staff for underperforming.

Ms. Dipp has also showed disregard for existing contracts with customers. In December of 2014, OvaScience entered into a contract with CARE Fertility in the UK. A series of regulatory missteps by CARE Fertility caused Michelle to search for another clinic in the UK with which to strike up a relationship. This was done despite the fact that OvaScience's contract with CARE Fertility was exclusive for the entire UK. I advised Ms. Dipp on multiple occasions to honor the exclusive relationship with CARE Fertility. However, she continued to pursue contract negotiations with the Oxford Fertility Unit. Those discussions continue to this day and show blatant disregard for existing contracts.

The lying is prevalent throughout the office environment with Michelle routinely misstating the facts regarding interactions and making up stories out of whole cloth. This has the effect of undermining her own leadership authority while creating an atmosphere of fear, suspicion, and doubt in the office. This is highly detrimental to company morale and forces employees to

spend time comparing stories, verifying facts, and generally consoling each other. This becomes a massive drain on scarce company resources.

I want to be clear that I am a massive believer in the overall mission of OvaScience. The technology is strong and will truly help to transform female fertility treatments. It is unfortunate, therefore, that the company is being grossly misguided by an unethical CEO. Her misrepresentations to employees, customers, and to regulatory agencies can only be harmful to the overall goals of the company and to its broader set of stakeholders.

Sincerely,

David P. Harding
Former Chief Commercial Officer

On this 31st day of August 2015, before me the undersigned notary public, personally appeared DAVID HARDING, proved to me through satisfactory evidence which was MA DL to be the person whose name is signed on the preceding or attached document in my presence.



ERIC M. LaVOYE
Notary Public
Commonwealth of Massachusetts
My Commission Expires Jan. 28, 2016